No. 26-40094

# In the United States Court of Appeals for the Fifth Circuit

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, BUSINESS
ROUNDTABLE, AMERICAN INVESTMENT COUNCIL, AND
LONGVIEW CHAMBER OF COMMERCE,

*Plaintiffs-Appellees,*

v.

FEDERAL TRADE COMMISSION, ET AL.,

*Defendants-Appellants.*

On Appeal From The United States District Court
For The Eastern District Of Texas (Kernodle, J.)
Case No. 6:25-cv-00009

## PLAINTIFFS' OPPOSITION TO MOTION FOR STAY PENDING APPEAL

JORDAN L. VON BOKERN
AUDREY DOS SANTOS
U.S. CHAMBER LITIGATION
CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337

JEFFREY B. WALL
JUDSON O. LITTLETON
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500

MAXWELL F. GOTTSCHALL
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Counsel for Plaintiffs-Appellees
Chamber of Commerce of the United
States of America, Business Roundtable,
American Investment Council, and
Longview Chamber of Commerce*

## CORPORATE DISCLOSURE STATEMENT

Plaintiff Chamber of Commerce of the United States of America is a non-profit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent organization, and no publicly held company has 10% or greater ownership of the organization.

Plaintiff Business Roundtable is a non-profit, tax-exempt organization incorporated in the District of Columbia. Business Roundtable has no parent organization, and no publicly held company has 10% or greater ownership of the organization.

Plaintiff American Investment Council is a non-profit, tax-exempt organization incorporated in the District of Columbia. American Investment Council has no parent organization, and no publicly held company has 10% or greater ownership of the organization.

Plaintiff Longview Chamber of Commerce is a non-profit, tax-exempt organization incorporated in Texas. The Longview Chamber has no parent organization, and no publicly held company has 10% or greater ownership of the organization.

# TABLE OF CONTENTS

Page

INTRODUCTION.................................................................................1

BACKGROUND..................................................................................3

    A.   Legal And Factual Background ...........................................3

    B.   Procedural History ..............................................................7

ARGUMENT ......................................................................................8

I.   THE FTC HAS NOT SHOWN THAT IT IS LIKELY TO
SUCCEED ON THE MERITS ...................................................9

    A.   The District Court Correctly Held That Plaintiffs Have
Article III Standing ............................................................9

    B.   The District Court Correctly Held That The Rule Is
Unlawful. ..........................................................................14

        1.   The Rule exceeds the FTC's statutory authority ...............14

        2.   The Rule failed to reasonably analyze costs and
benefits ................................................................................19

        3.   The FTC failed to justify its rejection of less
burdensome alternatives......................................................20

II.   THE FTC HAS NOT SHOWN THAT IT WILL SUFFER
IRREPARABLE INJURY DURING ITS APPEAL ............................21

III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST
FACTORS CUT STRONGLY AGAINST A STAY ...............................23

CONCLUSION....................................................................................25

# TABLE OF AUTHORITIES

Page(s)

CASES

*Alliance for Hippocratic Med.* v. *FDA*,
2023 WL 2913725 (5th Cir. Apr. 12, 2023) ........................................21

*Castanon-Nava* v. *DHS*,
161 F.4th 1048 (7th Cir. 2025) ...........................................................22

*Chamber of Com. of United States* v. *SEC*,
85 F.4th 760 (5th Cir. 2023) ...............................................................18

*Council of Ins. Agents & Brokers* v. *Juarbe-Jimenez*,
443 F.3d 103 (1st Cir. 2006) ...............................................................13

*Diamond Offshore Co.* v. *A&B Builders, Inc.*,
302 F.3d 531 (5th Cir. 2002) ...............................................................13

*DIRECTV, Inc.* v. *Budden*,
420 F.3d 521 (5th Cir. 2005) ...............................................................13

*FCC* v. *Prometheus Radio Project*,
592 U.S. 414 (2021) .............................................................................18

*Hunt* v. *Washington State Apple Advert. Comm'n*,
432 U.S. 333 (1977) .............................................................................13

*Louisiana ex rel. Landry* v. *Biden*,
64 F.4th 674 (5th Cir. 2023) ...............................................................20

*Maurer* v. *Independence Town*,
870 F.3d 380 (5th Cir. 2017) ...............................................................13

*Mexican Gulf Fishing Co.* v. *U.S. Dep't of Com.*,
60 F.4th 956 (5th Cir. 2023) ...............................................................15

*Michigan* v. *EPA*,
576 U.S. 743 (2015) .............................................................................15

iii

*National Infusion Ctr.* v. *Becerra,*
   116 F.4th 488 (5th Cir. 2024) ........................................................11

*Nken* v. *Holder,*
   556 U.S. 418 (2009) .......................................................................21

*Plaquemines Parish* v. *Chevron USA, Inc.,*
   84 F.4th 362 (5th Cir. 2023) ...........................................................8

*Ruiz* v. *Estelle,*
   666 F.2d 854 (5th Cir. 1982) .........................................................21

*Speech First, Inc.* v. *Fenves,*
   979 F.3d 319 (5th Cir. 2020) .........................................................11

*Summers* v. *Earth Island Inst.,*
   555 U.S. 488 (2009) ................................................................10, 11

*Texas* v. *Biden,*
   10 F.4th 538 (5th Cir. 2021) .........................................................21

*Trump* v. *CASA, Inc.,*
   606 U.S. 831 (2025) .......................................................................22

*U.S. Navy Seals 1-26* v. *Biden,*
   27 F.4th 336 (5th Cir. 2022) ............................................................9

**STATUTES**

5 U.S.C. § 553 ....................................................................................23

15 U.S.C. § 18a ..........................................................................*passim*

**REGULATIONS**

*Premerger Notification; Reporting and Waiting Period Requirements,*
   89 Fed. Reg. 89,216 (Nov. 12, 2024).....................................*passim*

**OTHER AUTHORITIES**

S. Rep. No. 94-803 (1976) ...............................................................1, 3

# INTRODUCTION

The Hart-Scott-Rodino Act requires thousands of parties to mergers and acquisitions each year to file a "premerger notification" (the HSR Form) with the FTC and Department of Justice, and then to wait 30 days before closing. 15 U.S.C. § 18a. Congress's goal was to stop "midnight mergers"—companies merging quickly and secretly before the agencies could even learn about the transaction—"without unduly burdening business with unnecessary paperwork or delays." S. Rep. No. 94-803, at 65 (1976). For 50 years, the Form required essentially the same targeted information: enough to determine whether further scrutiny was warranted, but not so much that the burden of completing the Form would "impede consummation of the vast majority of mergers and acquisitions" that are obviously lawful. *Id.* at 66. By all accounts, that version of the Form did its job. As recently as August 2024, even the FTC proclaimed it "a success" that "ha[d] minimized the number of post-merger challenges the enforcement agencies have had to pursue." Dkt. 75 (Op.) at 23-24 (Ex. A).[1]

---

[1] "Dkt." refers to filings on the district-court docket. Plaintiffs attach certain filings from the proceedings below as exhibits to this brief.

Only a few months later, however, the FTC decided to massively expand the HSR Form, adding 20 brand-new categories of required documents and information. *Premerger Notification; Reporting and Waiting Period Requirements*, 89 Fed. Reg. 89,216 (Nov. 12, 2024). By the FTC's own lowball estimate, those changes *more than triple* the average time and expense of completing the Form for thousands of transactions each year. Yet the agency has no evidence of any real problem with the prior Form, let alone one requiring that magnitude of change. The Commission never identified even a *single* transaction it believes was missed due to the prior Form.

After full briefing and oral argument, the district court concluded in a thorough opinion that the FTC's unprecedented overhaul of the HSR Form exceeded the limits Congress placed on its authority and reflected arbitrary and capricious decisionmaking several times over. Nothing in the FTC's stay motion even begins to show that this considered decision was erroneous. Instead, the Commission mostly tries to avoid the merits altogether, challenging on evidentiary grounds the way that plaintiffs' declarations established associational standing. But as the court explained, those arguments run counter to well-settled rules for establishing standing in this Circuit—hardly grounds for issuing an emergency stay.

Nor can the FTC show that the other stay factors support this Court's emergency intervention. The agency claims that it will suffer irreparable harm from a return to the longstanding HSR Form while this appeal proceeds. But the district court concluded—even after extending deference to the FTC—that the agency never plausibly explained how receiving all of the new information the revised Form mandates would help it to "detect illegal mergers more effectively than" it did under "the prior Form." Op. 22, 27. The FTC tried to fix something that was not broken; undoing that needless "fix" will not break anything in turn. It would instead force all HSR filers to continue bearing the unjustified and undisputed costs of an unlawful Form during the FTC's appeal.

## BACKGROUND

### A.    Legal And Factual Background

1.    To "balanc[e]" the "need to detect and prevent illegal mergers and acquisitions prior to consummation" with the imperative to avoid "unduly burdening business," S. Rep. No. 94-803, at 65, Congress divided the HSR process into two steps:  the initial screen and (if warranted) a "Second Request."  The screen relies on the "notification" that parties to every reportable transaction must file.  The FTC may specify the "documentary material and information" that must be submitted in that "notification."

15 U.S.C. § 18a(d)(1). But Congress placed limits on that authority: the Commission may require only "such documentary material and information . . . as is necessary and appropriate to enable the [FTC and DOJ] to determine whether [the proposed] acquisition may, if consummated, violate the antitrust laws." *Id.* Then, if an agency determines during the 30-day waiting period that a transaction requires further scrutiny, it may issue a much broader Second Request. 15 U.S.C. § 18a(e).

Historically, only 3% of deals receive a Second Request, and 92% do not even trigger a preliminary investigation to determine whether a Second Request might be warranted. *See* Op. 25; *see also* Dkt. 44 at 26-27. The two-step process thus ensures that only the handful of transactions that pose a potential concern—based on the agencies' review of the parties' "notification"—must suffer the heavy costs and delays associated with full-blown premerger review.

2.    The FTC published the original HSR Form in 1978, and it remained in effect with only minor tweaks for the next 46 years. *See* 89 Fed. Reg. at 89,257. As the district court explained, the business community, antitrust bar, and until recently even the antitrust agencies consistently lauded the Form as "highly effective" at enabling the government to reliably

identify potentially problematic transactions. *See* Op. 4 (citing such statements); *see also* Dkt. 27 at 23-26 (collecting others). If anything, "a significant criticism of" the HSR Form was that it was already "too burdensome and costly" to prepare. Op. 5. Indeed, in the one instance where Congress made any significant changes, it *loosened* the HSR Act's requirements. *Id.* (describing amendments in 2000).

3.      In June 2023, the FTC "proposed dramatically expanding the Form by requiring thirty-four new categories of information." Op. 5. "Hundreds of commenters" "urg[ed] the FTC to withdraw or rewrite the proposed rule," *id.*, explaining that the proposal exceeded the agency's authority under the HSR Act; grossly underestimated the costs of expanding the Form; and ignored far less burdensome tools that the agencies could use to obtain the new information. The FTC nevertheless finalized the rule in October 2024. 89 Fed. Reg. at 89,394. "Although [it] pared back the categories of new information required by filers," the Rule still "substantially modified the Form, requiring approximately twenty" brand-new "categories of information and documents." Op. 6.[2]

---

[2] Describing each new and onerous addition to the Form would take most of this brief. Exhibit B excerpts plaintiffs' complaint, Dkt. 27, which provides details.

The FTC recognized the "significant and widespread costs" of the expanded Form.  Op. 2.  It estimated that the prior Form had taken 37 hours on average to complete.  Op. 7.  The new version, however, would now on average take 105 hours.  89 Fed. Reg. at 89,332.  Even that number masked the severity of the change, as nearly half of filings—those in which the parties have identified any market overlap or supply relationship, even between affiliates—would now take 158 hours.  *Id.*  Thus, under the FTC's own estimate, the revised Form *more than quadruples* the burden on thousands of harmless (indeed, beneficial) transactions every year.

The Rule's main justification for saddling HSR filers with such substantial new burdens was that it would allow the agencies to detect more unlawful mergers by addressing purported "information deficiencies." 89 Fed. Reg. at 89,217, 89,251-89,252.  But the Commission never squared this sudden need to close major gaps with its repeated recent descriptions of the prior Form as "highly effective" and "a success."  Op. 4, 23-24.  And despite being "repeatedly asked" to do so, the FTC has never "identif[ied] a single illegal merger in the forty-six-year history of the prior Form that" it believes would have been flagged by the new Form.  Op. 22.

## B.     Procedural History

Plaintiffs filed this suit to challenge the Rule.  The FTC first moved to dismiss or transfer this case to the District of Columbia on the ground that one of the plaintiffs, Longview Chamber, lacked standing.  Dkt. 23.  Plaintiffs amended their complaint, Dkt. 27, and then moved for summary judgment, Dkt. 44.  As to standing, plaintiffs submitted declarations from their senior leaders.  *See* Dkts. 44-1 (Ex. C), 44-2 (Ex. D), 44-3 (Ex. E), 44-4 (Ex. F).  Each declaration details how specific members (identified by pseudonym to avoid disclosing confidential business plans and inviting unwarranted regulatory scrutiny) are harmed by the Rule, including by entering into HSR-reportable transactions since the Rule's adoption and thus incurring the Rule's higher costs.

On February 12, 2026, the district court granted summary judgment to plaintiffs and vacated the Rule.  The court first held that plaintiffs had established associational standing with appropriate and substantively undisputed evidence.  Op. 12.  The court then held that the Rule violated the HSR Act and APA for at least three reasons.  First, the FTC exceeded its statutory authority by requiring HSR filers to submit documents and information that "would impose substantially more costs . . . to compile and

produce than are justified by any benefit to the antitrust agencies' initial evaluation of the transaction." Op. 15.  Second, the Rule failed to engage in a reasoned analysis of the benefits of its unprecedented expansion of the Form compared to its substantial costs.  Op. 27-29.  Finally, the Rule unjustifiably rejected less burdensome information-gathering alternatives already at the agencies' disposal.  Op. 29-32.[3]  The court concluded that the appropriate remedy was to vacate the Rule.  Op. 32-34.

The district court stayed its order until February 19.  Op. 34.  The FTC asked that court for a stay pending appeal on February 17, which plaintiffs opposed and the court denied the next day.  *See* Dkt. 76, 79.  The FTC sought the same relief from this Court, which plaintiffs now oppose.

## ARGUMENT

A stay pending appeal "is extraordinary relief for which defendants bear a heavy burden."  *Plaquemines Parish* v. *Chevron USA, Inc.*, 84 F.4th 362, 373 (5th Cir. 2023).  Courts consider (i) "whether the stay applicants have made a strong showing that they are likely to succeed on the merits"; (ii) "whether the applicants will be irreparably harmed absent a stay";

---

[3]   The district court had no occasion to reach plaintiffs' additional statutory challenges to individual requirements of the Rule.  *See* Dkt. 44 at 17-19.

(iii) "whether issuance of the stay will substantially injure the other parties"; and (iv) "where the public interest lies." *U.S. Navy Seals 1-26* v. *Biden*, 27 F.4th 336, 349-350 (5th Cir. 2022). Here, all four factors cut strongly against a stay.

## I.     THE FTC HAS NOT SHOWN THAT IT IS LIKELY TO SUCCEED ON THE MERITS.

The FTC has not shown that it is likely to prevail on appeal. The district court was right that plaintiffs have associational standing. And the court did not err in *any* of its independent grounds for vacating the Rule, much less all three.

### A.     The District Court Correctly Held That Plaintiffs Have Article III Standing.

In trying to move this case to the District of Columbia, the FTC argued below that only one plaintiff—the Longview Chamber—lacked standing because it had not shown that its members faced imminent harm from the Rule. The district court rejected that argument, Op. 11-13, and the FTC does not repeat it here for good reason. As the district court noted, "where a party is an object of the action" being challenged, typically "there is little question that the party has standing to challenge it." Op. 12 (internal quotation marks omitted). Here, the Longview Chamber President stated in her declaration

9

that, as of July 29, 2025, multiple members had "*already* engaged in HSR-reportable transactions" that year. *Id.* at 13 (quoting Dkt. 44-4 ¶ 5, Ex. F) (emphasis added). And still other members face at least a "substantial risk of future harm" from the Rule because they engage in HSR-reportable transactions as a "regular and consistent feature of their business model" and "plan to continue" a "similar level of HSR-reportable activity going forward." *Id.* at 12-13 (quoting Dkt. 44-4 ¶¶ 5-11, Ex. F).

The FTC thus no longer contends that the Longview Chamber's members will not be harmed by the Rule. Instead, the Commission presses two *evidentiary* objections to how all plaintiffs proved their standing at the summary-judgment stage. Those arguments run contrary to the law of this Circuit and long-recognized practice when associations sue on behalf of their members. The Commission cannot possibly make a "strong showing of probability of success" when its arguments require convincing this Court to depart from settled precedent and revolutionize associational-standing law in this Circuit.

1. The Commission contends (at 18) that, under *Summers* v. *Earth Island Inst.*, 555 U.S. 488, 498-499 (2009), plaintiffs could not refer to their members using pseudonyms. But this Court has already rejected that

argument, holding that *Summers* requires an association to aver only "that there is a specific injured member," and "*does not require naming that member.*"  *National Infusion Center* v. *Becerra*, 116 F.4th 488, 497 n.5 (5th Cir. 2024) (emphasis added).  *Summers* rejected a "statistical," "probabilistic" argument by a large organization that it surely had an affected member somewhere in its ranks.  555 U.S. at 497-499.  That did not satisfy Article III, so the Court required associations to establish that they have at least one injured member.  Whether that specific member is identified by real name or pseudonym was not relevant to the Court's decision.

The FTC notes (at 19-20) that *National Infusion Center* arose "on a motion to dismiss."  But that makes no difference.  *How* a plaintiff must establish the legal requirements of standing at each stage of the case is different from *what* those requirements are:  the former changes as the case progresses (from allegations to sworn declarations), but the latter is constant (Article III injury-in-fact).  Nothing about the use of a pseudonym inherently creates any factual dispute or issue of proof that is relevant to summary judgment.  Nor are this Court's cases limited only to motions to dismiss; the Court has held that an association relying on pseudonyms had standing to

obtain a preliminary injunction. *See Speech First, Inc.* v. *Fenves*, 979 F.3d 319, 329, 331 (5th Cir. 2020).

2.    The FTC also argues (at 15-18) that plaintiffs' declarations impermissibly relied on hearsay because the declarants "lacked personal knowledge" about their members' histories and practices of entering into HSR-reportable transactions.    That is not only wrong, but radically so. Membership associations routinely establish their standing to bring suit on behalf of their members just the way plaintiffs did here.    *See* Dkt. 62 at 3 n.1 (collecting cases).    The FTC does not cite a single case holding that associations may not submit declarations that attest to the harms of their members.

First, as the district court pointed out, "each declarant expressly states that [his or her] declaration is based upon [his or her] personal knowledge and belief and/or upon [his or her] review of [the association's] business records." Op. 10 (citations omitted).    So the FTC's claims (at 16-17) that "[n]one of the declarants purported to have reviewed any records" and that they "lacked personal knowledge" about the facts in their declarations are simply untrue.

Second, "each declaration sets forth information that is reasonably within the declarant's position or 'sphere of responsibility'" as a senior

association leader.  Op. 10 (quoting *DIRECTV, Inc.* v. *Budden*, 420 F.3d 521, 530 (5th Cir. 2005)).  A long-recognized purpose of associations like plaintiffs is to bring suit "on behalf of [their] members" without requiring those members' direct "participation."  *Hunt* v. *Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Thus, the declarants' "personal knowledge and competence to testify" about their members' harms "are reasonably inferred from their positions."  *DIRECTV*, 420 F.3d at 530; *see Diamond Offshore Co.* v. *A&B Builders, Inc.*, 302 F.3d 531, 544 n.13 (5th Cir. 2002) (relying on declarant's "personal knowledge and his position" to reject "personal knowledge" and "hearsay" objections); *Council of Ins. Agents & Brokers* v. *Juarbe-Jimenez*, 443 F.3d 103, 111 n.10 (1st Cir. 2006) (same for trade-association leader).  The district court relied on all three of these cases in rejecting the FTC's argument.  Op. 10-11.  The Commission's stay motion ignores them.

Finally, even if there were hearsay in plaintiffs' declarations, "the factual statements in a declaration at summary judgment" "'need only be *capable* of being presented in a form that would be admissible in evidence' at trial."  Op. 9 (quoting *Maurer* v. *Independence Town*, 870 F.3d 380, 384 (5th Cir. 2017)) (emphasis added).  Here, there was at least one "obvious way to

make th[e] testimony admissible": "for the unnamed members" described in the declarations to testify at trial themselves. Op. 10. The FTC complains (at 16) that it does not know the names of those witnesses, but that just rehashes its pseudonymity objection. As the district court held, there is "nothing to compel a conclusion" here that representatives of the pseudonymous members could not testify to the pertinent facts. *Id.* (quoting *Maurer*, 870 F.3d at 384). Indeed, the FTC has never offered any basis to doubt the truth of the facts in the declarations, nor could it. This case accordingly bears no resemblance to the ones cited by the FTC (at 17) involving hearsay statements on truly disputed factual issues by "unknown witnesses" who might never "emerge."

## B.    The District Court Correctly Held That The Rule Is Unlawful.

The district court held that the Rule violated the APA on three separate, independent grounds. The FTC cannot show a strong likelihood that this Court will reverse on any, let alone each.

### 1.    The Rule exceeds the FTC's statutory authority.

First, the district court correctly concluded that the FTC exceeded its authority under the HSR Act, because the statute "prohibit[s]" the agency "from demanding certain documents or information from all HSR filers if

doing so would impose significant costs while doing comparatively little to enable the agency to determine whether to issue a Second Request." Op. 16.

a.     The HSR Act allows the FTC to require in the initial "premerger notification" only "such documentary material and information relevant to a proposed acquisition *as is necessary and appropriate* to enable the [agencies] to determine whether such acquisition may, if consummated, violate the antitrust laws." 15 U.S.C. § 18a(d)(1) (emphasis added). As the district court held, that provision "requires that any benefits to the FTC in mandating additional information in the premerger notice 'reasonably outweigh' the costs." Op. 19 (quoting *Mexican Gulf Fishing Co.* v. *U.S. Dep't of Com.*, 60 F.4th 956, 965 (5th Cir. 2023)). That conclusion follows directly from *Mexican Gulf* and *Michigan* v. *EPA*, 576 U.S. 743, 752 (2015), both of which construed identical "necessary and appropriate" language as "limit[ing] the authorization" to regulate and "at a minimum requir[ing] that [the rule's] benefits reasonably outweigh its costs." *Mexican Gulf*, 60 F.4th at 965.

The structure, purpose, and original FTC interpretation of the HSR Act all confirm the district court's reading. Dkt. 44 at 12-15. The whole point of the Act's two-step design is to ensure that the initial "notification" is just that—a notification, not an application—that is kept "as minimally

15

burdensome as possible without compromising the agencies' ability to investigate and interdict transactions." Op. 26 (citation omitted). Congress intended the real costs to arise only from the intrusive Second Request process—which is not constrained by the same "necessary and appropriate" language, 15 U.S.C. § 18a(e)(1)(A)—and thus remain limited to the tiny fraction of transactions that raise antitrust concerns at the first step.

b.      In the Rule, the FTC rejected this limit on its authority to demand materials in the notification Form. It instead took the view that Congress gave it "broad discretion" to demand whatever it wanted in the Form. Op. 16-17; *see* 89 Fed. Reg. at 29,236. To the extent the FTC presses that argument here (at 21), it does so without analysis. Instead, the agency falls back on a one-sentence argument (at 24) that it *did* "extensively consider[] the costs and benefits of the Rule," despite disavowing any such obligation.

As the district court aptly responded, however, "[s]tating that a statutorily mandated factor was considered is not a substitute for considering it." Op. 27 (citation omitted). Nowhere in the Rule did the FTC ever purport to determine, let alone substantiate, that any of the 20 new categories of documents and information were beneficial enough to the first-step notification to be worth their exorbitant costs on all HSR filers. *See* Dkt. 44 at

15-17; Dkt. 62 at 11-13.  Instead, the FTC decided to revamp the Form to add many brand-new requirements, and *then* occasionally tried "to minimize *where possible*" the costs of complying with all of those mandates.  *E.g.*, 89 Fed. Reg. at 89,217 (emphasis added).  That inverts Congress's command.  The HSR Act requires the agency to determine *before* adding any new requirement to the Form that the benefits of doing so justify the cost *on all filers*.

On that point, the Rule offered only "vague and conclusory" explanations for why the agencies need the 20 new categories of information to spot potentially unlawful transactions—let alone badly enough to justify their "significant and widespread costs."  Op. 2, 22-27.  The FTC merely invoked its "experience and expertise" without providing any "specifics" or "evidence." *Id.*  For example, the agency could not "identify a single illegal merger in the forty-six-year history of the prior Form that the Final Rule's new form would have prevented."  Op. 22.  Indeed, to the extent the FTC invoked anything resembling concrete evidence—a single study of hospital mergers, 89 Fed. Reg. at 89,221—that study actually demonstrated that "the prior Form worked as it should have," by triggering additional review of the transactions discussed.  Op. 23.

The FTC generically insists (at 22-23) that agencies enjoy some deference in weighing costs and benefits.  But the district court applied a deferential standard, *see* Op. 27 (invoking "substantial evidence" standard), and still concluded that the FTC's "conclusory," "unsubstantiated," "vague," and "lack[ing] specifics" analysis of the Rule's purported benefits, measured against its undisputedly substantial costs, rendered the Rule unlawful.  Op. 24-25.  The FTC is not asking this Court for deference to a reasonable judgment call based on relevant evidence; it is requesting (in an emergency posture) approval of a cost-benefit label that has no actual weighing of costs and benefits behind it.

The FTC also protests that agencies are entitled to make "predictive judgments" even in the absence of past harms.  But that is not a license to disregard the APA or HSR Act, both of which required the FTC to "adequately substantiate[]" the existence of a "genuine problem" that could have remotely required such a massive expansion of the Form.  *See Chamber of Com. of United States* v. *SEC*, 85 F.4th 760, 777-778 (5th Cir. 2023).  An agency may make "reasonable predictive judgment[s] *based on the evidence it ha[s]*."  *FCC* v. *Prometheus Radio Project*, 592 U.S. 414, 426-427 (2021) (emphasis added).  It cannot simply ignore the record assembled by

commenters and make "predictions" not rooted in that record—which, again, reveals five decades of the prior Form's working well, permitting zero identified harmful mergers to slip through, and being praised even by the FTC itself until shortly before it finalized this Rule. Op. 24.

### 2.    The Rule failed to reasonably analyze costs and benefits.

As an independent ground, the district court also found the Rule arbitrary and capricious because the FTC lacked any evidence to reasonably conclude that the Rule's benefits "bear a rational relationship" to its costs. Op. 28-29. In a footnote (at 21 n.3), the FTC claims that this APA issue is duplicative of the court's statutory holding. Not so. Plaintiffs separately argued below that the FTC's own (eye-popping) estimate of compliance costs "drastically underestimate[d]" those costs. Dkt. 44 at 19-23. The district court saw no need to consider that additional argument, Op. 20 n.1, but this Court would have to do so to reverse the judgment.

The FTC has no likelihood of success on that point either. As plaintiffs explained, the Commission's cost analysis relied entirely on an informal survey *of its own legal staff.* 89 Fed. Reg. at 89,332. Little wonder then that the Commission did not reconcile its estimate with the much higher estimates by commenters, or consider the Rule's full costs, including how it would extend

deal timelines and closings, harm small businesses, and hinder innovation and entrepreneurial activity. Dkt. 44 at 20-23. Each of those "serious flaw[s]" in the agency's cost analysis independently "render[s]" the Rule "unreasonable" under the APA. *Louisiana ex rel. Landry* v. *Biden*, 64 F.4th 674, 678 n.10 (5th Cir. 2023).

### 3. The FTC failed to justify its rejection of less burdensome alternatives.

Finally, the district court also correctly held that the FTC failed to "properly consider less burdensome alternatives offered in comments to the Final Rule"—another independent APA defect. Op. 29. Specifically, the FTC did not reasonably explain why increasing the use of Second Requests or voluntary requests during the initial 30-day period were not better alternatives than dramatically expanding the HSR Form for all filers. *See* Dkt. 44 at 27-30. The FTC claims (at 24-25) that it did explain its rejection of those alternatives. But the court's point was not that the agency said nothing; it was that what the agency did say was irrational. In particular, the FTC "fail[ed] to explain why imposing" the additional costs associated with early voluntary requests or Second Requests "on a small subset of filers" was "a *more* 'costly' alternative than tripling the costs of *every* HSR-reportable transaction for all filers." Op. 31 (emphases added).

## II.    THE FTC HAS NOT SHOWN THAT IT WILL SUFFER IRREPARABLE INJURY DURING ITS APPEAL.

"Of the remaining three factors, irreparable injury matters most." *Alliance for Hippocratic Med.* v. *FDA*, 2023 WL 2913725, at *18 (5th Cir. Apr. 12, 2023).  Success on this factor also requires "a strong showing," not merely "some possibility of irreparable injury."  *Nken* v. *Holder*, 556 U.S. 418, 434 (2009).  And "failure to show irreparable injury often decides the [stay] application." *Alliance*, 2023 WL 2913725, at *18.

The FTC has not shown that it will suffer *any* injury from returning to the time-tested prior Form during "the pendency of the appeal."  *Texas* v. *Biden*, 10 F.4th 538, 559 (5th Cir. 2021) (emphasis omitted).  The Commission protests (at 26) that this would "prevent the Executive Branch from receiving" all the new information mandated by the Rule.  But as discussed, the district court found that the FTC "*fail[ed] to substantiate* [its] assertions" that this new information would help the agencies "detect illegal mergers and save agency resources," especially compared to the excellent track record under the prior Form.  Op. 2 (emphasis added).  The FTC "bears the burden of proof" to establish irreparable harm, *Ruiz* v. *Estelle*, 666 F.2d 854, 855 n.4 (5th Cir. 1982), and it has offered nothing of substance to carry that burden.  That alone is sufficient to deny a stay.

The Commission claims (at 25-26) that *Trump* v. *CASA, Inc.*, 606 U.S. 831 (2025), establishes that a government agency *always* suffers irreparable harm whenever a court vacates a rule the agency "believes" "is necessary." But *CASA* involved federal courts' statutory power to issue universal injunctions, and expressly reserved "the distinct question whether the [APA] authorizes federal courts to vacate federal agency action"—the remedy granted here. 606 U.S. at 847 n.10. Nothing in *CASA* stands for the remarkable proposition that the government is automatically irreparably harmed any time a court "prevent[s] the Executive Branch from" doing something, Mot. 26, however unsubstantiated the "need" for that something may be. *See Castanon-Nava* v. *DHS*, 161 F.4th 1048, 1063 (7th Cir. 2025).

The Commission argues (at 26) that a stay is warranted because there are certain provisions of the Rule that "plaintiffs did not dispute" or "to which plaintiffs never objected." But plaintiffs in fact argued that the *entire* Rule is unlawful because the FTC failed to recognize or abide by the key limits on its authority. Dkt. 62 at 25. In any event, to the extent there is supposedly uncontroversial information the FTC actually urgently needs during this appeal, it does not explain why it cannot take other action to obtain that information (such as issuing guidance to stop using out-of-date NAICS codes).

As for information the Commission is "mandated" under a 2022 statute to obtain, Mot. 26 (quoting 15 U.S.C. § 18b), the agency could claim "good cause" to promulgate an interim final rule immediately requiring that information. 5 U.S.C. § 553(b)(3)(B).  But the Commission took over two years to comply with that "mandate[]" in the first place, and this appeal will presumably not take so long.  Regardless, the FTC should not be permitted to leverage a minor provision or two in its vastly overbroad rulemaking into restoring the entire unlawful Rule for the pendency of this appeal.

## III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST FACTORS CUT STRONGLY AGAINST A STAY.

Finally, the Commission cannot show that the equities or public interest support a stay.  The district court correctly found that the Rule is unlawful and unjustifiably imposes substantial costs on parties to mergers that pose no conceivable antitrust concern.  There is *no* interest in requiring those parties—including but certainly not limited to plaintiffs' members—to continue bearing those excessive costs.

The Commission claims (at 27-28) that parties will face "uncertainty" absent a stay because they will "have to decide whether to begin preparing the old form instead of the new form."  But there is no reason why keeping the new Form in place notwithstanding the ruling below would generate any more

uncertainty than allowing the old Form to take effect. More fundamentally, the FTC cannot invoke injuries to regulated parties that the agency is perfectly capable of solving itself by issuing timely guidance. Indeed, the FTC has already done so twice about this case over the past two weeks.[4] And in the unlikely event that this Court reverses and restores the new Form, the Commission can easily give parties a grace period for compliance—just as it did after adopting the Rule on October 10, 2024, with an effective date of February 10, 2025.

As for the Commission's objection (at 27) that some parties "have already incurred the time and expense of completing some or all of the new form," the district court correctly rejected that argument: the "existence of some costs to some parties"—costs that are already sunk—is not grounds to continue imposing far greater costs on *all* parties. Op. 34. In any event, the Rule did not change the old Form into an entirely new one; it *expanded* the old Form by "requiring approximately twenty … new categories of information and documents." Op. 6. So parties' recent efforts to complete the new Form will not be entirely wasted, and parties' future efforts to complete the old Form pending appeal will not be wasted at all.

---

[4] *See* https://www.ftc.gov/enforcement/premerger-notification-program.

Finally, the Commission's claim (at 28) that "any harms to plaintiffs are minimal" is hard to take seriously. The Rule itself acknowledged that the new Form will impose "roughly triple the costs to comply with the previous Form," Op. 20, and more than quadruple for half of all reportable transactions. Plaintiffs showed that their members have already incurred and will continue to incur those harms as they enter into HSR-reportable transactions. And the fact that plaintiffs did not seek a TRO or preliminary injunction at the outset does not somehow waive their ability to oppose a stay now that a federal court has thoroughly held that the Rule is unlawful several times over.

## CONCLUSION

The Court should deny the FTC's motion for a stay pending appeal.

Respectfully submitted,

*/s/ Jeffrey B. Wall*

| | |
|---|---|
| JORDAN L. VON BOKERN | JEFFREY B. WALL |
| AUDREY DOS SANTOS | JUDSON O. LITTLETON |
| U.S. CHAMBER LITIGATION CENTER | SULLIVAN & CROMWELL LLP |
| 1615 H STREET NW | 1700 New York Avenue NW |
| WASHINGTON, DC 20062 | Washington, DC 20006 |
| (202) 463-5337 | (202) 956-7500 |

MAXWELL F. GOTTSCHALL
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Counsel for Plaintiffs-Appellees
Chamber of Commerce of the
United States of America,
Business Roundtable, American
Investment Council, and
Longview Chamber of Commerce*

FEBRUARY 23, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,195 words.

This brief also complies with the requirements of Federal Rule of Appellate Procedure 32(a) because it was prepared in 14-point font using a proportionally spaced typeface.

*/s/ Jeffrey B. Wall*
JEFFREY B. WALL

FEBRUARY 23, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2026, I electronically filed the foregoing brief with the Clerk of Court for the U.S. Court of Appeals for the Fifth Circuit using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Jeffrey B. Wall
JEFFREY B. WALL

FEBRUARY 23, 2026

# Exhibit A
# (District Court Opinion, Dkt. 75)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, et al., | § § § | |
| | § | |
| Plaintiffs, | § § | |
| v. | § § | Case No. 6:25-cv-9-JDK |
| FEDERAL TRADE COMMISSION, et al., | § § § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

This case challenges a 2024 rule promulgated by the Federal Trade Commission. The rule significantly expands the amount of documentary material and information that merging companies must include in a premerger notification to the agency. Premerger Notification; Reporting and Waiting Periods Requirements, 89 Fed. Reg. 89,216 (Nov. 12, 2024) (hereinafter, "the Final Rule" or "the Rule").

Plaintiffs challenge the Final Rule as unlawful under the Administrative Procedure Act ("the APA"). Plaintiffs first claim that the Rule exceeds the FTC's statutory authority because the information requested by the Rule is not "necessary and appropriate," as the statute requires. Additionally, Plaintiffs argue that the Final Rule was the product of arbitrary and capricious rulemaking. Specifically, Plaintiffs contend that the FTC failed to show that the Rule's benefits outweigh its costs and failed to explain why the agency rejected less burdensome alternatives.

The parties cross-moved for summary judgment.  The FTC for its part defends the Rule on both grounds.  It also challenges the parties' standing.  On the merits, the agency claims that the information sought by the Final Rule is both necessary and appropriate to determine whether a proposed transaction would violate the antitrust laws.  And the FTC defends its rulemaking, explaining that it considered the costs and benefits and reasonably rejected the alternatives.

For the reasons set forth below, the Court grants Plaintiffs' motion and denies the FTC's cross-motion.  On standing, Plaintiffs have properly shown that they are associations representing members who face imminent injury because of the Final Rule.  Plaintiffs also succeed on the merits.  First, the Final Rule exceeds the FTC's statutory authority because the agency has not shown that the Rule's claimed benefits will "reasonably outweigh" its significant and widespread costs.  *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 965 (5th Cir. 2023).  Though the FTC asserts that the Rule will detect illegal mergers and save agency resources, the FTC fails to substantiate these assertions.  The Final Rule is therefore not "necessary and appropriate," and the statute "does not authorize [the FTC] to promulgate [the Final Rule]."  *Id.*

The Final Rule is also arbitrary and capricious for largely the same reason: the FTC "failed to consider an important aspect of the problem," namely that the Rule's benefits "bear a rational relationship" to its costs.  *Id.* at 973.  The FTC also did not adequately explain its rejection of less costly and burdensome alternatives.

Accordingly, the Court vacates and sets aside the Final Rule.

# I.

In 1978, acting under congressional authority, the FTC promulgated a rule requiring certain information from merging parties that was "necessary and appropriate" to enforce the antitrust laws. Forty-six years later, the FTC determined that the old form was outdated and issued the Final Rule that is the subject of this case.

**A.    The Statute.**    In 1976, Congress enacted the Hart-Scott-Rodino Antitrust Improvements Act, 15 U.S.C. § 18a ("HSR Act"). The HSR Act requires parties to certain mergers and acquisitions to file a "premerger notification" with the FTC and the Department of Justice thirty days before finalizing the transaction. *Id.* § 18a(a)–(b). The purpose of the requirement is to detect "illegal mergers and acquisitions prior to consummation without unduly burdening business with unnecessary paperwork or delays." S. Rep. No. 94-803, at 65 (1976).

The HSR Act authorizes the FTC to specify the "documentary material and information" to be submitted with the premerger notification. 15 U.S.C. § 18a(d)(1). Specifically, the FTC "shall require that the notification . . . be in such form and contain such documentary material and information relevant to a proposed acquisition as is necessary and appropriate to enable the [FTC and DOJ] to determine whether such acquisition may, if consummated, violate the antitrust laws." *Id.* If an agency determines during the thirty-day period that a particular transaction needs further scrutiny, then the agency may "require the submission of additional information or documentary material." *Id.* § 18a(e). This broader "Second Request"

generally applies only to a small subset of transactions that pose a potential antitrust concern.  89 Fed. Reg. at 89,216.

**B.**    **The 1978 Rule.**    In 1978, the FTC published the first premerger notification "Form."  *See* Premerger Notification; Reporting and Waiting Period Requirements, 43 Fed. Reg. 33,450, 33,519 (July 31, 1978).  The Form required parties to submit:

> The identities of the persons involved and the type of acquisition (item 1); A description of the voting securities or assets to be acquired and of the means by which the acquisition is to be carried out (item 2); The percentage and total dollar amount of the assets and voting securities of the acquired person to be held by the acquiring person as a result of the acquisition (item 3); Copies of various SEC filings [and] Annual reports and financial statements of the reporting person, as well as studies or analyses of the acquisition (item 4); A listing of dollar revenues derived by the reporting person, broken down separately by industry, product class and product (item 5); Information about the entities included within the reporting person, as well as information about the shareholders of the reporting Person and the shareholdings of the reporting person in other persons (item 6); Geographic market information relating to industries in which the reporting person and another party to the acquisition both derived dollar revenues (item 7); Information about revenues resulting from certain vendor-vendee relationships existing between the reporting person and another party to the acquisition (item 8); [and] Any other recent acquisitions by the acquiring person in an industry from which both it and the acquired person derive dollar revenues (item 9).

*Id.* at 33,520.

This Form, with only minor adjustments, has governed mergers and acquisitions for nearly fifty years.  43 Fed. Reg. at 89,257.  Over the years, the FTC and DOJ have repeatedly stated that the Form was "highly effective" in "giving the government the opportunity to investigate and challenge mergers."  Docket No. 44, Ex. 17 at 28 (Fed. Trade Comm'n & U.S. Dep't of Justice, *Annual Report Fiscal Year*

*2001* (corrected April 2008)).    Indeed, from 2001 to 2020, only about 3% of transactions submitting Forms triggered a Second Request for additional information.  Logan Billman & Steven C. Salop, *Merger Enforcement Statistics: 2001-2020*, 85 ANTITRUST L.J. 1 (2023).

Although the agencies now claim the Form fails to provide sufficient information, a significant criticism of the Form was that it was too burdensome and costly and applied to too many transactions.  146 Cong. Rec. 24,253 (2000) (statement of Sen. Hatch).  As a result, Congress amended the HSR Act in 2000 to raise the dollar thresholds for filing a premerger notification and indexed them to economic growth.  Pub. L. No. 106-553, § 630, 114 Stat. 2762 (2000).

C.    **The 2024 Rule.**  In 2023, the FTC proposed dramatically expanding the Form by requiring thirty-four new categories of information.  Premerger Notification; Reporting and Waiting Period Requirements, 88 Fed. Reg. 42,178, 42,185-42,186 (June 29, 2023).  According to the FTC, the Form no longer served its purposes in "the economy of 2024."  89 Fed. Reg. at 89,216.  The FTC argued that "profound changes" in corporate structures, business competition, mergers, and investment strategies had "rendered the Form's focus on traditional corporate structures outdated" and left agencies "unable to determine which entities or individuals will be making competitive decisions post-merger."  *Id.* at 89,217.

Hundreds of commenters responded, urging the FTC to withdraw or rewrite the proposed rule.  One commenter noted that the new rule would "treat all reportable transactions as deserving of an extensive degree of disclosure and scrutiny far in

excess of any actual competitive risks they pose" and "establish a presumption that M&A activity is inherently dubious." Nat'l Ass'n of Mfrs., *Comment Letter on Proposed Rule* (September 28, 2023), https://www.regulations.gov/comment/FTC-2023-0040-0700. Another commenter noted that the new requirements in the proposed rule exceeded even what the agencies typically request in an informal investigation. Nat'l Council of Farmer Coops., *Comment Letter on Proposed Rule* (August 8, 2023), https://www.regulations.gov/comment/FTC-2023-0040-0496. Still another questioned what benefits the proposed rule would provide when "[t]he Agencies have not identified any transactions as raising competition issues that would have only made clear if the Proposed Rules were implemented." Mo. Chamber of Com. and Indus., *Comment Letter on Proposed Rule* (September 26, 2023), https://www.regulations.gov/comment/FTC-2023-0040-0660. Others argued that the proposed rule violated the HSR Act and its mandate for a "balance between providing the government with information to enforce the antitrust laws properly and avoiding undue burdens on legitimate merger and acquisition activity." Nat'l Retail Fed'n, *Comment Letter on Proposed Rule* (September 27, 2023), https://www.regulations.gov/comment/FTC-2023-0040-0679.

On October 10, 2024, the FTC adopted the Final Rule at issue here. 89 Fed. Reg. at 89,394. Although the Final Rule pared back the categories of new information required by filers, it substantially modified the Form, requiring approximately twenty (rather than thirty-four) new categories of information and documents:

> Translations, Changes to Identification of Additional Minority Interest Holders, Organization of Controlled Entities, Description of Ownership

Structure, Organizational Chart (if it exists), Identification of Certain officers and Directors, Description of Business of the Acquiring Person, Transactions Subject to International Antitrust Notification, Transaction Rationale, Transaction Diagram (if one exists), Competition Documents from Supervisory Deal Team Lead, Plans and Reports, Transaction Agreements, Other Agreements Between the Parties, Overlap Description, Supply Relationship Description, Geographic market Information (new organization, street-level reporting, and reporting of francisees [sic]), Limiting Minority-Held Entity Identification to Overlaps, Prior Acquisitions, Subsidies from Foreign Entities or Governments of Concern, Defense or Intelligence Contracts.

*Id.* at 89,264 (Figure 3: Applicability of Significant Updated and New Information Requirements); *see also id.* at 89,277. The FTC also revised the estimated time to comply with the new Rule. According to the agency, the Final Rule would take an average of 105 hours for financial institutions to complete, 89 Fed. Reg. at 89,333, lower than the proposed rule's estimate of 144 hours, 88 Fed. Reg. at 42,208, but still nearly triple that of the prior Form's average time of 37 hours, *id.*

**D.     This Lawsuit.** On January 10, 2025, Plaintiffs Longview Chamber of Commerce, Chamber of Commerce of the United States of America, American Investment Council, and Business Roundtable challenged the Final Rule under the APA, 5 U.S.C. §§ 701, *et seq.* Docket No. 27. The FTC thereafter moved to dismiss the Longview Chamber for lack of subject matter jurisdiction and to transfer the case to the U.S. District Court for the District of Columbia. Docket No. 30. Before the Court had an opportunity to rule on the FTC's motion, Plaintiffs filed a motion for summary judgment. Docket No. 44. The FTC then cross-moved for summary judgment, again challenging the Longview Chamber's standing, among other issues. Docket No. 57.

This Memorandum Opinion addresses the summary judgment motions. Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

As explained further below and as the parties agreed, this Opinion moots the FTC's other pending motions (Docket Nos. 23, 30, and 53). Those motions are therefore denied as moot.

## II.

The FTC argues that Plaintiffs lack standing to challenge the Final Rule. First, the FTC claims that Plaintiffs' only evidence of standing is inadmissible. Alternatively, the FTC argues, Plaintiffs' evidence is insufficient to establish the Longview Chamber's standing. Both arguments fail.

## A.

Plaintiffs bear the burden to establish standing. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 242 & n.3 (2006). Here, Plaintiffs have submitted declarations of individuals who are officers in each of the Plaintiff associations. Docket No. 44, Ex. A–D. Each declarant attests that he or she is an officer of the association and has personal knowledge that many of the association's members "regularly enter into merger[s], acquisition[s], or other transactions that meet or exceed the size thresholds

8

for filing a premerger notification form under the HSR Act and will be subject to the requirements of the Rule." Docket No. 44, Ex. D ¶¶ 1, 2, 5; *see also id.* Ex. A ¶¶ 1, 2, 7; *id.* Ex. B ¶¶ 1, 2, 4; *id.* Ex. C ¶¶ 1, 2, 9. The declarants further state that these members "are harmed by the Rule" in part by making it "far more costly for [the association's] members to consummate such deals." Docket No. 44, Ex. D ¶ 13; *see also id.* Ex. A ¶ 12; *id.* Ex. B ¶ 9; *id.* Ex. C ¶ 13. The declarations easily satisfy Federal Rule of Civil Procedure 56(c)(4), which requires that a declaration in support of summary judgment "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). *See, e.g.*, *Chamber of Com. of the U.S. v. CFPB*, 691 F. Supp. 3d 730, 738 (E.D. Tex. 2023); (relying on similar declarations to find that an associational plaintiff has standing to challenge agency action).

The FTC nevertheless argues that the declarations are not competent summary judgment evidence because they "rely on inadmissible hearsay" by the associations' members. Docket No. 57 at 9. The factual statements in a declaration at summary judgment, however, "need only be capable of being 'presented in a form that would be admissible in evidence'" at trial. *See Maurer v. Independence Town*, 870 F.3d 380, 384 (5th Cir. 2017) (citing FED. R. CIV. P. 56(c)). "This flexibility allows the court to consider the evidence that would likely be admitted at trial—as summary judgment is trying to determine if the evidence admitted at trial would allow a jury to find in favor of the nonmovant—without imposing on parties the time and expense

9

it takes to authenticate everything in the record." *Id.* Here, the most obvious way to make this testimony admissible would be for the unnamed members themselves to testify at trial, as Plaintiffs propose. Docket No. 62 at 2–3; *see, e.g., Hargiss v. Princeton Excess & Surplus Lines Ins. Co.*, 2023 WL 11886895, at *4 (W.D. La. Dec. 8, 2023) (finding that a declaration with hearsay is permissible summary judgment evidence because the hearsay could be admissible at trial through testimony). Because there is "nothing to compel a conclusion" that these unnamed members would be incapable of testifying, the declarations are admissible for the purpose of summary judgment. *Maurer*, 870 F.3d at 384.

The FTC also argues that the declarations are not "based on the declarants' personal knowledge." Docket No. 57 at 8. But each declarant expressly states that the declaration "is based upon my personal knowledge and belief and/or upon [the declarant's] review of [the association's] business records." Docket No. 44, Ex. A ¶ 2; *id.* Ex. B ¶ 2; *id.* Ex. C ¶ 2; *id.* Ex. D ¶ 2. This is all that is needed to satisfy Rule 56(c)(4). *Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 544 n.13 (5th Cir. 2002), *overruled on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009). Further, and in any event, each declaration sets forth information that is reasonably within the declarant's position or "sphere of responsibility," which is sufficient for a finding of personal knowledge. *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 530 (5th Cir. 2005). For example, Kelly Hall states that she is the President of the Longview Chamber of Commerce, "oversee[s] all of the Longview Chamber's operations," and represents and advocates for the Longview

Chamber's members on a variety of issues, including antitrust enforcement.  Docket
No. 44, Ex. D ¶¶ 1, 3.  Hall's testimony about transactions by members of the
Longview Chamber is thus within her personal knowledge for purposes of summary
judgment.  *See, e.g., Council of Ins. Agents & Brokers v. Juarbe-Jimenez*, 443 F.3d
103, 111 n.10 (1st Cir. 2006) (finding that declarations from the president of a trade
association came from personal knowledge because of the president's position).

## B.

The FTC alternatively argues that the Longview Chamber's evidence, even if
admissible, "does not establish that [the] Longview Chamber has associational
standing."  Docket No. 57 at 10.  The Court disagrees.

An association has standing to sue on behalf of its members when "(a) its
members would otherwise have standing to sue in their own right; (b) the interests it
seeks to protect are germane to the organization's purpose; and (c) neither the claim
asserted nor the relief requested requires the participation of individual members in
the lawsuit."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).
Here, the FTC primarily challenges the first requirement, arguing that "the alleged
injury to [the] Longview Chamber's members is speculative."  Docket No. 57 at 11.
In particular, the FTC argues, the evidence showing that some members of the
Longview Chamber "'plan' or 'expect[] to enter into' HSR-reportable transactions in
the 'foreseeable future' or 'by the end of 2025'" is "insufficient to demonstrate
standing."  *Id.*

The FTC misunderstands both the law and the evidence.  The injury-in-fact standard requires an injury to have three elements.  First, the injury must be "concrete, meaning that it must be real and not abstract." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021).  Second, the injury must be "particularized" and not a "generalized grievance." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Third, the injury must be actual or imminent, not speculative. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  To satisfy this last requirement for imminent injury, a plaintiff needs more than "allegations of possible future injury" or "a highly attenuated chain of possibilities"; rather, an imminent injury means one that is "certainly impending." *Clapper*, 568 U.S. at 410; *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur.'" (quoting *Clapper*, 568 U.S. at 414 n.5)); *Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019) (adopting the "substantial risk" standard for imminence).  Further, where a party is an "object of the action . . . at issue," there is "little question" that the party has standing to challenge it. *E.g., Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025).

The Longview Chamber's evidence satisfies the imminent-injury requirement. The key declaration states that members of the Longview Chamber "regularly enter into merger[s], acquisition[s], or other transactions that meet or exceed the size thresholds for filing a merger notification form under the HSR Act, including members for which M&A activity is a regular and consistent feature of their business

model." Docket No. 44, Ex. D ¶ 5. In fact, "Longview Chamber members have already engaged in HSR-reportable transactions this year." *Id.* As objects of the Final Rule, there is "little question" that these members have standing. *Diamond Alt. Energy*, 606 U.S. at 114. Further, "consistent with their past levels of deal activity, members of the Longview Chamber also plan to engage in HSR-reportable transactions in the forthcoming months." Docket No. 44, Ex. D ¶ 5. The declaration then provides details about five specific members who have already engaged in HSR-reportable transactions this year and plan to continue engaging "in a similar level of HSR-reportable activity going forward," including "at least one more HSR-reportable transaction this year." *Id.* ¶¶ 5–11. All of this is sufficient to show a substantial risk of future harm. *See, e.g.*, *Driehaus*, 573 U.S. at 161–62 (concluding that a pro-life organization sufficiently established impending harm because it had made pro-life statements in past elections and planned to make them in the upcoming election year); *Barilla v. City of Houston*, 13 F.4th 427, 432–33 (5th Cir. 2021) (concluding that a street performer sufficiently established impending harm because he had previously performed on a street and stated that he planned to perform again on the same street). *Cf. Lujan*, 504 U.S. at 558 (concluding that an association lacked standing where the evidence showed only that members "intend[ed]" to visit Sri Lanka "in the future" to see endangered species imperiled by the regulation).

The FTC also argues that this case "is not germane to the Longview Chamber's interests." Docket No. 57 at 13. Germaneness, however, is not a high bar for associational standing. Rather, "the germaneness requirement is 'undemanding' and

13

requires 'mere pertinence' between the litigation at issue and the organization's purpose." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 n.2 (5th Cir. 2010) (quoting *Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 148 (2nd Cir. 2006)). And here, the Longview Chamber has established that its purpose is to "advocate for policies that promote economic development and job creation," including by "challenging harmful and misguided federal regulations." Docket No. 44, Ex. D ¶ 3. The Longview Chamber has also demonstrated that the Final Rule would harm its members and the local economy. *Id.* ¶¶ 13–15. This satisfies the "pertinence" between the lawsuit and the Longview Chamber's purpose. *E.g., Tex. Med. Bd.*, 627 F.3d at 550 n.2.

Finally, the FTC contends that the Longview Chamber fails to establish standing because the key declaration identifies the affected members pseudonymously. Docket No. 57 at 12 (citing *Summers v. Earth Island Inst.*, 55 U.S. 488, 498–499 (2009)). The FTC misreads *Summers*. As the Fifth Circuit has explained, "*Summers* only requires that the plaintiff allege that there is a specific injured member. . . . Alleging that a specific member exists does not require naming that member." *Nat'l Infusion Ctr. v. Becerra*, 116 F.4th 488, 497 n.5 (5th Cir. 2024) (citations omitted); *see also CFPB*, 691 F. Supp. 3d at 738.

\* \* \*

The FTC's standing argument thus fails as a matter of law.

14

## III.

Plaintiffs argue that the Final Rule exceeds the FTC's statutory authority under the HSR Act.  Docket No. 44 at 11.  According to Plaintiffs, "the HSR Act forbids the FTC from demanding materials that would impose substantially more costs on filing parties to compile and produce than are justified by any benefit to the antitrust agencies' initial evaluation of the transaction."  *Id.*  Because the FTC "never performed the required cost-benefit analysis," Plaintiffs contend, the Final Rule is unlawful and should be set aside under the APA.  *Id.* at 11–12.  As explained below, the Court agrees.

The APA requires courts to "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(C).  "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  "Agencies, as mere creatures of statute, must point to explicit Congressional authority justifying their decisions." *Inhance Techs., LLC v. EPA*, 96 F.4th 888, 893 (5th Cir. 2024); *see also Earl v. Boeing Co.*, 515 F. Supp. 3d 590, 615 (E.D. Tex. 2021) ("[B]efore promulgating rules or regulations pursuant to a statute, agencies must demonstrate a clear 'textual commitment of authority' in the language Congress enacted." (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001))).

After reviewing the governing statute, the Court concludes that the HSR Act requires that the benefits of the Final Rule reasonably outweigh its costs. The Court then determines that the Rule fails to satisfy this statutory requirement.

## A.

The FTC claims authority for the Final Rule from Section 18(a) of the HSR Act. That provision states that the FTC "shall require that the [premerger] notification . . . be in such form and contain such documentary material and information relevant to a proposed acquisition as is *necessary and appropriate* to enable the [FTC and DOJ] to determine whether such acquisition may, if consummated, violate the antitrust laws." 15 U.S.C. § 18a(d)(1) (emphasis added). Additionally, the statute permits the FTC and DOJ to "define the terms used in this section," "exempt from the requirements of this section [those mergers] which are not likely to violate the antitrust laws," and "prescribe such other rules as may be necessary and appropriate to carry out the purposes of this section." 15 U.S.C. § 18a(d)(2)(A)–(C).

The key phrase at issue is "necessary and appropriate." Plaintiffs argue that this phrase "constrains the FTC's authority, prohibiting it from demanding certain documents or information from all HSR filers if doing so would impose significant costs while doing comparatively little to enable the agency to determine whether to issue a Second Request." Docket No. 44 at 12. The FTC, on the other hand, argues that "necessary and appropriate" is a "capacious standard" giving the agency "broad

16

discretion" to determine what information to require in a premerger notice—without conducting a cost-benefit analysis.  Docket No. 57 at 16.

Precedent supports Plaintiffs on this point.  In *Michigan v. EPA*, the Supreme Court interpreted the term "appropriate and necessary" in a statute permitting the EPA to promulgate emissions regulations for power plants.  576 U.S. 743, 752 (2015).  Although the term "appropriate" is "capacious" and "leaves agencies with flexibility," "[r]ead naturally in the present context," "the phrase 'appropriate and necessary' requires at least some attention to cost."  *Id*.  "One would not say that it is even rational, never mind 'appropriate,' to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits."  *Id*.  "In addition, 'cost' includes more than the expense of complying with regulations; any disadvantage could be termed a cost."  *Id*.  Indeed, "[n]o regulation is 'appropriate' if it does significantly more harm than good."  *Id*.  Accordingly, the Court held, the EPA's regulation was unlawful because the agency had "deemed cost irrelevant to the decision to regulate power plants."  *Id*. at 760.

A few years later, the Fifth Circuit interpreted the phrase "necessary and appropriate" in the Magnuson-Stevens Act, Pub. L. No. 94-265, § 1852, 90 Stat. 331 (1976).  The provision there authorized the Department of Commerce to promulgate regulations "necessary and appropriate for the conservation and management of the fishery."  *Mexican Gulf Fishing*, 60 F.4th at 965.  "As an initial matter," the Fifth Circuit began, "the adjectives *necessary* and *appropriate* limit the authorization contained in this provision."  *Id*.  "For this reason, the rule is authorized by the

17

Magnuson-Stevens Act only if it is necessary and appropriate, which at a minimum requires that its benefits reasonably outweigh its costs." *Id.* (citing *Nat'l Grain & Feed Ass'n v. OSHA*, 866 F.2d. 717, 733 (5th Cir. 1988)). Additionally, "a necessary-and-appropriate condition requires more than just consideration of financial costs." *Id.* at 966. It also requires an analysis of "any disadvantage" that could be deemed a cost. *Id.* (quoting *Michigan v. EPA*, 576 at 752).

Applying that standard to the relevant regulation, the Fifth Circuit found that the rule exceeded Commerce's statutory authority. The rule required fishing vessels to keep expensive GPS-tracking equipment to verify whether a vessel was at the dock or "whether a fishing trip was taken, and the length of that trip." *Id.* at 965. Although a "strict cost-benefit analysis is not required," the court held, the rule was unlawful because the agency "failed to show that the GPS-tracking requirement is necessary and appropriate for the conservation and management of the fishery." *Id.* at 966. Installing the equipment would cost $3,000 with additional monthly service fees— significant costs for small businesses operating on thin margins. *See id.* at 965. And, yet, there was "[n]ext to nothing" in benefits. *Id.* Information about vessel location was the only cited benefit, and "the Government already has this information" from less-costly reporting requirements. *Id.* at 966. Accordingly, the court concluded, "the Act does not authorize [the agency] to promulgate the GPS-tracking requirement." *Id.*

The FTC contends that *Michigan v. EPA* and *Mexican Gulf Fishing* are distinguishable because the statutes in those cases authorized the agencies to issue

a rule only if it was necessary and appropriate.  Docket No. 57 at 19.  Whereas here, the FTC argues, the HSR Act "requires" the FTC to issue a rule and permits the agency the flexibility to determine whether the rule is "necessary and appropriate," "even if the costs outweigh the benefits."  *Id.* (citing 15 U.S.C. § 18a(d)(1)).  According to the FTC, the HSR Act falls under the handful of "settings in which the phrase 'appropriate and necessary' does not encompass cost."  *Id.* (quoting *Michigan*, 576 U.S. at 752).  The Court is unpersuaded.  Nothing in *Michigan v. EPA* nor *Mexican Gulf Fishing* draws the distinction urged by the FTC here.  Rather, in both cases the courts interpreted the phrase to be a limit on agency authority, "which at a minimum requires that [the rule's] benefits reasonably outweigh its costs," *Mexican Gulf Fishing*, 60 F.4th at 965.  *See also Michigan v. EPA*, 576 U.S. at 752.  Further, in any event, in *Mexican Gulf Fishing*, one of the catch-all provisions authorizing the rule explicitly required the agency to regulate, yet the Fifth Circuit made no note of this distinction in analyzing the meaning of "necessary and appropriate."  *See* 16 U.S.C. § 1853 (a)(1)(A); *id.* § 1853 (b)(14); *Mexican Gulf Fishing*, 60 F.4th at 965–66.

In sum, the HSR Act requires that any benefits to the FTC in mandating additional information in the premerger notice "reasonably outweigh" the costs. *Mexican Gulf Fishing*, 60 F.4th at 965.

## B.

Plaintiffs argue that the FTC failed to conduct any cost-benefit analysis and that the Final Rule therefore exceeds the FTC's statutory authority.  "[T]he FTC never determined . . . that obtaining the newly mandated materials would be helpful

enough to the decision to issue a Second Request that they were worth the additional burden on thousands of annual HSR filers." Docket No. 44 at 15. The FTC counters that, even though it believed a cost-benefit analysis was unnecessary, the agency nevertheless weighed the costs and benefits and determined that the Final Rule was worth the additional burden on filers. Docket No. 57 at 17. Again, Plaintiffs have the better argument. Even assuming that the FTC's discussion of costs and benefits constituted a cost-benefit analysis, the Court finds that the agency failed to show that the benefits of the Final Rule reasonably outweighed its costs.

Start with costs. *See Mexican Gulf Fishing*, 60 F.4th at 965. The FTC concedes that the costs to comply with the Final Rule are roughly triple the costs to comply with the previous Form. 89 Fed. Reg. at 89,333. While the prior Form took an average of 37 hours to complete, 88 Fed. Reg. at 42,208, the FTC expects that the Final Rule's new form will require 105 hours, 89 Fed. Reg. at 89,333. Estimating an hourly rate of $583 for "executive and attorney compensation," the Office of Management and Budget determined that each filing under the Final Rule would cost $39,644 (68 hours X $583) more than the cost to complete the prior Form. *Id*. With 3,515 HSR filings in Fiscal Year 2023, OMB determined that the overall additional burden to comply with the Final Rule would be 239,020 hours (3,515 filings X 68 additional hours per filing) and would cost approximately $139.3 million (239,020 hours X $583 per hour). *Id*.[1]

---

[1] Plaintiffs dispute OMB's estimate. Docket No. 44 at 20–21. Plaintiff U.S. Chamber of Commerce estimated the cost of complying with the FTC's *proposed* rule (which included more requirements than the Final Rule). The U.S. Chamber concluded that the FTC's proposed rule would add approximately 242 hours to the average transaction, Docket No. 44, Ex. 6 ¶¶ 45–48, far more than

And yet, the benefits of the Final Rule identified by the FTC are illusory or, at least, unsubstantiated. These claimed benefits can be divided into two main categories: (1) detecting additional harmful mergers and (2) saving the FTC the time and cost of obtaining more information during the premerger screening process.[2]

---

OMB's estimate of 107 additional hours for the proposed rule, *id.* ¶ 35. Although the U.S. Chamber acknowledges that the Final Rule has fewer requirements than the proposed rule, the Chamber contends that the removed requirements alone cannot explain the significant disparity between the Chamber's estimate (an increase of 241 hours) and OMB's estimate (an increase of only 68 hours). Docket No. 44. at 21. The Court need not decide this dispute, however, because even using OMB's lower cost estimate, the Court concludes that the costs outweigh the FTC's claimed benefits.

[2] The FTC lists the benefits of the Final Rule as the following:

    (1) the non-consumption of harmful mergers that otherwise would not have been caught during premerger screening, whose harm continues unless and until the merger is unwound and competition in the affected market is restored, if it can be restored at all;

    (2) the reallocation of staff hours from attempting to collect additional necessary information from the parties on a voluntary basis and reduced uncertainty that delay and insufficiency create for resource allocation decisions;

    (3) the reallocation of staff hours from collecting additional necessary information from third parties regarding the parties' business operations;

    (4) the reduction in burden required for third parties to respond to the Agencies' outreach to provide information known to the filing parties, but not currently required by the Form;

    (5) improvements in premerger screening through

        (i) more accurate identification of transactions requiring in-depth review;

        (ii) the reduction in the number of HSR Filings withdrawn and refiled for the purpose of allowing Agency staff to collect and review more information from the parties;

        (iii) reduction in delays associated with HSR Filings, including those that are withdrawn and refiled but do not receive Second Requests;

        (iv) the narrowing of issues required to properly focus any in-depth review, including through the issuance of more targeted and less burdensome Second Requests;

        (v) the reduction in the number of Second Request investigations that do not ultimately result in enforcement or voluntary restructuring; and

    (6) a more efficient allocation of resources devoted to merger enforcement, including by avoiding expensive and time-consuming litigation to unwind consummated mergers that cause harm but were not identified under the current rules.

89 Fed. Reg. at 89,252.

1.      As to the first category, preventing illegal mergers is certainly a benefit. But the FTC has not shown that the Final Rule's new form would prevent any illegal mergers not already prevented by the previous Form.  In fact, although repeatedly asked, counsel for the FTC could not identify a single illegal merger in the forty-six-year history of the prior Form that the Final Rule's new form would have prevented. The FTC offers evidence that premerger enforcement is needed, 89 Fed Reg. at 89,2220, and that the prior Form did not request all the information available to the parties in acquisitions, 89 Fed. Reg. at 89,233.  But none of this demonstrates that the Final Rule's new form will detect illegal mergers more effectively than the prior Form, as the FTC claims.  The FTC also argues that firms "structure their deals to avoid premerger review," Docket No. 57 at 29, but the agency fails to explain how the Final Rule would eliminate that problem, especially since the reporting thresholds are unchanged.  *See* 89 Fed. Reg. at 89,264 ("[N]othing in the final rule changes which acquisitions are subject to premerger review.").

The FTC relies heavily on a study of hospital mergers that were submitted for premerger review, co-authored by two economists at the FTC's Bureau of Economics. 89 Fed Reg. at 89,221 (citing Keith Brand et al., *In the Shadow of Antitrust Enforcement: Price Effects of Hospital Mergers from 2009–2016*, 66 J. L. Econ. 639 (2023)).  Per the FTC, the study identified certain hospital mergers that were subject to the premerger notification process that later had anticompetitive effects (i.e., price increases).  The FTC suggests that the prior Form failed to provide the agency with "sufficient information to trigger additional investigations that could have blocked

22

these harmful mergers before they were consummated." Docket No. 57 at 29 (quoting 89 Fed. Reg. at 89,221). But the study itself also stated that the FTC issued Second Requests in reviewing these problematic mergers, which means that the prior Form worked as it should have—triggering additional review by the agency. Brand, *supra*, at 662. The failure of the agency to prevent the mergers therefore had nothing to do with the Form's alleged deficiencies but rather with "[in]sufficient resources to challenge th[os]e mergers," "evidence [being] too weak," or plain error. *Id*. at 662–63.

The FTC also repeatedly cites its own "experience and expertise" in concluding that the Final Rule's new form will detect unlawful mergers. 89 Fed. Reg. at 89,217. The FTC claims that it "compared documentary material and information [the FTC and DOJ have] received over the years" and identified information that, if the agencies had at the beginning of previous investigations, "would have changed the Agencies' decision whether and how to investigate reportable transactions." *Id*. But the FTC fails to substantiate this claim. Nor does the agency provide any specifics. It does not identify the mergers, does not state what information it lacked, and does not say whether the agency would have approved the mergers or not.

The FTC asserts that requiring evidence of a past illegal merger is "an insanely lofty standard." Docket No. 57 at 30. But it's the FTC's own standard. The agency claimed that the Final Rule was necessary to detect "harmful mergers that otherwise would not have been caught during premerger screening." 89 Fed. Reg. at 89,252. Meanwhile, for years, until August 2024, the FTC's own online guide to the HSR program declared that the "Program [using the prior Form] has been a success" and

"has minimized the number of post-merger challenges the enforcement agencies have had to pursue." *See* Docket No. 44, Ex. 19 at 2 (Fed. Trade Comm'n, *What is the Premerger Notification Program? An Overview* (Mar. 2009)); Docket No. 27 ¶ 5. With this record, it's not "insanely lofty" to ask the agency to identify at least one "harmful merger" that the prior Form failed to detect. As the Supreme Court recently held, an agency should at least have "evidence to support [its] findings." *Loper Bright Ents. v. Raimondo*, 603 U.S. 369, 387 (2024). After all, "courts, not agencies, will decide '*all* relevant questions of law' arising on review of agency action." *Loper Bright*, 603 U.S. at 387 (quoting 5 U.S.C. § 706).

Although a "strict cost-benefit analysis is not required," *Mexican Gulf Fishing*, 60 F.4th at 965, the FTC's vague and conclusory assertions about preventing illegal mergers does not justify the significant costs of the Final Rule's new form—costs to be borne by thousands of annual HSR filers. *See Mexican Gulf Fishing*, 60 F.4th at 965–66 (holding that the agency's claim that GPS-trackers would provide necessary information was insufficient to justify the cost of the trackers because the claim was conclusory and unsubstantiated); *see also Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 587 F. Supp. 3d 428, 460 (E.D. La. 2022), *rev'd*, 60 F.4d 956 (5th Cir. 2023) (quoting the agency's claims that the requested information was required to improve management of fisheries and facilitate enforcement of the Magnuson-Stevens Act).

**2.** The FTC's second category of claimed benefits is saving the agency time and resources in obtaining more information during the premerger screening process. 89 Fed. Reg. at 89,252. Saving resources is also, undoubtedly, a benefit. But the

FTC's resource-savings argument is limited to a small subset of HSR filers, and the agency again fails to show how that limited benefit reasonably outweighs the significant costs on the thousands of other annual filers.

As an initial matter, the FTC's resource-savings justification suffers from many of the same flaws as its detecting-illegal-mergers argument: it is conclusory, lacks specifics, and is unsubstantiated. *See, e.g.*, *id.* at 89,252–54; *id.* at 89,269–70. It is also underwhelming. By the FTC's own estimate, approximately 92% of HSR-reported mergers do not require any investigation or additional requests by the agency. Docket No. 44, Ex. 23 at T1(Fed. Trade Comm'n & U.S. Dep't of Justice, *Hart-Scott-Rodino Annual Report Fiscal Year 2021*). Indeed, the FTC opens an investigation in only 8% of HSR-reported mergers, and even fewer—3%—receive Second Requests from the agency. *Id.*; *see* Billman & Salop*, Merger Enforcement Statistics: 2001-2020*, 85 ANTITRUST L.J. 1, 10 (2023) (finding that from 2001 to 2020, only about 3% of HSR-reportable transactions received a Second Request). And yet, the agency justifies the Final Rule on the time and resources saved in only the few mergers that receive a closer look. The FTC claims that the new form will allow it to more quickly conclude investigations, 89 Fed. Reg. at 89,252, and will permit more targeted Second Requests, which will save the agency both time and resources, *id.* In conclusion, the FTC asserts, the new form will lead to "an overall reduction in the number of staff hours spent collecting additional information from all sources, including the parties, as well as a reduction in associated burdens of reviewing and processing that information." *Id.*

The problem for the FTC is that the Final Rule's new form imposes costs on *all filers*—including the 92% for which the new form will provide the agency with little or no benefit.  And even the benefit in 8% of the transactions is unclear.  The FTC does not argue that the new form would eliminate or substantially curtail investigations or Second Requests.  Nor does the agency attempt to specify or substantiate how exactly the new form will save time and resources.  A typical explanation is that the Final Rule will allow the agencies to "narrow[] the scope of their investigations in some cases, and in others, reduce[] the need to conduct a more burdensome in-depth investigation by issuing Second Requests."  *See, e.g.*, 89 Fed. Reg. at 89,217.  This does not satisfy *Mexican Gulf Fishing*'s standard, which requires the agency to show "at a minimum" that the new rule will provide a "meaningful benefit," one that "reasonably outweigh[s] its costs."  F.4th at 965–66.

The FTC argues that "it is appropriate to shift some of this information-gathering burden to the merging parties and away from other market participants— including customers who may suffer harm if the merger is consummated—who currently absorb this burden due to deficiencies in the existing HSR Form."  89 Fed. Reg. at 89,253.  But as noted above, the agency has provided no evidence that any deficiencies in the prior Form resulted in illegal mergers that the new form would prevent.  Such cost-shifting, moreover, would hardly keep the form "as minimally burdensome as possible without compromise the agencies' ability to investigate and interdict proposed transactions."  Docket No. 44, Ex. 17 at 29.

* * *

To be sure, the FTC made more of an effort to consider costs and benefits than the agencies in *Michigan v. EPA* and *Mexican Gulf Fishing*. But the lack of specifics and evidence here prevents the Court from concluding that the claimed benefits of the Final Rule reasonably outweigh its significant costs, as required by the HSR Act. *See, e.g., Mexican Gulf Fishing*, 60 F.4th at 965–66; *Tex. Indep. Ginners Ass'n v. Marshall*, 630 F.2d 398, 411 (5th Cir. 1980) (citing *Am. Petroleum Inst. v. OSHA*, 581 F.2d 493, 503 (5th Cir. 1978)) (holding that the agency's "estimate of the anticipated cost and expected benefit of the proposed regulations are factual findings that must be supported by substantial evidence in the record."); *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986) ("Stating that a statutorily mandated factor was considered is not a substitute for considering it.").

The Court thus concludes that the Final Rule is unlawful because it exceeds the FTC's statutory authority.  5 U.S.C. § 706(2)(C).

## IV.

Plaintiffs also argue that the Final Rule should be vacated because it is the product of arbitrary and capricious rulemaking in violation of the APA.  Docket No. 44 at 19–20.  Specifically, Plaintiffs contend that the FTC "failed to show that the Rule's benefits are worth the immense new costs on every HSR filer," *id*. at 20, and "gave no reasoned explanation for rejecting less burdensome alternatives," *id*. at 27.

The APA instructs courts to "hold unlawful and set aside" rules that are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."

5 U.S.C. § 706(2)(A). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *see also ExxonMobil Pipeline Co. v. U.S. Dept. of Transp.*, 867 F.3d 564, 571 (5th Cir. 2017) ("Arbitrary and capricious review focuses on whether an agency articulated a rational connection between the facts found and the decision made." (citation modified)). "In reviewing that explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Texas v. EPA*, 983 F.3d 826, 835 (5th Cir. 2020) (quoting *Motor Vehicle Mfrs. Assn. of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The Court addresses each of Plaintiffs' arguments in turn.

## A.

First, the cost-benefit analysis. Docket No. 44 at 20–24. Plaintiffs argue that the FTC "unreasonably understated the costs of the Rule" while "unreasonably overstat[ing] the benefits." *Id.* at 20, 23. The Court agrees.

"[A] regulation is arbitrary and capricious if the agency 'failed to consider an important aspect of the problem'" which "includes, of course, considering the costs and benefits associated with the regulation." *Mexican Gulf Fishing*, 60 F.4th at 973 (quoting *State Farm*, 463 U.S. at 43)). "[A]s part of the cost-benefit analysis, the agency must identify benefits that 'bear a rational relationship to the . . . costs imposed.'" *Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 777 (5th Cir. 2023) (quoting *Mexican Gulf Fishing*, 60 F.4th at 973). The Court must consider whether an agency

"examine[d] the relevant data and articulate[d] a satisfactory explanation for its action.'" *FCC v. Fox Television Studios, Inc.*, 556 U.S. 502, 513 (2009) (quotation omitted). The Court also must ensure that the agency "has acted within a zone of reasonableness," but "may not substitute its own policy judgment for that of the agency." *Prometheus*, 592 U.S. at 423.

Plaintiffs' argument succeeds for the same reason that the necessary-and-appropriate provision does not authorize the Final Rule: the FTC "failed to demonstrate that it would obtain meaningful benefits" from the new form. *Mexican Gulf*, 60 F.4th at 973 (holding that the GPS-tracking requirement was arbitrary and capricious "for the same reason that the necessary-and-appropriate provisions do not authorize [the tracking requirement]"). The FTC lacks any evidence that the Final Rule would detect illegal mergers more effectively than the prior Form. And it failed to show that the claimed benefit of saving time and resources reasonably outweighs the Final Rule's significant costs. Thus, the Rule is arbitrary and capricious because its benefits do not "bear a rational relationship" to its costs. *Id.*

## B.

Plaintiffs also argue that the FTC failed to properly consider less burdensome alternatives offered in comments to the Final Rule. Specifically, Plaintiffs contend that the FTC dismissed "more targeted tools" like voluntary requests for reasons that were "irrational, contrary to the evidence, or both." Docket No. 44 at 27–28. The FTC claims that it fully considered the alternatives and rejected them because they would

create further delays or shift more costs to the investigated parties.  Docket No. 57 at 33–37.

"[A]n agency must consider and explain its rejection" of "'significant and viable' and 'obvious' alternatives."  *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 724 (5th Cir. 2013) (quoting *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 1984)); *see also Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1511 (D.C. Cir. 1984) ("It is well established that an agency has a duty to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." (citing *State Farm,* 463 U.S. at 47–53; *Int'l Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 815 (D.C. Cir. 1983))).  "An agency's failure to respond meaningfully to [alternatives] raised by a party renders its decision arbitrary and capricious."  *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (quoting *Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001)).  So too is an "artificial narrowing of options" by the agency by responding to alternatives with "a recital of conclusions, not facts" and a "conclusion with little supporting rationale visible."  *Pillai v. CAB*, 485 F.2d 1018, 1027 (D.C. Cir. 1973).

The FTC's main complaint with the suggested alternatives is that they did not "address the information deficiencies . . . with the current information requirements." 89 Fed. Reg. 89,248-89,249.  The FTC claims that alternatives like voluntary submissions and more targeted Second Requests are not comparable because the agencies first need the information provided by the new form before they can

30

determine which transactions require additional information.  *Id.* at 89,247-89,249.  But once again, the FTC does not substantiate this claim.  The agency does not specify what information was lacking in the prior Form that the Final Rule would now provide—or what transactions the prior Form allowed to proceed that the Final Rule would flag as problematic.  As discussed above, the FTC cannot show that a single illegal merger occurred due to "information deficiencies" in the old Form.  *See supra* Section III.B.1.

The FTC also argues that the proposed alternatives are "extremely costly" compared to the Final Rule.  The FTC points to a 2014 report by the American Bar Association estimating that Second Requests cost recipients an average of $4.3 million and 7.9 additional months to conclude the premerger approval process.  *Id.* at 89,247.  But the agency fails to explain why imposing these costs on a small subset of filers is a more "costly" alternative than tripling the costs of every HSR-reportable transaction for all filers.   Nor does it explain why voluntary disclosures *before* a Second Request would also be unacceptable.

The Court thus concludes that the FTC's rejection of the alternatives was based on improper reasoning and that the agency failed to consider an "important aspect of the problem."  *State Farm*, 463 U.S. at 43; *see also Canadian Ass'n of Petroleum Producers*, 254 F.3d at 222 (finding that agency acted in an arbitrary and capricious manner when its reasoning for rejecting an alternative was "not wholly accurate" math); *Pillai*, 485 F.2d at 1027 (finding that agency's rejection of

alternatives was arbitrary and capricious when the agency's reasoning relied on "unsupported conclusions" and "sheer faith in the [agency's] 'expertise.'").

* * *

The FTC's failure to apply reasoned decision-making provides a second and independent basis to hold unlawful and set aside the Final Rule under the APA. 5 U.S.C. § 706(2)(A).

**V.**

Having determined that the Rule violates the APA, the Court considers the proper remedy. Plaintiffs ask for "universal vacatur" of the Rule. Docket No. 44 at 30; Docket No. 62 at 25. The FTC states that the Rule is "ill-suited for universal relief" because "hundreds of parties have already sought premerger review . . . using the new form." Docket No. 57 at 39. Additionally, the FTC asks that any vacatur be limited to "members of the plaintiff associations who have demonstrated that they have standing." *Id.* at 38.

"Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374-75 (5th Cir. 2022). And vacatur under the APA is "not party-restricted." *Career Colls. and Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024). "'When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Id.* (quoting *Harmon v. Thornburgh*, 978 F.2d 484, 495 n.21 (D.C. Cir. 1989). As such, the Fifth Circuit has repeatedly rejected government efforts to limit

32

relief to the parties and has upheld universal vacatur as the appropriate remedy in APA cases. *See, e.g., id.*; *Career Colls. and Schs. of Tex*, 98 F.4th at 255; *Tex. Med. Ass'n v. U.S. Dep't of Health and Hum. Servs.*, 110 F.4th 762, 779–80 (5th Cir. 2024).

Though vacatur is the "default rule," *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc), courts may deviate based on two equitable interest factors: "(1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *Texas v. Biden*, 20 F.4th 928, 1000 (5th Cir. 2021), *rev'd on other grounds*, 597 U.S. 785 (2022) (quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)). Considering these factors here, the Court concludes that the appropriate remedy is vacatur.

First, the seriousness of the Final Rule's deficiencies makes it unlikely that the FTC can justify its decision on remand. In fact, the FTC has said nothing to suggest otherwise, noting instead that it would be an "insanely lofty and impossible standard" to require the agency to identify problematic transactions that the prior Form failed to detect. Docket No. 57 at 30. Without an "explanation as to how [the FTC] could correct the Final Rule's conflicts with the statute on remand," this factor thus weighs against the FTC. *Tex. Med. Ass'n*, 110 F.4th at 779 (citation modified).

Second, the Court finds that vacatur would not be unduly disruptive. The FTC argues that the Final Rule is already in effect and that merging parties would be forced to "scrap the time and money spent on preparing the new form and pivot[] to the old form, which included requirements that are not part of the new form." Docket

No. 57 at 39.  But the existence of some costs to some parties is not unduly disruptive. *See Texas*, 20 F.4th at 1000.  Vacatur here would not be unduly disruptive, moreover, because the old Form—used for forty-six years—certainly "provide[s] a sufficient framework" for mergers to be processed.  *Tex. Med. Ass'n v. U.S. Dep't of Health and Hum. Servs.*, 587 F.Supp.3d 528, 549 (E.D. Tex. 2022).

With no reason to depart from the default rule, the Court finds that vacatur of the Rule and remand is the proper remedy.

## VI.

In sum, the Court holds that (1) Plaintiffs have standing to challenge the FTC's Final Rule, (2) the Rule conflicts with the unambiguous terms of the Act, (3) the Rule is the product of arbitrary and capricious decision-making, and (4) vacatur and remand is the proper remedy.

Accordingly, the Court **GRANTS** Plaintiffs' motion for summary judgment (Docket No. 44), **DENIES** the FTC's cross-motion for summary judgment (Docket No. 57), and **ORDERS** that the Rule be vacated.  The Court further **DENIES AS MOOT** the FTC's motions to dismiss (Docket Nos. 23, 30) and motion to stay (Docket No. 53).

Finally, the Court **STAYS** the applicability of this order for seven days to allow the FTC time to seek emergency relief from the United States Court of Appeals for the Fifth Circuit.

So **ORDERED** and **SIGNED** this **12th** day of **February, 2026.**

JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE

34

# Exhibit B
# (Amended Complaint, pp. 44-50, Dkt. 27)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA,
BUSINESS ROUNDTABLE,
AMERICAN INVESTMENT COUNCIL,
and LONGVIEW CHAMBER OF
COMMERCE,

          *Plaintiffs*,

v.

FEDERAL TRADE COMMISSION and
ANDREW N. FERGUSON, in his official
capacity,

          *Defendants*.

Case No. 6:25-cv-00009-JDK

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

to just under half of all reported transactions—or at least 1,000 per year at current levels of M&A activity.

### 2.    The New Requirements

99.    Depending on how one counts, the FTC retained with some modification at least 20 of the 34 additions to the premerger notification form the agency had originally proposed. *See* 89 Fed. Reg. at 89,264. The Final Rule also kept many of the most burdensome additions with minimal, if any, modifications.

100. *Transaction Rationale.* The Final Rule retained without any change the requirement that filers submit a narrative response "describ[ing] all strategic rationales for the transaction." 89 Fed. Reg. at 89,299. That requirement also mandates that filers "identify which documents submitted with the HSR Filing support the rationale(s) described in the narrative." *Id.* The Final Rule states that "if documents provide inconsistent rationales, filers should address these inconsistencies." *Id.*

101. *Ordinary Course Documents (Periodic Plans and Reports).* The Final Rule retained with a very small change the NPRM's creation of a new category of "plans and reports" generated by the filer's business but not "created specifically for analyzing the filed-for transaction." 89 Fed. Reg. at 89,303. Thus, all filers must submit, going back one year, "all regularly prepared plans and reports that were provided" to the CEO or board of directors of the filer (or the CEO or board of any entity the filer controls or is controlled by), if those documents "analyze market shares, competition, competitors, or markets pertaining to any product or service" that the other party "also produced, sold," or is "known to be" developing. *Id.* at 89,371, 89,386.

102.    The FTC made one tweak to this requirement as compared to the NPRM: it "dropp[ed] the need to collect and produce documents from any person who reports directly to the relevant CEO."  89 Fed. Reg. at 89,304.  That way, the Final Rule explained, only the CEO and entire board of directors of each party to the transaction—as well as the CEO and directors of all entities that control or are controlled by each party— will need to be "custodians" when the parties to the transaction use "forensic document technology" to comply with this requirement.  *Id.*  The FTC stated that it considered that "reduced" burden more "manageable."  *Id.*

103.    *Drafts of Transaction-Related Documents*.    Although the Final Rule purported to remove the NPRM's requirement that filers provide all draft versions of transaction-related documents, the Rule effectively took back much of that concession.  It "clarifies that any" transaction-related document that "was shared with any member of the board of directors (or similar body)" "should not be considered a draft" but rather "a final version," and therefore should be "submitted with the HSR Filing."  89 Fed. Reg. at 89,303.  Thus, filers must provide all earlier draft versions of any covered document shared with any board member or member of a "similar body," even if the actual final version is already being included in the HSR filing.

104.    "Transaction-Related Documents" include:

- any "studies, surveys, analyses, and reports" prepared "for the purpose of evaluating or analyzing the acquisition with respect to market shares, competition, competitors, markets, potential for sales growth, or expansion," prepared by or for any officer, director, or "supervisory deal team lead";

- similar documents prepared by "third party advisors" going back one year;

- "confidential information memoranda prepared by or for any officer(s) or director(s)" of the buyer "that specifically relate to the sale of the target," or, if no such document exists, "any document(s) given to any officer(s) or director(s) . . . meant to serve th[at] function"; and

- all "studies, surveys, analyses, and reports evaluating or analyzing synergies, and/or efficiencies prepared by or for any officer(s) or director(s) . . . for the purpose of evaluating or analyzing the acquisition."

89 Fed. Reg. at 89,370-89,371, 89,386-89,387.

105.   Although the Final Rule did not expand the required Transaction-Related Documents, its redefinition of the concept of a "draft" significantly expanded the volume of such documents that must be provided with the premerger form.  It also massively increased the burden for all filers of finding, compiling, reviewing, and ultimately submitting those documents as part of preparing the HSR submission.

106.   *D/B/A Names and Minority Interest Holders*.  The Final Rule adopted the proposal to require additional information about related entities and minority holders with some modifications.  The Rule retained the requirement to provide "doing business as" names for all entities within both filers with assets over $10 million, but eliminated the requirement to also provide such names going back three years.  89 Fed. Reg. at 89,292. The Rule also mandates disclosure of holders of over 5% of any entity controlled by, or that controls, the filer, if that entity overlaps with the other party—including, if applicable, limited partners in a limited partnership.  *Id.* at 89,288.  The Rule did modify that limited-partner obligation so that it applies only to limited partners with the right to serve as, nominate, appoint, veto, or approve board members or their equivalent.  *Id.* at 89,384.  Nevertheless, the Final Rule is still a major expansion over the prior form, which

always required limited partnerships to disclose at most their general partners.  *Id.* at 89,288.

107.    The Final Rule recognized that these changes to the form would be particularly burdensome for private equity funds and other similar investment vehicles, as well as large conglomerates, but concluded that the FTC "need[s] to know about" any investor who either "holds a small but significant stake (five percent or more) or plays a role" in the filer's decisionmaking.  89 Fed. Reg. at 89,267.

108.    *Overlap Description.*  The Final Rule also retained with minor changes the new requirement that filers list and describe "each of the current or known planned products or services . . . that competes with (or could compete with) a current or known planned product or service of" the other party.  89 Fed. Reg. at 89,371, 89,387.  In transactions involving large companies, the Overlap Description might "identif[y] hundreds of products or services."  *Id.* at 89,311.  For *each* "product or service listed," the filer must then provide:

- the "sales (in dollars) for the most recent year" or, if pre-revenue, projections;

- a "description of all categories of customers of the [filer] that purchase or use the product or service (e.g., retailer, distributor, broker, government, military, educational, national account, local account, commercial, residential, or institutional)," or detailed information on the product or service's development stage;

- the "top 10 customers in the most recent year (as measured in dollars)"; and

- the "top 10 customers for each customer category identified."

*Id.* at 89,371-89,372, 89,387.

109.    The Final Rule claimed to have "made significant modifications to the Overlap Description to reduce the cost to filers," 89 Fed. Reg. at 89,315, but that again overstates things.  The FTC touted the fact that, compared to the NPRM, the Final Rule limits reporting from "the two most recent fiscal years" to "the most recent fiscal year," allows sales information to be reported in "only dollars" rather than "in units," and "eliminate[s] the requirement[s]" to "provide individual contact information for customers," "describe licensing agreements and non-compete or non-solicitation agreements," and "provide an estimate of how much of the product or service each customer category purchased or used monthly for the last fiscal year."  *Id.*  Even with those modest changes, the Overlap Description will be very burdensome for filers.

110.    *Supply Relationships Description.*    The Final Rule also kept the new mandate that "each filing person . . . provide information about existing or potential purchase or supply relationships between the filing persons."  89 Fed. Reg. at 89,317.  Specifically, that new category requires the filer to describe "each product, service, or asset" that the buyer has "sold, licensed, or otherwise supplied" at over $10 million in revenue in the most recent year to either (i) the other party, or (ii) any other business that uses the filer's products or services as an input to compete against the other party.  *Id.* at 89,372, 89,387.  For each such product, the filer must then provide:

- The sales (in dollars) for the most recent year, or projections if applicable;

- A description of "all categories of customers of the target that purchase or use the product or service," or detailed information on the product or service's development stage;

- the "top 10 customers in the most recent year (as measured in dollars)"; and

- the "top 10 customers for each customer category identified."

*Id.* at 89,372, 89,387.

111.    The filer must also provide what is essentially the flip side of the coin, if applicable:  a description of all products, services, or assets that the filer uses as an input in its own business and has purchased from either (i) the other party, or (ii) any other business that competes with the other party as a supplier of the relevant input.  89 Fed. Reg. 89,372, 89,388.  And then again, for each such product, regardless of whether either party has any appreciable market position, the filer must provide:

- "The purchased amount (in dollars)"; and
- The top 10 suppliers for the relevant product, service, or asset, "and a description of" the terms on which the filer obtains that input.

*Id.* at 89,372, 89,388.

112.    The Final Rule made similar marginal modifications to the NPRM's version of the Supply Relationships Description as it had made to the Overlap Description— eliminating the requirement to provide contact information of customers or suppliers, reducing the relevant period from two years to one year, and requiring reporting "only in dollars, not also in units."  89 Fed. Reg. at 89,319.  The Final Rule also added the $10 million threshold.  *Id.*

113.    *Officers and Directors*.  The Final Rule retained the requirement to identify certain officers and directors, with a few modifications.  Unlike the NPRM, the Final Rule does not mandate any disclosure of board observers.  89 Fed. Reg. at 89,294.  And unlike the NPRM, the Rule requires only the buyer—not the seller—to identify certain officers and directors.  *Id.*  Still, the Final Rule requires the buyer to identify all officers or

directors of both the buyer itself and its subsidiaries who hold a similar role at (i) the seller company; (ii) any of the seller's subsidiaries; or (iii) any other entities "that are in the same industry as the [seller]." *Id.* The buyer must also identify any officers and directors in the same industry as the seller who also serve in similar roles at related "entities within" the buyer. *Id.* Any time the buyer identifies an officer or director who must be reported, the buyer must also name the other entity involved.

114.    It appears to be up to the buyer to seek out and disclose the officers and directors covered by the Final Rule, regardless of whether that information is readily available to the buyer. 89 Fed. Reg. at 89,294; *see id.* at 89,297 ("[T]he acquiring person must determine whether" its own pertinent officers and directors "also serve as an officer or director . . . of another entity that derives revenue in the same NAICS codes as the target.").

### 3.    Responses to Comments

115.    The Final Rule discussed the FTC's purported justifications for the many new additions to the HSR premerger notification form. Where relevant, those justifications are discussed below. The Final Rule also offered several responses to the many negative comments the FTC had received during the rulemaking process.

116.    First, the Rule noted that the FTC "disagrees that avoiding potential cost or delay to those involved in dealmaking is the primary focus of the HSR Act." 89 Fed. Reg. at 89,238. Instead, according to the FTC, Congress's "overarching" goal was "promoting vigorous and effective enforcement of the antitrust laws." *Id.*

# Exhibit C
# (Declaration of Sean
# Heather, Dkt. 44-1)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

CHAMBER OF COMMERCE OF THE UNITED
STATES OF AMERICA, BUSINESS
ROUNDTABLE,
AMERICAN INVESTMENT COUNCIL, and
LONGVIEW CHAMBER OF COMMERCE,

                *Plaintiffs*,

v.

FEDERAL TRADE COMMISSION and
ANDREW N. FERGUSON, in his official
capacity,

                *Defendants*.

Case No. 6:25-cv-00009-JDK

**DECLARATION OF SEAN HEATHER, SENIOR VICE PRESIDENT, INTERNATIONAL
REGULATORY AFFAIRS & ANTITRUST,
U.S. CHAMBER OF COMMERCE**

Pursuant to 28 U.S.C. § 1746, I, Sean Heather, hereby declare as follows:

1.      I am Senior Vice President for International Regulatory Affairs and Antitrust at the U.S. Chamber of Commerce.  In that capacity, among other things, I oversee the U.S. Chamber's antitrust policy on behalf of its members.  My business address is 1615 H Street, NW, Washington, DC 20062.

2.      I am over 18 years old.  This Declaration is based upon my personal knowledge and belief and/or upon my review of business records of the U.S. Chamber.  If called as a witness, I could and would testify competently thereto.

3.      The U.S. Chamber is the world's largest business federation, representing approximately 300,000 direct members and indirectly representing an underlying membership of more than three million U.S. businesses and professional organizations of every size and in every economic sector and geographic region of the country, including the Eastern District of Texas.

4.      The U.S. Chamber's mission is to advocate for policies that will help businesses create jobs and grow the national economy.  As part of advancing that mission, the U.S. Chamber seeks to ensure that the federal antitrust laws promote healthy competition without imposing unnecessary regulatory burdens that divert productive capital into compliance costs and harm American companies' ability to grow, create jobs, and innovate, including by entering into value-creating, pro-competitive mergers and acquisitions.  As economists have shown empirically, a vibrant and free market for M&A activity helps direct assets to higher valued uses and is thus vital for a healthy and dynamic economy.  By the same token, overzealous and unnecessary antitrust enforcement and regulation can create

the sorts of harms to competition and to consumers that the antitrust laws are designed to prevent.

5.      An important function of the U.S. Chamber is to represent the interests of its members and advance its view of public policy before Congress, the Executive Branch, and the courts.  The U.S. Chamber regularly challenges agency actions, including rulemakings, that in its view will interfere with those goals.  *See, e.g.*, *Chamber of Commerce* v. *EPA*, No. 24-1051 (D.C. Cir. 2024); *Ryan LLC* v. *FTC*, No. 24-10951 (5th Cir. 2024); *Chamber of Commerce* v. *SEC*, No. 23-5409 (6th Cir. 2024); *Chamber of Commerce* v. *U.S. Dep't of Labor*, No. 5:17-cv-00009 (W.D. Okla. 2024); *Chamber of Commerce* v. *EPA*, No. 3:23-cv-00007 (E.D. Ky. 2023).

6.      On November 12, 2024, the Federal Trade Commission adopted a rule that amends the premerger notification form required under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (HSR Act), 15 U.S.C. § 18a.  *Premerger Notification; Reporting and Waiting Period Requirements*, 89 Fed. Reg. at 89,216 (Nov. 12, 2024). The Rule massively expands the amount of documentary material and information that must be included in the initial premerger notification form for all HSR-reportable transactions.  Even under the agency's conservative estimate, the Rule's changes to the notification form will more than quadruple the average time and expense of preparing an HSR filing.

7.      As Senior Vice President for International Regulatory Affairs and Antitrust at the U.S. Chamber, I have worked with many U.S. Chamber members to understand how the new HSR Form will affect our members.  Unsurprisingly, the U.S. Chamber has many members that regularly enter into merger, acquisition, or other transactions that meet or exceed the size thresholds for filing a premerger notification form under the HSR Act and thus will be subject to the requirements of the Rule, including members for which frequent

M&A activity is a regular and consistent feature of their business model.  Consistent with their past levels of deal activity, members of the U.S. Chamber plan to engage in HSR-reportable transactions in the forthcoming months.  Indeed, U.S. Chamber members have already engaged in HSR-reportable transactions this year that were subject to the Rule's requirements.  These members have been or will be subject to the requirements of the Rule, and thus have incurred or will incur the substantially increased burden and expense necessary to complete the revised HSR notification form.

8.     Information about our members' HSR-reportable activity is highly sensitive.  Public disclosure of members' near- and medium-term plans to engage in HSR-reportable activity could have a significant impact on the members' businesses, on potential transactions they are considering, and in some cases on public securities markets.  Moreover, our members deal frequently with federal regulators, including the FTC in the context of HSR review, and are concerned that being identified in this suit could result in greater regulatory scrutiny.  Accordingly, our members have asked me not to reveal their identities and to avoid providing unnecessary details that could be used to identify them.  Nevertheless, certain members have authorized disclosure of the following information to demonstrate that they will enter into HSR-reportable transactions and thus be harmed by the Rule.

9.     Member A is a healthcare company with over 2,300 employees in Texas.  Member A regularly engages in M&A transactions, including HSR-reportable transactions, as part of its business model.  Over the past 10 years, Member A has engaged in more than 25 HSR-reportable transactions as well as other transactions below the HSR reporting threshold.  Consistent with its business model and historic level of activity, Member A plans to continue to engage in HSR-reportable transactions in the foreseeable future.

10.     Member B is a transportation company with over 10,000 employees in Texas. Member B has engaged in several HSR-reportable transactions, as part of its business model, over the last 10 years. Consistent with its business model and historic level of activity, Member B plans to continue to engage in HSR-reportable transactions in the foreseeable future.

11.     Member C is a large company with significant operations in Texas and often engages in HSR-reportable transactions. Consistent with its historic level of activity, Member C plans to continue to engage in HSR-reportable transactions in the foreseeable future.

12.     These and other U.S. Chamber members are harmed by the Rule, and that harm would be redressed by an order vacating the Rule and/or enjoining the FTC from requiring parties to HSR-reportable transactions to comply with it. The FTC's massive expansion of the information and material required in the premerger notification form, which both the buyer and seller in virtually every HSR-reportable transaction must file, will make it far more costly for U.S. Chamber members to consummate such deals. The FTC itself estimates that the average time for all filers to complete the revised premerger notification form will nearly triple, from 37 hours to complete the existing form to 105 hours to complete the new form. 89 Fed. Reg. at 89,332. For half of all reportable transactions, the FTC estimates that the time for the buyer to complete the form will increase to 158 hours, a 427% increase over the status quo. *Id*. When U.S. Chamber members enter into HSR-reportable transactions, they will experience these increased costs as a result of being subject to the Rule.

13.     On behalf of the U.S. Chamber, I filed a comment letter during the rulemaking strongly opposing the FTC's proposed revisions to the HSR Form and urging the agency to withdraw the Rule. *See* U.S. Chamber Comment (Sept. 27, 2023),

4

https://www.regulations.gov/comment/FTC-2023-0040-0684.  In that comment letter, I attached a study of the NPRM conducted by Professor S.P. Kothari of MIT, whom the Chamber engaged to analyze the NPRM.  The U.S. Chamber also conducted a survey of 70 antitrust practitioners to solicit their views of the NPRM and to better understand its costs. Incorporating the results of that survey, Professor Kothari concluded that the FTC's NPRM underestimated the *average* additional cost of the proposed rule to filing parties by a factor of seven.  In other words, the average HSR filing would be seven times more expensive for the filing parties to complete than the FTC was estimating.  And many filings would of course be far more time-consuming and expensive than the average.

14.     In the Final Rule, the FTC admitted that Professor Kothari's cost estimates were more accurate than the agency's estimates in the NPRM.  89 Fed. Reg. at 89,331.  The FTC claimed to have improved its methodology and argued that its new estimates of the cost of the Final Rule are "generally consistent with" the results of the U.S. Chamber's practitioner survey and the Kothari Report.  *Id.* at 89,332-89,333.  Based on my conversations with U.S. Chamber members and antitrust practitioners, I do not agree with that statement.  The FTC may no longer be off by a factor of seven, but its cost estimates are still far too low.  In any case, even the FTC concluded that the Final Rule triples the costs of completing the HSR Form for the average transaction and quadruples it for so-called "overlap" transactions, which are half of all HSR-reported transactions.  Even those (understated) impacts remain massive increases in direct compliance costs that are attributable to the Rule.

15.     Beyond these direct compliance costs, the Rule inflicts significant indirect costs on U.S. Chamber members who enter into, or are even considering entering into, HSR-reportable transactions.  For example, the need to collect, review, analyze, and prepare the

additional information required by the Rule will significantly extend and delay deal timelines. Such delays may hamper the transacting parties' ability to obtain financing, increase the risk that news of a non-public deal will leak, and generally impede if not prevent consummation of the transaction. The Rule also imposes a significant opportunity cost to businesses, which must divert valuable director, officer, and employee time to preparing the premerger notification form instead of running the company. The Rule will therefore likely deprive certain U.S. Chamber members of the additional resources, talent, efficiencies, and economies of scale that are gained through productive M&A activity. As a result, the Rule will also limit the ability of certain U.S. Chamber members to bring new and better products to more consumers and more markets.

16.     In light of the above harmful effects of the Rule, and based on consultation with the members of the U.S. Chamber, the Chamber directly advances its mission and the interests of its members by bringing this lawsuit to challenge the Rule.

I declare under penalty of perjury that the foregoing is true and correct to the best of

my knowledge.

Executed on July 30, 2025, at 1615 H Street, NW, Washington, DC 20062.

_____

Sean Heather

Exhibit D
(Declaration of Elizabeth
Dougherty, Dkt. 44-2)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

|  |  |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, BUSINESS ROUNDTABLE, AMERICAN INVESTMENT COUNCIL, and LONGVIEW CHAMBER OF COMMERCE, <br><br> *Plaintiffs*, <br><br> v. <br><br> FEDERAL TRADE COMMISSION and ANDREW N. FERGUSON, in his official capacity, <br><br> *Defendants*. | Case No. 6:25-cv-00009-JDK |

**DECLARATION OF ELIZABETH DOUGHERTY,
GENERAL COUNSEL AND CORPORATE SECRETARY,
BUSINESS ROUNDTABLE**

Pursuant to 28 U.S.C. § 1746, I, Elizabeth Dougherty, hereby declare as follows:

1.     I am the General Counsel and Corporate Secretary at Business Roundtable. Business Roundtable is a non-profit association comprised of more than 200 chief executive officers (CEOs) of America's leading companies, representing every sector of the U.S. economy.  Business Roundtable is headquartered in Washington D.C.

2.     I am over 18 years old.  This Declaration is based upon my personal knowledge and belief and/or upon my review of business records of Business Roundtable.  If called as a witness, I could and would testify competently thereto.

3.     Since 1972, Business Roundtable has worked to promote a thriving U.S. economy that creates economic opportunity for all Americans.  Business Roundtable's members work closely with policymakers to advance sound economic policies, including policies related to federal antitrust law.  To support that work, Business Roundtable engages in public advocacy and litigation on legal and policy issues relating to competition.  One area of Business Roundtable's focus has been the Federal Trade Commission's proposed and now final rule massively expanding the amount of documentary material and information that must be included in the initial premerger notification form for all HSR-reportable transactions.  Even under the agency's conservative estimate, the Rule's changes to the notification form will more than quadruple the average time and expense of preparing an HSR filing.  Business Roundtable filed a comment letter during the rulemaking stage opposing the rule and urging the agency to withdraw it.  Business Roundtable Comment (Sept. 27, 2023), https://www.regulations.gov/comment/FTC-2023-0040-0718.

4.     Many Business Roundtable members are CEOs of companies that regularly enter into merger, acquisition, or other transactions that meet or exceed the size thresholds

for filing a premerger notification form under the HSR Act and thus will be subject to the requirements of the Rule, including members for which frequent M&A activity is a regular and consistent feature of their business model. Consistent with their past levels of deal activity, member companies of Business Roundtable plan to engage in HSR-reportable transactions in the forthcoming months. Indeed, Business Roundtable members' companies have already engaged in HSR-reportable transactions this year that were subject to the Rule's requirements. These members have been or will be subject to the requirements of the Rule, and thus have incurred or will incur the substantially increased burden and expense necessary to complete the revised HSR notification form.

5.      Information about our members' HSR-reportable activity is highly sensitive. Public disclosure of members' near- and medium-term plans to engage in HSR-reportable activity could have a significant impact on the members' businesses, on potential transactions they are considering, and in some cases on public securities markets. Moreover, many of our members deal frequently with federal regulators, including the FTC in the context of HSR review, and are concerned that being identified in this suit could result in additional and unwarranted regulatory scrutiny. Accordingly, our members have asked me not to reveal their identities and to avoid providing unnecessary details that could be used to identify them, which I understand is not required under applicable law. Nevertheless, certain members have authorized disclosure of the following information to demonstrate that they will enter into HSR-reportable transactions and thus be harmed by the Rule.

6.      Member A is a healthcare company that regularly engages in M&A transactions, including HSR-reportable transactions, as part of its business model. Since 2015, Member A has engaged in more than 25 HSR-reportable transactions. Consistent with

its business model and historic level of activity, Member A plans to continue to engage in HSR-reportable transactions in the foreseeable future.

7.     Member B is a transportation company with over 10,000 employees in Texas.  Member B has engaged in several HSR-reportable transactions, as part of its business model, over the last 10 years. Consistent with its business model and historic level of activity, Member B plans to continue to engage in HSR-reportable transactions in the foreseeable future.

8.     Member C is a company in the financial sector that regularly engages in M&A activity as part of its business model and plans to engage in at least one HSR-reportable transaction in the foreseeable future.  Member C is therefore directly regulated and harmed by the Rule.  In addition, Member C regularly provides lending and other services in connection with HSR-reportable transactions and plans to continue to do so.  Because the Rule dramatically increases the costs associated with HSR-reportable transactions, Member C expects that the Rule will affect its business by deterring M&A activity that would otherwise have taken place, affecting the market for Member C's services and causing transactions for which Member C could have provided those services not to be consummated.

9.     These and other Business Roundtable members are harmed by the Rule, and that harm would be redressed by an order vacating the Rule and/or enjoining the FTC from requiring parties to HSR-reportable transactions to comply with it.  The FTC's massive expansion of the information and material required in the premerger notification form, which both the buyer and seller in virtually every HSR-reportable transaction must file, will make it far more costly for Business Roundtable members' companies to consummate such

deals.  The FTC itself estimates that the average time for all filers to complete the revised premerger notification form will nearly triple, from 37 hours to complete the existing form to 105 hours to complete the new form. 89 Fed. Reg. at 89,332.  For half of all reportable transactions, the FTC estimates that the time for the buyer to complete the form will increase to 158 hours, a 427% increase over the status quo.  *Id.*  When Business Roundtable members' companies enter into HSR-reportable transactions, they will experience these increased costs as a result of being subject to the Rule.

10.      Beyond these direct compliance costs, the Rule inflicts significant indirect costs on Business Roundtable members who enter into, or are even considering entering into, HSR-reportable transactions.  For example, the need to collect, review, analyze, and prepare the additional information required by the Rule will significantly extend and delay deal timelines.  Such delays may hamper the transacting parties' ability to obtain financing, increase the risk that news of a non-public deal will leak, and generally impede if not prevent consummation of the transaction.  By imposing all of these new direct and indirect costs, the Rule is likely to prevent consummation of at least some HSR-reportable transactions that Business Roundtable members' companies would otherwise have entered.

11.      In light of the above effects of the Rule, and based on consultation with the members of Business Roundtable, Business Roundtable directly advances its mission and the interests of our members by bringing this lawsuit to challenge the Rule.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on July 28, 2025, in Washington, D.C.

Elizabeth Dougherty

Elizabeth Dougherty

# Exhibit E (Declaration of Rebekah Goshorn Jurata, Dkt. 44-3)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA,
BUSINESS ROUNDTABLE,
AMERICAN INVESTMENT COUNCIL,
and LONGVIEW CHAMBER OF
COMMERCE,

                            *Plaintiffs*,

v.

FEDERAL TRADE COMMISSION and
ANDREW N. FERGUSON, in his official
capacity,

                            *Defendants*.

Case No. 6:25-cv-00009-JDK

DECLARATION OF REBEKAH GOSHORN JURATA,
GENERAL COUNSEL FOR PLAINTIFF
AMERICAN INVESTMENT COUNCIL

Pursuant to 28 U.S.C. § 1746, I, *R. G. Jurata*, hereby declare as follows:

1.      I am the General Counsel of the American Investment Council (AIC).  My business address is 815 Connecticut Ave NW Suite 620, Washington, DC 20006.

2.      I am over 18 years old.  This Declaration is based upon my personal knowledge and belief and/or upon my review of business records of AIC.  If called as a witness, I could and would testify competently thereto.

3.      AIC is a 501(c)(6) nonprofit association of private equity and private credit firms.  AIC is the premier trade association for the private investment industry.  AIC's mission is to develop and provide information about the private investment industry and its contribution to the long-term growth of the U.S. economy and retirement security of American workers.  As part of its mission, AIC advocates on behalf of its members and the overall private investment industry before Congress, the Executive Branch, and the courts, to ensure the best possible regulatory environment for the industry to continue successfully investing in and across America.

4.      Private equity firms invest capital in companies that are perceived to have growth potential and then work with those companies to expand or grow the business.  The capital is contributed by large institutional investors and organized into funds.  The fund managers will typically use the capital in those funds to buy companies, work with them for a period of three to seven years to improve their operations and profitability, and then take the companies public or sell them at a higher valuation, returning the profits to investors.  Because buying and selling companies is inherent in the private equity model, private equity firms are frequent participants in merger-and-acquisition (M&A) transactions.

5.      Many of the country's leading private equity firms are members of AIC.  Our members have offices and portfolio companies in every state in America.  In Texas alone, there are hundreds of private equity firms and over 1,000 private equity-backed companies, including companies operating in the Eastern District of Texas.

6.      Investment from AIC's member firms fuels thousands of small businesses that are the lifeblood of local communities.  In 2024, 85% of all private equity investments went to small businesses with fewer than 500 employees.  That capital, financing, and expertise helps companies of all shapes and sizes develop new and better goods and service, increase productivity, hire new employees, improve their operations, and ultimately, compete more effectively with entrenched incumbents.  And the returns flow to the 34 million public sector workers and retirees whose pensions are invested in private equity vehicles.

7.      On November 12, 2024, the Federal Trade Commission adopted a rule that amends the premerger notification form required under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (HSR Act), 15 U.S.C. § 18a.  *Premerger Notification; Reporting and Waiting Period Requirements*, 89 Fed. Reg. at 89,216 (Nov. 12, 2024). The Rule massively expands the amount of documentary material and information that must be included in the initial premerger notification form for all HSR-reportable M&A transactions.  Even under the agency's conservative estimate, the Rule's changes to the notification form will more than quadruple the average time and expense of preparing an HSR filing.

Case: 26-40094    Document: 23    Page: 98    Date Filed: 02/23/2026

8.      The Rule will have a direct and acute impact on AIC's membership.  As noted above, M&A is a necessary component and consistent feature of the private equity business model.  Such transactions are the way that private equity firms generally provide capital and financing to their portfolio companies, and are a common mechanism by which firms exit successful investments to realize returns for their investors.  According to public data, from 2011 to 2024, there were over 83,000 acquisitions involving private equity firms.  Over 24,000 of those were deals valued at over $100 million and thus above the applicable HSR reporting threshold, which is adjusted every year for inflation and crossed the $100 million threshold only in 2022.  In the most recent year, 2024, there were over 8,000 acquisitions involving private equity firms and over 1,500 private equity exits.  Over 2,300 acquisitions were valued at over $100 million; the HSR reporting threshold was $119.5 million.

9.      Consistent with these figures and given their business models, virtually all of AIC's private equity firm members regularly enter into merger, acquisition, or other transactions that meet or exceed the size thresholds for filing a premerger notification form under the HSR Act.  Thus, virtually all of AIC's private equity firm members routinely file the HSR premerger notification form.  Indeed, many of AIC's members have already engaged in HSR-reportable transactions this year that were subject to the Rule's requirements.  AIC's members are thus subject to the requirements of the Rule, and have consequently incurred or will incur the substantially increased burden and expense necessary to complete the revised HSR notification form.

10.      Indeed, it is entirely unsurprising that the Rule so substantially impacts AIC's membership because the Rule expressly targets the private equity industry.  In the

3

Case: 26-40094     Document: 23     Page: 99     Date Filed: 02/23/2026

Rule, the FTC claims that one of the major reasons for its complete redesign of the HSR Form is the fact that "[p]rivate equity has accounted for an increasing share of all merger activity over time," leading to a "recent estimate[]" that "private equity deal-making [now] account[s] for 40% or more of domestic M&A activity."  89 Fed. Reg. at 89223 & n.48.  The Rule also points to "private equity buyers" to justify the HSR Form's new focus on serial acquisitions, 89 Fed. Reg. at 89,234, its new requirement that filers must provide additional information about minority interest holders and related entities, 89 Fed. Reg. at 89,288, and other requirements.  In fact, the phrase "private equity" appears in the Rule no fewer than 44 separate times.  Again, the Rule's consistent focus on the private-investment industry make sense, since few if any sectors of the economy are more directly and concretely affected by a regulation that drastically increases the costs associated with M&A activity.

11.     Information about our members' HSR-reportable activity is highly sensitive. Public disclosure of members' near- and medium-term plans to engage in HSR-reportable activity could have a significant impact on the members' businesses, on potential transactions they are considering, and in some cases on public securities markets. Moreover, our members deal frequently with federal regulators, including the FTC in the context of HSR review, and are concerned that being identified in this suit could result in additional and unwarranted regulatory scrutiny.  Accordingly, our members have asked me not to reveal their identities and to avoid providing unnecessary details that could be used to identify them, which I understand is not required under applicable law.

12.     Nevertheless, one member has authorized disclosure of the following information to demonstrate that they will enter into HSR-reportable transactions and thus

4

be harmed by the Rule, as a representative example. Member A is a firm that engages in regular M&A activity as part of its business model. Since 2020, Member A has engaged in over 15 HSR-reportable transactions. Going forward, Member A plans to continue to engage in a similar level of HSR-reportable activity and expects to enter into several HSR-reportable transactions in the next 12 months.

13. Given the nature of their business, virtually all of AIC's private equity members could demonstrate that the Rule harms them in the same or similar ways as Member A. That harm would be redressed by an order vacating the Rule and/or enjoining the FTC from requiring parties to HSR-reportable transactions to comply with it. The FTC's massive expansion of the information and material required in the premerger notification form, which both the buyer and seller in virtually every HSR-reportable transaction must file, will make it far more costly for AIC members to consummate such deals. The FTC itself estimates that the average time for all filers to complete the revised premerger notification form will nearly triple, from 37 hours to complete the existing form to 105 hours to complete the new form. 89 Fed. Reg. at 89,332. For half of all reportable transactions, the FTC estimates that the time for the buyer to complete the form will increase to 158 hours, a 427% increase over the status quo. *Id.* When AIC members enter into HSR-reportable transactions, they will experience these increased costs as a result of being subject to the Rule.

14. Beyond these direct compliance costs, the Rule inflicts significant indirect costs on AIC members who enter into, or are even considering entering into, HSR-reportable transactions. For example, the need to collect, review, analyze, and prepare the

additional information required by the Rule will significantly extend and delay deal timelines. Such delays may hamper the transacting parties' ability to obtain financing, increase the risk that news of a non-public deal will leak, and generally impede if not prevent consummation of the transaction. By imposing all of these new direct and indirect costs, the Rule is likely to prevent consummation of at least some HSR-reportable transactions that AIC members would otherwise have entered.

15.   In light of the above effects of the Rule, and based on consultation with the members of AIC, AIC directly advances its mission and the interests of our members by bringing this lawsuit to challenge the Rule. Indeed, AIC filed a comment letter strongly opposing the FTC's proposed revisions to the HSR Form during the rulemaking and urged the agency to withdraw the Rule. *See* AIC Comment (Sept. 27, 2023), https://www.regulations.gov/comment/FTC-2023-0040-0705.

6

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on July 30, 2025, at 815 Connecticut Ave NW Suite 620, Washington, DC 20006.

Rebekah Goshorn Jurata

# Exhibit F (Declaration of Kelly Hall, Dkt. 44-4)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

CHAMBER OF COMMERCE OF THE UNITED
STATES OF AMERICA, BUSINESS
ROUNDTABLE,
AMERICAN INVESTMENT COUNCIL, and
LONGVIEW CHAMBER OF COMMERCE,

<em>Plaintiffs</em>,

v.

FEDERAL TRADE COMMISSION and
ANDREW N. FERGUSON, in his official
capacity,

<em>Defendants</em>.

Case No. 6:25-cv-00009-JDK

## DECLARATION OF KELLY HALL, PRESIDENT AND CEO OF
## PLAINTIFF LONGVIEW CHAMBER OF COMMERCE

Pursuant to 28 U.S.C. § 1746, I, Kelly Hall, hereby declare as follows:

1.      I am the President and CEO of the Longview Chamber of Commerce.  In that capacity, I oversee all of the Longview Chamber's operations.  My business address is 410 N Center Street, Longview, TX 75601.

2.      I am over 18 years old.  This Declaration is based upon my personal knowledge and belief and/or upon my review of business records of the Longview Chamber.  If called as a witness, I could and would testify competently thereto.

3.      The Longview Chamber of Commerce represents over 1,000 businesses and professional organizations.   We routinely advocate in federal courts on matters of competition, free markets, and antitrust enforcement, including filing lawsuits challenging anti-business laws and regulatory actions.  The Longview Chamber's mission is to advocate for policies that promote economic development and job creation both in the Longview Trade Area, which includes Gregg County and 11 surrounding counties, and in the interconnected economic region, which includes the Dallas, Houston, and Shreveport metropolitan areas.  To further its mission and the interests of its members, the Longview Chamber regularly files litigation challenging harmful and misguided federal regulations. *See, e.g.*, *Ryan LLC* v. *FTC*, No. 24-10951 (5th Cir. 2024); *Minnesota Telecom Alliance* v. *FCC*, No. 24-1179 (8th Cir. 2024); *Longview Chamber of Commerce* v. *CFPB*, No. 24-915 (D.D.C. 2024); *Longview Chamber of Commerce* v. *OSHA*, No. 24-271 (E.D. Tex. 2024); *Longview Chamber of Commerce* v. *NLRB*, No. 24-40331 (E.D. Tex. 2024).

4.      On November 12, 2024, the Federal Trade Commission adopted a rule that amends the premerger notification form required under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (HSR Act), 15 U.S.C. § 18a.  *Premerger Notification; Reporting and*

*Waiting Period Requirements*, 89 Fed. Reg. at 89,216 (Nov. 12, 2024).  The Final Rule massively expands the amount of documentary material and information that must be included in the initial premerger notification form for all HSR-reportable transactions.  Even under the agency's conservative estimate, the Rule's changes to the notification form will more than quadruple the average time and expense of preparing many HSR filings.

5.     The Longview Chamber has members that regularly enter into merger, acquisition, or other transactions that meet or exceed the size thresholds for filing a premerger notification form under the HSR Act, including members for which M&A activity is a regular and consistent feature of their business model.  Longview Chamber members have already engaged in HSR-reportable transactions this year.  In addition, consistent with their past levels of deal activity, members of the Longview Chamber also plan to engage in HSR-reportable transactions in the forthcoming months.  These members have been or will be subject to the requirements of the Rule, and thus have incurred or will incur the substantially increased burden and expense necessary to complete the revised HSR notification form.

6.     Information about our members' HSR-reportable activity is highly sensitive.  Public disclosure of members' near- and medium-term plans to engage in HSR-reportable activity could have a significant impact on the members' businesses, on potential transactions they are considering, and in some cases on public securities markets.  Moreover, many of our members deal frequently with federal regulators, including the FTC in the context of HSR review, and are concerned that being identified in this suit could result in additional and unwarranted regulatory scrutiny.  Accordingly, our members have asked me not to reveal their identities and to avoid providing unnecessary details that could be used

to identify them, which I understand is not required under applicable law. Nevertheless, certain members have authorized disclosure of the following information to demonstrate that they will enter into HSR-reportable transactions and thus be harmed by the Rule.

7.  Member A engages in M&A activity as part of its business model. Member A has engaged in multiple HSR-reportable transactions over the past ten years, including transactions involving companies with a presence in the Longview Trade Area and the surrounding economic region. Indeed, Member A has already engaged in at least one HSR-reportable transaction this year. Member A plans to continue to engage in a similar level of HSR-reportable activity going forward and intends to engage in at least one more HSR reportable transaction this year.

8.  Member B is a global telecom company with over 2,000 employees and 2,000,000 customers in Texas. Member B regularly engages in M&A transactions, including HSR-reportable transactions, as part of its business model. Since 2015, Member B has engaged in more than 25 HSR-reportable transactions as well as many other transactions below the HSR reporting threshold. Consistent with its business model and historic level of activity, Member B plans to continue to engage in HSR-reportable transactions in the foreseeable future.

9.  Member C is a private capital firm with an office in Dallas. Member C has at least 10 portfolio companies with a presence in Texas as well as subsidiaries of several other companies; together these companies provide over 2,400 jobs in Texas. Member C has looked at over 1,200 opportunities in Texas in the past 5 years. A number of these portfolio companies operate in the Longview Chamber's larger economic region. Member C engages in regular M&A activity as part of its business model. Since January 2020, Member C has

3

engaged in 19 HSR-reportable transactions, along with a number of other M&A transactions that did not meet the reporting threshold.  Going forward, Member C plans to continue to engage in a similar level of HSR-reportable activity and expects to enter into several HSR-reportable transactions in the next 12 months, including at least one by the end of 2025.

10.     Member D is a large company with significant operations in Texas and often engages in HSR-reportable transactions.  Consistent with its historic level of activity, Member D plans to continue to engage in HSR-reportable transactions in the foreseeable future.

11.     Member E is a company in the financial sector that has a number of business locations in Texas and provides services to companies with a presence in the Longview Trade Area and the surrounding economic region. Member E regularly engages in M&A activity as part of its business model and plans to engage in at least one HSR-reportable transaction in the foreseeable future.  Member E is therefore directly regulated and harmed by the Rule.  In addition, Member E regularly provides lending and other services in connection with HSR-reportable transactions and plans to continue to do so.  Because the Rule dramatically increases the costs associated with HSR-reportable transactions, Member E expects that the Rule will affect its business by deterring M&A activity that would otherwise have taken place, affecting the market for Member E's services and causing transactions for which Member E could have provided those services not to be consummated.

12.     Members A and E were members of the Longview Chamber prior to the filing of the original complaint in this action.  Members B, C, and D joined the Longview Chamber prior to the filing of the operative amended complaint.

4

13.     These and other Longview Chamber members are harmed by the Rule, and that harm would be redressed by an order vacating the Rule and/or enjoining the FTC from requiring parties to HSR-reportable transactions to comply with it.  The FTC's massive expansion of the information and material required in the premerger notification form, which both the buyer and seller in virtually every HSR-reportable transaction must file, will make it far more costly for Longview Chamber members to consummate such deals.  The FTC itself estimates that the average time for all filers to complete the revised premerger notification form will nearly triple, from 37 hours to complete the existing form to 105 hours to complete the new form. 89 Fed. Reg. at 89,332.  For half of all reportable transactions, the FTC estimates that the time for the buyer to complete the form will increase to 158 hours, a 427% increase over the status quo.  *Id.*  When Longview Chamber members enter into HSR-reportable transactions, they will experience these increased costs as a result of being subject to the Rule.

14.     Beyond these direct compliance costs, the Rule inflicts significant indirect costs on Longview Chamber members who enter into, or are even considering entering into, HSR-reportable transactions.  For example, the need to collect, review, analyze, and prepare the additional information required by the Rule will significantly extend and delay deal timelines.  Such delays may hamper the transacting parties' ability to obtain financing, increase the risk that news of a non-public deal will leak, and generally impede if not prevent consummation of the transaction.  The Rule also imposes a significant opportunity cost to businesses, which must divert valuable director, officer, and employee time to preparing the premerger notification form instead of running the company.  The Rule will therefore likely deprive certain Longview Chamber members of the additional resources, talent, efficiencies,

and economies of scale that are gained through productive M&A activity.  As a result, the Rule will also limit the ability of certain Longview Chamber members to bring new and better products to more consumers and more markets.

15.     The FTC's expansion of the premerger notification form will harm the communities that make up the Longview Trade Area and interconnected economic region.  Larger businesses utilize M&A to unlock efficiencies, enhance innovation, and expand operations.  Smaller companies, entrepreneurs, and early-stage investors benefit from opportunities for capital formation, liquidity, and growth, as well as the possibility of a future exit.  By facilitating the continued growth and development of all kinds of businesses, pro-competitive mergers and acquisitions benefit not only the relevant companies involved in the deal, but also their employees, their investors, their local communities, and ultimately the American consumers whom the antitrust laws are designed to protect.  The Rule will delay and prevent lawful HSR-reportable transactions, depriving the Longview Trade Area and interconnected economic region of the benefits of these pro-competitive mergers.

16.     In light of the above effects of the Rule, and based on consultation with the members of the Longview Chamber, the Longview Chamber directly advances its mission and the interests of our members by bringing this lawsuit to challenge the Rule.  As mentioned above, the Longview Chamber's mission is to promote economic development and job creation both in the Longview Trade Area and the larger, interconnected economic region.  The Longview Chamber fulfills that mission by taking action to ensure that businesses large and small are fully able to compete, grow, create jobs, and innovate through deals that do not pose competitive concern.  Such actions help our members to better serve our communities.  The Longview Chamber also directly advances the interests of its

members by taking action to decrease the direct and indirect costs imposed on our members by local, state, and federal regulations—especially where, as with the Rule, those costs are disproportionate to any regulatory benefit.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on July 29, 2025, at 410 N Center St., Longview, TX 75601.

_____

Kelly R. Hall