No. 26-40094

═══════════════════════════════════════════════

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

───────────────────────────────────────────────

CHAMBER OF COMMERCE OF THE UNITED STATES OF
AMERICA, ET AL.,
*Plaintiffs-Appellees,*

v.

FEDERAL TRADE COMMISSION, ET AL.,
*Defendants-Appellants.*

───────────────────────────────────────────────

On Appeal from the United States District Court
for the Eastern District of Texas

───────────────────────────────────────────────

## APPELLANTS' REPLY IN SUPPORT OF MOTION FOR STAY
## PENDING APPEAL

───────────────────────────────────────────────

LUCAS CROSLOW
   *General Counsel*

H. THOMAS BYRON III
   *Deputy General Counsel*

BENJAMIN F. AIKEN
   *Attorney*

Federal Trade Commission
600 Pennsylvania Ave, NW
Washington, D.C. 20580
T: (202) 326-2151
baiken@ftc.gov

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required under Fifth Circuit Rule 28.2.1 as appellants are all governmental parties.

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY ........................................................... 1

ARGUMENT ........................................................................................ 2

    I.    The Commission Is Likely to Succeed on the Merits. ............ 2

    II.   The Commission Will Suffer Irreparable Harm
        Absent a Stay. ........................................................................ 11

    III.  The Balance of Harms and Public Interest Favor a
        Stay. ........................................................................................ 13

CONCLUSION ................................................................................... 14

# INTRODUCTION AND SUMMARY

Plaintiffs' opposition identifies no case supporting their position on *any* of the legal issues supporting a stay. They cite no case holding that a party can rely on hearsay in a declaration to establish standing at summary judgment. And this Court's precedent holding that an association may allege harm to pseudonymous members does not apply at summary judgment—and plaintiffs cite no case from this Court considering the issue at that stage. On the merits. Plaintiffs cite no case requiring the Commission to identify missed mergers before it can update the outdated HSR form, nor any case that requires an agency to do anything more than consider alternatives and explain why it was not adopting them—exactly what the Commission did here. The Commission is thus very likely to succeed on the merits.

The remaining factors also favor a stay. There is no denying that the Executive Branch will be unable to enforce a duly promulgated rule absent a stay, nor that the antitrust agencies will lack critical information during their initial premerger review, including information that even plaintiffs seem to concede is appropriate. Meanwhile, plaintiffs offer no meaningful response to the uncertainty

that the vacatur will cause, and they have no convincing explanation for how the insubstantial harm to some of their members outweighs the substantial cost to the public, filers, and third parties.

This Court should stay the district court's decision pending appeal.

## ARGUMENT

### I. The Commission Is Likely to Succeed on the Merits.

**A.** The Commission is likely to succeed on the merits of its argument that plaintiffs produced no admissible evidence of their standing because they relied entirely on hearsay. *See* Mot. 15-18.

Plaintiffs themselves are not subject to the Rule. Much like in *Summers*, "[t]he regulation[] under challenge here neither requires nor forbids any action on the part of" plaintiffs. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). Plaintiffs thus must establish, with admissible evidence, that they have members subject to the Rule.[1]

---

[1] Plaintiffs are wrong that the Commission "no longer contends that the Longview Chamber's members will not be harmed by the Rule." Opp. 10. For purposes of a stay only, the Commission has focused on whether plaintiffs met their burden to demonstrate standing with admissible evidence.

Plaintiffs do not deny that they relied on hearsay to establish standing. Their position therefore cannot be reconciled with Rule 56. Mot. 17-18. Plaintiffs parrot the district court's flawed conclusion that the declarations suffice simply because the declarants incanted the magic words "personal knowledge." Opp. 12; Op. 10. But plaintiffs failed to introduce any "*evidence*" that would "support a finding that the witness has personal knowledge," Fed. R. Evid. 602 (emphasis added). The declarants never purported to have reviewed any members' documents that informed their declarations, nor do they claim that they—presidents of four nonprofit associations—were part of their private members' highly sensitive business negotiations. *See* Opp. Exhs. C-F. Nor do plaintiffs claim that their declarants were competent to testify on the matters stated in their declarations. Rule 56(c)(4) forecloses the approach the district court endorsed.

Plaintiffs try to carve out an exception to hearsay for associations, saying "[m]embership associations routinely establish their standing to bring suit on behalf of their members just the way plaintiffs did here."

Opp. 12.[2] But plaintiffs cannot cite a single case blessing this approach; instead, two cases they cite support the Commission.

In *Diamond Offshore Co. v. A&B Builders, Inc.*, this Court rejected a hearsay objection because the challenged affidavits came from an employee who "had reviewed [his employer's] records as they pertain to information contained in the affidavits." 302 F.3d 531, 544 n.13 (5th Cir. 2002), *overruled on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009) (en banc). That is exactly what plaintiffs' declarants here did *not* do.

In *DIRECTV, Inc. v. Budden*, this Court held that the declarant had "personal knowledge" because he was the Senior Director of a company and testifying about matters affecting that company. 420 F.3d 521, 530 (5th Cir. 2005). This Court explained that Rule 56 does not "require[] … a set of magic words," and the matters within the challenged affidavit pertained to the employee's "sphere of responsibility" with his company. *Id.* Here, plaintiffs are relying entirely on their unsupported incantation of "personal knowledge" to

---

[2] Plaintiffs omit that membership associations—including *these* plaintiffs—also routinely enter declarations from affected members. *See* Dkt. 57 (Exh. A) at 12 (collecting cases).

support declarations offered by the presidents of member associations who are *not* employed by the businesses about whom they offered testimony. And plaintiffs do not explain how the highly sensitive details about potential nine-figure transactions are possibly within the "sphere of responsibility" of the presidents of membership associations to which one of the transacting parties belongs.[3]

Plaintiffs offer no meaningful response to the cases the Commission cited from multiple courts of appeals that directly reject plaintiffs' position. *See* Mot. 17. Plaintiffs fault the Commission for not "cit[ing] a single case holding that associations may not submit declarations that attest to the harms of their members." Opp. 12. But there are no special rules for associations. Instead, there is a rule for declarations, and multiple courts of appeals have held that parties cannot launder the testimony of unnamed, unidentified witnesses through declarations at summary judgment. *See* Mot. 17.

Nor can plaintiffs rely on hearsay by arguing that their "unnamed members" could "testify at trial themselves." Opp. 13-14. Courts of

---

[3] Plaintiffs also cite *Council of Ins. Agents & Brokers v. Juarbe-Jimenez*, but that case did not discuss hearsay. 443 F.3d 103, 111 n.10 (1st Cir. 2006).

appeals have repeatedly rejected the use of hearsay, even when the unidentified hearsay declarant could theoretically testify at trial. *See* Mot. 17-18. And plaintiffs have no response to the Commission's observation that the rule against hearsay at summary judgment would be toothless if the mere possibility of the hearsay declarant testifying later could excuse the defect. Mot. 18. Moreover, the declarations here describe *businesses*, not people, and never assert that some unnamed person, apparently unwilling to submit a declaration, would be willing to testify at trial. *See* Opp. Exhs. C-F. And contrary to plaintiffs' assertions, Opp. 14, the Commission *has* offered reasons to doubt the reliability of the declarations, pointing out that they rely on "vague" assertions and appear designed to obscure the relevant details of any future transactions. *See* Dkt. 57 (Exh. A) at 16.

**B**. The Commission is also likely to succeed on its argument that plaintiffs lack standing because their purportedly harmed members are pseudonymous and unidentified. That approach at summary judgment is irreconcilable with the Supreme Court's holding that an association is "require[d]" to "nam[e]" the affected members." *Summers*, 555 U.S. at 498.

Plaintiffs treat the holding of *Summers* as irrelevant, suggesting that "[w]hether the specific member is identified by real name or pseudonym was not relevant to the Court's decision." Opp. 11. But the Court's actual holding cannot be ignored merely because the case could have been resolved differently. And *Summers* described another Supreme Court decision as holding that an "affidavit provided … to establish standing would be insufficient because it did not name the individuals who were harmed." *Summers*, 555 U.S. at 498 (quoting *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 235 (1990)); *see also* Mot. 20-21.

Nor can plaintiffs find refuge in *National Infusion Center v. Becerra*, 116 F.4th 488 (5th Cir. 2024). That case arose on a motion to dismiss, where the burden is lower than at summary judgment. Contrary to plaintiffs' argument, Opp. 11, that procedural posture makes all the difference, as the Second Circuit has held. *See* Mot. 20. (citing *Bldg. & Const. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 145 (2d Cir. 2006)). This Court, too, implicitly recognized that distinction by holding that naming a specific member is not necessary to "[a]lleg[e]" that the member exists. *Nat'l Infusion Ctr.*, 116 F.4th at 497 n.5. And plaintiffs ignore that three

7

other courts of appeals have held that an association must name a harmed member at summary judgment. Mot. 19-20.

**C**. The Commission is also likely to succeed on the merits because the Rule was within the Commission's statutory authority and not the result of arbitrary and capricious decisionmaking.

Plaintiffs repeat their demonstrably incorrect assertion that the FTC never "purported to determine, let alone substantiate" that the Rule's benefits justified its costs. Opp. 16. That argument is simply irreconcilable with the text of the Rule, which included a section dedicated to the "Benefits and Costs of the Final Rule," 89 FR 89,250-64, spent dozens of pages discussing the costs and benefits of each provision, *id.* at 89,270-330, and expressly concluded that the Rule's benefits outweighed its costs. *See* Dkt. 57 (Ex. A) at 18.[4] This detailed analysis refutes the district court's conclusion, which plaintiffs repeat, that the Commission relied on "conclusory," "unsubstantiated," or "vague" reasoning. Opp. at 18.

---

[4] The Rule is available at https://www.govinfo.gov/content/pkg/FR-2024-11-12/pdf/2024-25024.pdf.

Plaintiffs also cannot dispute that the Commission may enact prophylactic rules *before* society suffers the substantial harm that the Rule is designed to prevent. Mot. 22. They argue that the Commission must "adequately substantiate the existence of a genuine problem" that required the Rule. Opp. 18 (cleaned up). But the Commission did exactly that, documenting the many ways that mergers and acquisitions have changed—making the antitrust agencies' premerger review more difficult—since the original form was adopted in 1978. *See* 89 FR 89,220-36; Mot. 7-8 (summarizing these changes). Plaintiffs, like the district court, simply ignore this analysis.

Plaintiffs also offer no authority requiring the Commission to identify a previous, uncontested HSR-reportable transaction that violated the Clayton Act. Opp. 17. That time-consuming and expensive requirement would create a practically insurmountable barrier to regulatory updates necessary to prevent *future* anticompetitive mergers that are likely to be missed in a changed economy. Mot. 22-23.

Plaintiffs also attack the basis for the Commission's estimate of costs, although the district court unsurprisingly declined to rely on that spurious argument. Opp. 19-20. Nor would this Court have to reach the

argument to reverse. *Id.* This Court routinely remands for district courts to consider matters not decided. Regardless, the argument is no barrier to a stay pending appeal, not least because it is entirely unsupported by authority and plaintiffs are simply wrong that "the Commission did not reconcile its estimate with the much higher estimates by commenters" or "consider the Rule's full costs" *Id. See* 89 FR 89,334-35 (reconciling the Commission's estimate with commenters'); 89 FR 89,257 (considering "Other Costs Not Attributable to the Final Rule").

Finally, the Commission is also likely to succeed on its argument that it reasonably considered proposed alternatives. *See* Mot. 24-25. Plaintiffs repeat the district court's flawed conclusion that the new form "triple[s] the costs of *every* HSR-reportable transaction for all filers." Opp. 20 (quoting Op. 31). That is simply untrue; the new form does *not* impose these costs on "all filers." The form is tailored so that transactions presenting little antitrust risk require less additional information, while the transactions that pose the most antitrust risk require more. *See* Mot. 9-10; *see also* 89 FR 89,344. Nor is there any support for the district court's conclusion, which plaintiffs repeat, that

the Commission "failed to explain" why it was imposing these additional costs. Opp. 20 (quoting Op. 31 (cleaned up)). The Commission did exactly that. *See* 89 FR 89,246-49 (explaining why "imposing minimal additional costs on all filers" and tailoring the form to antitrust risk was a preferred alternative to more "Second Requests" or voluntary submissions"); 89,268-69 (responding to proposed alternatives). Because the Commission did everything the APA requires, it is likely to succeed on this argument too.

## II.    The Commission Will Suffer Irreparable Harm Absent a Stay.

Plaintiffs' claim that the Commission and the Department of Justice (and hence the public) will suffer no harm ignores the unanimous, bipartisan determination of both agencies that additional information is critically necessary for pre-merger review due to significant changes to the economy, and to the nature of mergers and acquisitions, over the past five decades. Plaintiffs seek to distinguish *CASA*, Opp. 22, but they cannot dodge the Supreme Court's holding that the Executive Branch suffers harm when "a coordinate branch" prevents it "from enforcing its policies against nonparties," *Trump v.*

*CASA, Inc.*, 606 U.S. 831, 835 (2025) (cleaned up), which is the effect of the vacatur here. *See also Abbott v. Perez*, 585 U.S. 579, 603 (2018).

Plaintiffs also insist that even anodyne requirements of the Rule should be vacated because plaintiffs "argued that the *entire* Rule is unlawful because the FTC failed to recognize or abide by the key limits on its authority." Opp. 22. But plaintiffs do not seriously dispute that the Commission was authorized to update NAICS codes, or to collect information about foreign subsidies as the Merger Filing Fee Modernization Act requires. *Id.* at 22-23. The Rule includes many such adjustments to the form that do not impose serious costs—and some that *reduce* reporting costs—which neither plaintiffs nor the district court addressed.

Plaintiffs point to the APA's good cause exception. Opp. 23. Even that accelerated process could not avoid the *immediate* confusion and harm that the district court's ruling will cause absent a stay. At any rate, the Commission is of the view that the strict test for invoking the good cause exception, *see* 5 U.S.C. § 553(b), would not apply here.

### III. The Balance of Harms and Public Interest Favor a Stay.

Public and private interests also favor staying the district court's order pending appeal. Plaintiffs do not deny that parties to HSR-reportable transactions face substantial uncertainty if the Rule is vacated. They suggest, without explanation, that "keeping the new Form in place" would generate more uncertainty. Opp. 23-24. That doesn't make sense. A stay would provide certainty by maintaining the status quo while this Court considers the serious issues on appeal. Parties to these transactions will submit the new form, and the Commission will accept it. By contrast, not even plaintiffs dispute that denying a stay would create uncertainty on companies preparing filings for imminent transactions or planning future deals, and would also harm the public (including third parties that could be asked for information more readily available to filers).

Meanwhile, Plaintiffs fail to show any substantial harm from a stay. Opp. 25. They have identified, at most, a handful of allegedly imminent HSR-reportable transactions by a few of their members that object to the Rule. Opp. Exhs. C-F. These limited transactions are necessarily valued at over $126.4 million, while the average cost of

compliance with the Rule's additional requirements is $39,644 per party—roughly .03% of any reportable transaction's value. 89 FR at 89,334-35. And vacating the Rule would not necessarily avoid even those minor costs; some parties will be forced to incur similar (or even greater) costs in response to voluntary requests or Second Requests after filing the inadequate old form.

Contrary to plaintiffs' argument, the Rule does *not* "impose[] substantial costs on parties to mergers that pose no conceivable antitrust concern." Opp. 23. As explained in the motion and above, the Rule is tailored so that deals and parties that pose little antitrust require less additional information, while those that pose the most antitrust risk require more. *See supra* 12-13; Mot. 9-10. Even crediting plaintiffs' meager evidence of harm, it pales in comparison to the harm the public and other parties will face absent a stay.

## CONCLUSION

The district court's judgment should be stayed pending appeal.

Respectfully submitted,

Lucas Croslow
    *General Counsel*

H. Thomas Byron III
    *Deputy General Counsel*

February 26, 2026
/s/ Benjamin F. Aiken
Benjamin F. Aiken
    *Attorney*

Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
baiken@ftc.gov

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 2,598 words. This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word in Century Schoolbook 14-point font, a proportionally spaced typeface.


February 26, 2026              /s/ Benjamin F. Aiken
                               Benjamin F. Aiken

# Exhibit A (Dkt. 57)

(Commission's Opposition to Plaintiffs' Motion for
Summary Judgment and Cross-Motion for
Summary Judgment)

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*,<br><br>         Plaintiffs,<br><br>v.<br><br>FEDERAL TRADE COMMISSION, *et al.*,<br><br>         Defendants. | Case No. 6:25-cv-00009-JDK |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ..............................................................................................1

STATEMENT OF THE ISSUES.........................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................2

*Congress Enacted the HSR Act to Promote Effective Premerger Review of the Most Significant Transactions.* ......................................................................2

*The HSR Act Creates a Two-Step System for the Agencies to Review Mergers.* ............................3

*A Bipartisan, Unanimous Commission Updated the Decades-Old HSR Form After Experience Showed It Had Become Outdated.* ..................................................4

STANDARD OF REVIEW ..................................................................................7

ARGUMENT ...................................................................................................8

I.     Plaintiffs Have Failed To Demonstrate Standing. ...................................8

       A.     Plaintiffs' only evidence of standing is inadmissible. ................... 8

       B.     This case should be transferred because Longview Chamber lacks associational standing. ................................................ 10

II.    The Commission Properly Construed and Exercised Its Statutory Authority....................................................................................14

       A.     The Commission properly construed its statutory authority................. 15

       B.     The rule is a rational product of reasoned decisionmaking. .................. 24

       C.     The Commission considered and reasonably responded to proposed alternatives. ........................................ 33

III.   Any remedy should be appropriately tailored...................................38

CONCLUSION................................................................................................40

# TABLE OF AUTHORITIES

## CASES

*Arizona v. Biden*, 40 F.4th 375 (6th Cir. 2022)................................................................ 39

*Bellard v. Gautreaux*, 675 F.3d 454 (5th Cir. 2012)....................................................... 9

*Brown Shoe Co. v. United* States, 370 U.S. 294 (1962) ................................................. 2

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ................................................................. 38

*Chamber of Com. of U.S. v. CFPB*, 691 F. Supp. 3d 730 (E.D. Tex. 2023)........................................................................................................................ 13, 31

*Chamber of Commerce of United States v. SEC*, 85 F.4th 760 (5th Cir. 2023)............................................................................................................................ 31

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006)................................................... 8

*Dayton Area Chamber of Com. v. Becerra*, No. 3:23-cv-156, 2024 WL 3741510 (S.D. Ohio Sept. 29, 2023) ........................................................ 7, 13

*Dayton Area Chamber of Com. v. Kennedy*, No. 24-3868, 2025 WL 2237556 (6th Cir. Aug. 6, 2025) ........................................................... 12

*Doe v. Stegall*, 653 F.2d 180 (5th Cir. 1981)............................................................... 12

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)..................................... 15, 29

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021)........................... 19, 24, 27, 29

*Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826 (5th Cir. 1997)............................................................................................................. 39

*Ga. Republican Party v. SEC,* 888 F.3d 1198 (11th Cir. 2018)................................... 13

*Geiserman v. MacDonald*, 893 F.2d 787(5th Cir. 1990) .............................................. 8

*Gill v. Whitford*, 585 U.S. 48 (2018)............................................................................. 38

*Hecht Co. v. Bowles*, 321 U.S. 321 (1944) ................................................................... 38

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ....................................... 16, 24

*Louisiana ex. rel. Landry v. Biden*, 64 F.4th 674 (5th Cir. 2023)............................... 26

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................... 8

*Luminant Generation Co. LLC v. EPA*, 714 F.3d 841 (5th Cir. 2013)............................................................................................................................ 24

*Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547( 5th Cir. 1987).......................................................................................................................... 9, 10

*Mayfield v. DOL*, 117 F.4th 611 (5th Cir. 2024) ......................................................... 16

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956 (5th Cir. 2023)............................................................................................................. 19

*Michigan v. EPA*, 576 U.S. 743 (2015) ........................................................... 16, 18, 19

*Miller v. Michaels Stores, Inc.*, 98 F.4th 211 (5th Cir. 2024) ...................................................... 10

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983) ...................................................... 24, 27

*Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126 (D.C. Cir. 2022) ................................................ 25

*Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032 (D.C. Cir. 2012) .......................................................................................................... 26

*Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309 (11th Cir. 2021) .......................................................................................................... 25

*Sacora v. Thomas*, 628 F.3d 1059 (9th Cir. 2010) ................................................................ 25

*Sid Peterson Mem'l Hosp. v. Thompson*, 274 F.3d 301 (5th Cir. 2001) .......................................................................................................... 29

*Smith v. Sch. Bd. of Concordia Par.*, 88 F.4th 588 (5th Cir. 2023) ............................................. 20

*Starbucks v. McKinney*, 602 U.S. 33  (2024) ...................................................................... 38

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ............................................................ 12, 13

*Tenn. Republican Party v. SEC*, 863 F.3d 507 (6th Cir. 2017) .............................................. 13

*Texas v. BlackRock, Inc.*, No. 6:24-cv-437-JDK, 2025 WL 2201071 (E.D. Tex. Aug. 1, 2025) ...................................................................... 21

*Texas v. United States*, 50 F.4th 498 (5th Cir. 2022) ............................................................ 11

*Union Pac. R.R. Co. v. City of Palestine*, 517 F. Supp. 3d 609 (E.D. Tex. 2021) ...................................................................................................... 10

*United States v. Texas*, 599 U.S. 670 (2023) ...................................................................... 38

*Virden v. City of Austin, Texas*, 127 F.4th 960 (5th Cir. 2025) .............................................. 7

**STATUTES**

11 U.S.C. § 363 .............................................................................................................. 2

15 U.S.C. § 1312 ............................................................................................................ 37

15 U.S.C. § 18a ...................................................................................................... passim

15 U.S.C. § 19 ................................................................................................................ 22

15 U.S.C. § 57b-1 .......................................................................................................... 37

15 U.S.C. § 57b-3 .......................................................................................................... 17

28 U.S.C. § 1391 ............................................................................................................ 13

28 U.S.C. § 1406 ............................................................................................................ 13

28 U.S.C. §1404 ............................................................................................................. 14

5 U.S.C. § 702 ................................................................................................................ 39

5 U.S.C. § 706 ................................................................................................................ 7

Pub. L. No. 94-435, title II, § 201, 90 Stat. 1383, 1390 (1976) .................................................... 22

**OTHER AUTHORITIES**

16 C.F.R. § 803.90 .................................................................................................................. 40

16 C.F.R. Part 802 (1978) ........................................................................................................ 3

43 FR 33450 (July 31, 1978) ................................................................................................ 4, 5

Premerger Notification; Reporting and Waiting Period
Requirements, 88 FR 42,178 (June 29, 2023) ................................................................... 5

*Premerger Notification; Reporting and Waiting Period
Requirements*, 89 FR 89216 (Nov. 12, 2024) ................................................................... 1

Revised Jurisdictional Thresholds for Section 7A of the Clayton
Act, 90 FR 7,697 (Jan. 22, 2025) ..................................................................................... 3

**RULES**

Decision and Order, *In the matter of EQT Corp.*, Dkt. No. C-4799
(Oct. 10, 2023) ............................................................................................................... 23

*Early Termination Notices*, Federal Trade Commission ......................................................... 7

Fed. R. Evid. 602 .................................................................................................................... 8

Fed. R. Evid. 801 .................................................................................................................. 10

Fed. R. Evid. 802 .................................................................................................................. 10

John C. Harrison, *Vacatur of Rules Under the Administrative
Procedure Act*, 40 Yale Journal on Regulation Bulletin 119,
123-26 (2023) ................................................................................................................ 38

*Premerger Notification Program*, Federal Trade Commission .................................................. 7

*Premerger Notification Program*, Federal Trade Commission
(Aug. 16, 2025) ............................................................................................................... 3

S. Rep. 94-803(1976) .............................................................................................................. 2

## INTRODUCTION

The Federal Trade Commission in 2024 adopted a bipartisan rule updating the outdated, almost 50-year-old form that parties to certain large mergers and acquisitions were required to file before consummating their transactions. The rule does not affect any party to this case, nor is there any admissible evidence that any members of the plaintiff organizations are affected. And there is no evidence, admissible or otherwise, that any entity in this district is suffering or ever will suffer any harm from this rule. There is no Article III case or controversy here.

Even if this case were to go forward, this Court should reject the plaintiff associations' policy arguments, which are insufficient under the Administrative Procedure Act. The Commission unquestionably has authority to promulgate the rule, and the Commission explained in exhaustive detail why the rule was necessary and appropriate. Premerger review is a critical task that protects fair competition and fosters economic growth and prosperity. To effectively perform their vital role in the process, the FTC and Department of Justice (together the "antitrust agencies") need a premerger notification form suitable for the modern economy. Congress granted the Commission the authority to create just that, and the Commission properly exercised that authority here. Plaintiffs' arguments to the contrary either mischaracterize or flat-out ignore the extensive analysis and explanation of the rule by a bipartisan, unanimous Commission. Those arguments also stem from the false premise that the Commission must justify this rule in comparison to the previous rule rather than as a proper exercise of its statutory authority. The Court should reject those arguments and grant the Commission's cross-motion for summary judgment.

## STATEMENT OF THE ISSUES

1. Whether plaintiffs have failed to demonstrate standing.

2. Whether the HSR rule (*Premerger Notification; Reporting and Waiting Period Requirements*, 89 FR 89216 (Nov. 12, 2024), Dkt. 44-6) complies with the APA.

# STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

*Congress Enacted the HSR Act to Promote Effective Premerger Review of the Most Significant Mergers and Acquisitions.*

The Hart-Scott-Rodino Act, 15 U.S.C. § 18a ("HSR Act"), and the rules that implement it reflect Congress's decision that more rigorous and effective antitrust review was necessary following decades of difficulties preventing anticompetitive mergers and acquisitions. Congress prohibited such acquisitions in the Clayton Act in 1914, but that statute proved difficult to enforce prospectively. The FTC and DOJ were rarely able to block illegal mergers before they were consummated, and post-consummation enforcement was lengthy, costly, and often ineffective, *see* 89 FR at 89,237—thwarting Congress's goal that the Clayton Act would halt anticompetitive mergers "in their incipiency." *Brown Shoe Co. v. United* States, 370 U.S. 294, 318 n.32 (1962).

Congress addressed this problem in 1976 with the HSR Act. The Act is designed to create "a mechanism to provide advance notification to the antitrust authorities of very large mergers prior to their consummation, and to improve procedures to facilitate enjoining illegal mergers before they are consummated." S. Rep. 94-803, at 61 (1976). To accomplish that mission, the HSR Act requires parties to certain transactions to first notify the antitrust agencies of the transaction and, generally, to wait at least 30 days before consummation.[2] 15 U.S.C. § 18a(a)-(b). The Act applies only to the largest parties and transactions. In 2025, transactions are generally subject to HSR reporting if: (1) the transaction is valued at $126.4 million or more, and (2) one party has sales or assets of $252.9 million or more, while the other party has sales or assets of $25.3 million

---

[1] Plaintiffs label their factual narrative as a statement of undisputed material facts, Br. 2, so the Commission has responded in kind. The Commission is also separately filing a list of disputed facts in plaintiffs' statement.

[2] The waiting period is 15 days for cash tender offers and certain bankruptcies. *See* 15 U.S.C. § 18a(a)-(b); 11 U.S.C. § 363 (b)(2).

or more. *See* 15 U.S.C. § 18a(a); *see also* Revised Jurisdictional Thresholds for Section 7A of the Clayton Act, 90 FR 7,697 (Jan. 22, 2025) (setting 2025 thresholds).[3] The Act also exempts twelve different categories of transactions from the notification requirement. 15 U.S.C. § 18a(c); *see also* 16 C.F.R. Part 802 (implementing statutory exemptions). Because of these limitations, typically fewer than 20% of M&A transactions that occur each year are reported under the HSR Act. 89 FR at 89,219. That means, on average, there have been fewer than 200 HSR filings per month in the last two years. *See Premerger Notification Program*, Federal Trade Commission (Aug. 16, 2025), https://tinyurl.com/2nuydmam.

### *The HSR Act Creates a Two-Step System for the Agencies to Review Mergers.*

To allow the antitrust agencies to effectively complete their premerger review, the HSR Act provides that the FTC, with concurrence from DOJ's Antitrust Division, "shall require" by rule that the premerger notification "be in such form and contain such documentary material and information relevant to a proposed acquisition as is necessary and appropriate … to determine whether such acquisition may, if consummated, violate the antitrust laws." 15 U.S.C. § 18a(d)(1). To ensure the efficacy of this rulemaking authority, Congress further authorized the antitrust agencies to "define the terms used in [the HSR Act]" and to "prescribe such other rules as may be necessary and appropriate to carry out the provisions of" the Act. *Id.* § 18a(d)(2). The HSR premerger notification form is a vital element of the regulatory scheme because the agencies face tight timeframes of 15-30 days to evaluate whether a transaction may violate the antitrust laws and decide whether to investigate. The agencies rely on the information in the form to screen reportable transactions and identify those that might violate the antitrust laws.

---

[3] Absent an exemption, transactions over $505.8 million are reportable no matter the size of the parties. 15 U.S.C. § 18a (a)(2); *see also* 90 FR 7,697. The size-of-transaction and size-of-party thresholds are adjusted annually based on changes in gross national product. 15 U.S.C. § 18a(a).

If either of the antitrust agencies determines during this initial waiting period that the transaction warrants investigation, the statute allows them to demand significantly more information through what is colloquially known as a "second request." *See* 15 U.S.C. § 18a(e). When the agencies issue a second request, they may (and in practice, do) extend the waiting period until after substantial compliance with that request. *Id.* § 18a(e)(2). Second requests routinely elicit millions of documents and terabytes of data, and the agencies do not issue them lightly. *See, e.g.*, 89 FR at 89,244, 89,246. Second request negotiation, compliance, and review are time-consuming and resource-intensive for the agencies and for the merging parties. They can delay transactions by many months and impose millions of dollars in compliance costs. *See id.* at 89,247.

As the Commission explained in the rule, the notification form and second requests are different in scope and serve different functions. The agencies use the premerger notification form "to conduct a preliminary screen for antitrust risks." 89 FR 89,248. Second requests, by contrast, are far more onerous and "tailored for each recipient." *Id.* They "represent[] a whole different level of detail and analysis," which is necessary in particular cases to "determine[e] whether there are facts sufficient to establish … that the merger may substantially lessen competition or tend to create a monopoly." *Id.* To give the agencies more time for review, the buyer (often hoping to avoid a potential second request) sometimes will voluntarily withdraw and refile its HSR filing; that restarts the clock on the waiting period. *Id.* at 89,244.

### *A Bipartisan, Unanimous Commission Updated the Decades-Old HSR Form After Experience Showed It Had Become Outdated.*

The FTC promulgated the first set of HSR regulations, including a form seeking information for a preliminary antitrust risk assessment, in 1978. *See* 43 FR 33450 (July 31, 1978). The Commission considered requiring more information in the initial form (proposed in 1976) but opted for less in the 1978 final rule, while noting that it might revisit that decision based on

experience. *See, e.g.*, *id.* at 33,526. The Commission has revised the form via rulemaking to address discrete issues, 89 FR 89,249 n.248, but the form has not seen a substantial overhaul in the nearly five decades since its inception, *id.* at 89,217.

As a result, the form that existed before this rulemaking "did not always ensure that the [antitrust agencies] had the information they needed to fulfill Congress's intention." 89 FR 89,408 (Ferguson Concurrence). Among other things, the old form did not allow the agencies to keep up with trends in private investment (such as the role of private equity), changes in corporate structure and governance, acquisitions that create a risk of foreclosure (where a company limits competitors' access to products or services), threats to new businesses and innovation, or serial acquisition strategies. *See id.* at 89,222-36. These shortcomings have made the antitrust agencies' mandatory premerger screening "increasingly difficult." *Id.* at 89,225. Indeed, the limited information in the outdated form often forced the agencies to seek additional information from the merging firms or from third parties unconnected to the transaction on a voluntary basis—and to request, obtain, and review that information within the brief initial waiting period. *See id.* at 89,244.

To close these gaps and ensure that the antitrust agencies "have access to documents that reflect pre-transaction assessments of business realities," the FTC in 2023 issued a notice of proposed rulemaking (NPRM) to modernize the HSR form. Premerger Notification; Reporting and Waiting Period Requirements, 88 FR 42,178, 42,194 (June 29, 2023). The Commission received 721 comments; most supported the proposed rule and the effort to collect more information in the HSR form to help prevent harmful mergers. 89 FR at 89,217.

The Commission issued the rule in November 2024 following a unanimous, bipartisan vote. *See* 89 FR at 89,216. The rule is substantially narrower than the proposed rule. As then-Commissioner (now Chairman) Ferguson explained, the final rule "dramatically curtail[ed]" the

scope of the proposed rule in part because of bipartisan input. 89 FR at 89,412. After considering the comments—and the input of all five Commissioners—the agencies determined that the final rule was necessary and appropriate to enable them to effectively detect transactions that may violate the antitrust laws. *Id.* at 89,217. The rule eliminates the need to initiate a more burdensome investigation with second requests in some cases. *Id.* at 89,217. In others, it allows the agencies to narrow the scope of their investigations, focusing review (and potential second requests) on only those aspects of a transaction that may violate the antitrust laws. *Id.* The Commission also "believes that the final rule may shorten the overall waiting period for a significant number of transactions and perhaps even reduce the overall number of delayed transactions." *Id.* at 89,243. That benefit includes the reduced need for second requests or situations where the parties withdraw and refile, as well as increased opportunities for early terminations, which ends the waiting period early, allowing the transaction to proceed. *See id.* at 89,400 (Holyoak Concurrence) (explaining that the rule "will allow staff to more quickly identify which mergers should receive early termination, a significant benefit to both staff and merging parties").

Many of the rule's reforms are commonsense and long overdue. For instance, the new rule requires parties to provide translations of any documents in a foreign language, identify whether they do business under a different name, and describe the principal categories of products and services they offer. *Id.* at 89,277. The Commission also minimized burdens by limiting the information the parties must provide depending on the nature of the transaction and the parties. *See id.* at 89,261. Thus, not every filing party has to provide every category of information. The form aligns the information required with the antitrust risk associated with a given transaction. *Id.*

The rule was published in the Federal Register on November 12, 2024, and went into effect on February 10, 2025. 89 FR 89,216. Already, hundreds of parties have submitted the updated

form. *Premerger Notification Program*, Federal Trade Commission (last accessed Aug. 29, 2025), https://tinyurl.com/2nuydmam. And with the benefit of the additional information the rule requires, the agencies have been able to grant early termination of the waiting period to over 200 transactions filed using the updated form. *See Early Termination Notices*, Federal Trade Commission, https://tinyurl.com/33fvedhj.

Plaintiffs filed this lawsuit challenging the rule on January 10, 2025. Dkt. 1. After the Commission moved to transfer or dismiss the case, Dkt. 23, plaintiffs filed an amended complaint that added limited information about five unidentified members of plaintiff Longview Chamber of Commerce, three of whom joined the Longview Chamber after this case began. Dkt. 27 at 11 (¶ 23); Dkt. 41 at 3-4 n.2. The Commission brought a renewed motion to dismiss or transfer. Dkt. 30. The Commission has urged the Court to rule on that motion before this case proceeds to summary judgment. *See* Dkts. 31, 52. The Commission also moved to deny or defer summary judgment because the Commission has not had the opportunity to seek discovery. *See* Dkts. 31, 53; *Dayton Area Chamber of Com. v. Becerra*, No. 3:23-cv-156, 2024 WL 3741510 (S.D. Ohio Sept. 29, 2023), Dkt. 55 (permitting discovery into the standing of plaintiffs, including local chambers of commerce, and members on whose behalf they asserted standing); *see also* Fed. R. Civ. P. 56(d).

## STANDARD OF REVIEW

Each cross-movant for summary judgment "bears the burden of establishing that no genuine dispute of material fact exists and that it is entitled to judgment as a matter of law." *Virden v. City of Austin, Texas*, 127 F.4th 960, 965 (5th Cir. 2025) (cleaned up). Plaintiffs seek relief under the APA, which provides that agency action is lawful unless "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2).

# ARGUMENT

## I.  Plaintiffs Have Failed To Demonstrate Standing.

### A.  Plaintiffs' only evidence of standing is inadmissible.

Plaintiffs have *no* admissible evidence—literally zero—that establishes standing. Plaintiffs have not established that the sole evidence they rely on is based on the declarants' personal knowledge or that the evidence is not hearsay. Both deficiencies render that evidence inadmissible, and inadmissible evidence cannot be used at summary judgment.

Plaintiffs bear the burden of establishing standing. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 & n.3 (2006). That burden is higher at summary judgment than it is in response to a motion to dismiss. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("In response to a summary judgment motion … the plaintiff can no longer rest on … mere allegations, but must set forth by affidavit or other evidence specific facts ….") (cleaned up). And the evidence parties rely on at summary judgment must be admissible. *See* Fed. R. Civ. P. 56(c)(2); *also Geiserman v. MacDonald*, 893 F.2d 787, 793 (5th Cir. 1990) ("Material that is inadmissible will not be considered on a motion for summary judgment.…" (quotation omitted)).

Similarly, a movant may rely on a declaration to support its motion for summary judgment only if that declaration is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the … declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). That is consistent with the basic rule that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. Courts cannot consider hearsay in declarations or affidavits at summary judgment. *See Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam); *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012).

Plaintiffs' declarations all rely on inadmissible hearsay. Each plaintiff organization has entered a declaration from an officer of the organization who was "authorized" by members of that organization to represent certain facts about those members. *See* Dkt. 44-1, 44-2, 44-3, Dkt. 44-4. Because the declarations are materially identical, and each suffers the same infirmities, we explain below the shortcomings with the Longview Chamber's declaration.

Longview Chamber's sole evidence supporting standing is a declaration from Kelly Hall, the organization's President and CEO. Dkt. 44-4 at 1. She purports to base her declaration on her "personal knowledge and belief and/or upon [her] review of business records of the Longview Chamber." *Id.* Hall does *not* purport to be an employee or associate of any Longview Chamber member, nor does she aver that she reviewed any business records from any of those members. Nonetheless, Hall declares that "members of the Longview Chamber … plan to engage in HSR-reportable transactions in the forthcoming months." *Id.* at 2. She then offers assertions about five Longview Chamber members, including descriptions of the members' business models, the number of M&A transactions they have recently engaged in, and their expectations about future transactions. *Id.* at 2-4. The only basis Hall offers for this testimony is that these "members have authorized disclosure of" that information. *Id.* at 3.[4]

These key facts in the Hall declaration—which is the *only* evidence that plaintiffs rely on to establish Longview Chamber's standing—are inadmissible hearsay. Hearsay is "a statement that the declarant does not make while testifying at the current trial or hearing" and "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Absent

---

[4] This is a summary of the most critical facts that Hall relays on behalf of members. Much of the rest of the declaration—such as speculation about the rule's effects on members' business models, or the potential harm that members might suffer if their names were disclosed—appears to be information that someone told Hall, not her personal knowledge.

some exception—and plaintiffs offer none—"hearsay is not admissible." Fed. R. Evid. 802. The statements that Longview Chamber's members purportedly made to Hall when "authorizing" her to disclose the information in the declaration are out-of-court statements offered for the truth of the matter asserted. Indeed, Longview Chamber relies on these very facts to argue that it has standing. *See* Dkt. 44 at 10. But plaintiffs offer no evidence demonstrating that Hall has personal knowledge about Member C's plans to enter into a reportable transaction "by the end of 2025," or about Member A's "inten[t] to engage in at least one more HSR reportable transaction this year." *Id.* at 9-10. That is information that the members apparently told Hall and that she is now relaying to the Court. This is classic hearsay, which cannot support summary judgment. *Miller v. Michaels Stores, Inc.*, 98 F.4th 211, 218 (5th Cir. 2024); *Martin*, 819 F.2d at 549.

Given the lack of any admissible evidence of standing, this Court should deny plaintiffs' motion for summary judgment and grant defendants' cross-motion. When, as here, a party seeks summary judgment based solely on inadmissible hearsay, the motion "fails as a matter of law." *Union Pac. R.R. Co. v. City of Palestine*, 517 F. Supp. 3d 609, 634 (E.D. Tex. 2021) (Kernodle, J.), *aff'd*, 41 F.4th 696 (5th Cir. 2022). That should be the result here. To the extent that plaintiffs claim this evidence somehow *is* based on Hall's personal knowledge (and the same for the other plaintiffs), the Court should deny or defer ruling on the plaintiffs' motion because the Commission is entitled to discovery to probe the basis for that knowledge. *See* Fed. R. Civ. P. 56(d).

### B.    Longview Chamber lacks associational standing.

Even if the evidence in Hall's declaration were admissible, it does not establish that Longview Chamber has associational standing. The parties have fully briefed this issue, *see* Dkts. 30, 35, 38, and the Commission will not fully repeat (but preserves) the legal arguments set forth there. Here, the Commission focuses on shortcomings specific to summary judgment, where

plaintiffs bear the burden of establishing standing based on undisputed evidence in the record. *Texas v. United States*, 50 F.4th 498, 514 (5th Cir. 2022).

For three reasons, Longview Chamber has not carried its burden of establishing standing. *First*, the alleged injury to Longview Chamber's members is speculative. The parties disagree about the governing legal standard that specifies just how concrete and imminent an injury must be to satisfy Article III. *Compare* Dkt. 30 at 13-19 and Dkt. 38 at 1-5, *with* Dkt. 35 at 18-23. But plaintiffs have not even satisfied their preferred, forgiving standard for invoking this Court's jurisdiction. The most that Longview Chamber offers is a declaration that says some members "plan" or "expect[] to enter into" HSR-reportable transactions in the "foreseeable future" or "by the end of 2025." Dkt. 44-4 at 3-4. These vague, non-specific facts have not been subject to cross-examination, are very much disputed, and are insufficient to demonstrate standing. The declaration does not offer the basis for these members' plans or expectations; it does *not* say, for instance, that any Longview Chamber member is in active negotiations to complete a transaction that would require notification. And there is reason for skepticism: The declaration emphasizes these members' "business models" and suggests these ill-described plans are based on members' "historic level of activity" or "similar level of … activity." *Id.* at 3-4. But the touchstone of an Article III injury is that it must be concrete, not "speculative"—as even plaintiffs concede. *See* Br. 9 (quoting *Clapper* v. *Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013)). A plan or expectation based on a business's goals or projections is pure speculation and not concrete. At the very least, whether plaintiffs' members will imminently enter into a covered transaction is a disputed factual question that should be the subject of discovery. *See* Fed. R. Civ. P. 56(d).

The Court (like the Commission) needs more detail about the hypothetical transactions plaintiffs plan to engage in because the rule applies in different ways to different transactions and

parties. For instance, plaintiffs challenge the rule's requirement of a "transaction rationale," an "overlap description," and a "supply relationships description." Br. 18. But not all parties to reportable transactions have to provide those descriptions. *See, e.g.*, 89 FR 89,261-62, 89,370-72. Similarly, plaintiffs challenge the rule's requirements that acquirers provide a list of some officers and directors. Br. 16-18. Only the acquiring party, not the acquired party, has to provide that list— and only if those officers and directors serve in similar roles in other entities in the same industry as the target. *See* 89 FR 89,264. Longview Chamber's declaration does not detail whether its members would be buyers in the anticipated transactions, or whether any hypothetical buyers have officers and directors that they would have to report. Those requirements cannot injure the members if they are not required to comply, so plaintiffs lack standing to challenge them.

*Second*, Longview Chamber has failed to establish standing because it has not "nam[ed] the affected members." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). Plaintiffs identify their members pseudonymously. *See, e.g.*, Dkt. 44-4 at 3-5. They claim these members are concerned about "unwarranted regulatory scrutiny." Br. 10 n.4. They have not established any factual foundation for that fear, and there is none.[5] Nor have plaintiffs sought leave for their members to proceed pseudonymously or even attempted to meet the rigorous standards for such a request, which clashes with the "presumption of openness of judicial proceedings." *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir. 1981). Plaintiffs rely only on a single district court case, Br. 10 at n.4, but that case featured a plaintiff that "publicly named its harmed members." *Chamber of Com. of U.S. v. CFPB*, 691 F. Supp. 3d 730, 738 (E.D. Tex. 2023). And that decision's dicta about *Summers*

---

[5] These same plaintiffs and others like them have named members in suits against other rules. *See, e.g.*, *Ryan, LLC v. FTC*, No. 3:24-cv-986-E, (N.D. Tex. July 19, 2024), Dkt. 169-1; *Custom Commc'ns v. FTC*, No. 24-3137 (8th Cir. Feb. 18, 2025), Pet'r's Addendum; *Dayton Area Chamber of Com. v. Kennedy*, No. 24-3868, 2025 WL 1237556, at *2 (6th Cir. Aug. 6, 2025).

is not viable. *Summers* held that an organization must "nam[e] the affected members." *Summers*, 555 U.S. at 498. Plaintiffs' failure to name any affected members means they lack standing. *See Ga. Republican Party v. SEC,* 888 F.3d 1198, 1204-05 (11th Cir. 2018); *Tenn. Republican Party v. SEC*, 863 F.3d 507, 521 (6th Cir. 2017).

*Third*, this case is not germane to the Longview Chamber's interests for all the reasons the Sixth Circuit recently held in a similar suit. *See Dayton Chamber*, 2025 WL 2237556, at *4-5. Like that case, "[o]ne could argue" that the rule here "would actually improve" the business climate in the Longview area. *Id.* at 4. Timely and accurate premerger review is a pro-business policy that supports economic growth and fosters competition. And "any possible relation" between the unidentified members' "interests in this lawsuit and the [Longview] Chamber's purposes exists at only a sky-high level of generality … especially … because" those members "have no facilities in the [Longview] area." *Id.* Indeed, the only connection between any of the Longview members and this case is that one member has supposedly engaged in transactions "over the past ten years" that included "transactions involving companies with a presence in the Longview Trade Area," and another "provides services to companies with a presence in the Longview Trade Area." Dkt. 44-4 at 3-4. No member alleges that they are, or even transact with, businesses that reside in the Longview area, nor that any future transactions will affect the area.

Because Longview Chamber lacks standing, there is no party to this case that can invoke this Court's venue. *See* 28 U.S.C. § 1391(e). This case should accordingly be dismissed or transferred. *See* 28 U.S.C. § 1406(a). The remaining three plaintiffs and all defendants reside in the District of Columbia, which means venue would be proper there, and the Commission is prepared to immediately brief summary judgment in that district. Indeed, even if Longview Chamber has standing, this case should be transferred to Washington, D.C. in the interests of

justice. *See* 28 U.S.C. §1404(a). Plaintiffs' declarations confirm that none of the plaintiff associations have a member with standing who resides in this district. This case is blatant forum shopping and should be transferred. *See* Dkt. 30 at 26-28; Dkt. 38 at 9-10.

## II.     The Commission Properly Construed and Exercised Its Statutory Authority.

Even if plaintiffs have standing to bring this challenge, their challenge fails on the merits. Congress "require[d]" the Commission and DOJ to create a form to effectuate the premerger review regime and provided only that the form should "contain such documentary material and information relevant to a proposed acquisition as is necessary and appropriate" to enable the agencies to complete this review. 15 U.S.C. § 18a. That statutory language explicitly grants broad discretion to the Commission to identify the information needed to accomplish the premerger review Congress required. As explained below, the Commission correctly recognized the scope of its statutory authority and properly exercised it in updating the HSR form.

Plaintiffs largely make the same argument in two different ways: First, they suggest that the HSR Act bars the Commission from adopting a form in the absence of some (unspecified) cost-benefit analysis, and then they suggest that the rule is arbitrary and capricious because it lacks the analysis they say should have been included. Whatever the guise, that argument fails for multiple reasons. First, as plaintiffs grudgingly concede, the Commission *did* consider the costs and benefits of the rule. That suffices to answer either version of their argument. But notably, the HSR Act leaves the Commission no discretion about whether to issue a rule specifying the form of premerger filings, so this is not a case where an agency must decide *whether* to regulate at all.

Finally, plaintiffs' challenges to the Commission's explanations for the rule stem from a flawed premise. They repeatedly complain about the "new categor[ies]" of information the rule requires filers to provide and repeatedly compare the new rule to the old one. *E.g.*, Br. 15-16, 23-24. These complaints frame the dispute as whether the new rule is preferable to the old rule. But

14

the Supreme Court has rejected that very approach, explaining that an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009). Thus, combined with the statutory mandate to adopt a form for premerger filings, the Commission is entitled (indeed, obliged) to create a form meets the statute's standards.

The Supreme Court made clear that the Commission's task in updating the rule is the same as any agency adopting a rule: It must explain the reasons for adopting the requirement. *Fox*, 556 U.S. at 515. There is no requirement that the Commission satisfy plaintiffs that the new rule is better than the old one by any particular measure (including costs and benefits). Instead, the Commission was obliged merely to acknowledge and explain the change. *Id.* Plaintiffs never argue that the Commission failed to do that here. Beyond that, as with any rule, the Commission must rationally explain why the requirements of the new form are necessary to carry out its statutory duty to consider whether certain proposed transactions may violate the antitrust laws. The Commission did that too. Plaintiffs disagree with some of the choices the Commission made along the way, but Congress empowered the Commission to make those choices subject only to the requirement that it engage in reasoned decisionmaking. The Commission carefully explained its rationale for the rule and rationally responded to the various objections plaintiffs make here. That is all the APA requires.

### A.    The Commission acted within its statutory authority.

**1.** Congress mandated that the FTC, with DOJ's concurrence, "shall require that" the premerger notification "be in such form and contain such documentary material and information relevant to a proposed acquisition as is necessary and appropriate to enable" the agencies "to

determine whether such acquisition may, if consummated, violate the antitrust laws." 15 U.S.C. § 18a(d)(1). That statutory mandate imposes a nondiscretionary obligation: The Commission must specify the form for premerger filings. Thus, unlike some other statutes, regulation here is not optional; the HSR Act *required* the Commission to issue a rule creating the HSR form.

And the statute provides discretion to the Commission in determining the scope of information required in such a form. As the Supreme Court has recognized, "[o]ne does not need to open up a dictionary in order to realize the capaciousness of" the phrase "necessary and appropriate." *Michigan v. EPA*, 576 U.S. 743, 752 (2015); *cf.* Br. 13 (relying on *Michigan*). The "term leaves agencies with flexibility" subject to the default rule that they cannot "entirely fail to consider an important aspect of the problem." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Thus, Congress—while requiring the Commission to undertake rulemaking to specify the information in the premerger notification form—granted the Commission broad discretion to assess what information would be needed to accomplish the statute's goals. Indeed, the HSR Act is the exact sort of statute whose "meaning" is that "the agency is authorized to exercise a degree of discretion." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). As the Supreme Court explained, statutes that use terms like "appropriate" signal that Congress "empower[ed]" the agency "to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility." *Id.* at 395 (cleaned up). Given this "explicit delegation of authority, the question is whether the Rule is within the outer boundaries of that delegation." *Mayfield v. DOL*, 117 F.4th 611, 617 (5th Cir. 2024).

The rule easily satisfies that capacious standard. The Commission explained why the new form is necessary and appropriate to serve the purposes of the statutorily required premerger review. And the Commission further elaborated on the rationale for each provision. That would

suffice by any measure under the APA. But here, the Commission did more—it expressly considered the costs and benefits of the new rule, and it explained that the substantial benefits outweighed any increased costs. Thus, the Commission amply justified the rule under any standard.

Plaintiffs contend that the Commission exceeded its statutory authority by allegedly creating a new HSR form without considering the form's costs and benefits. Br. 12-15. This is not truly a claim about statutory authority—the HSR Act says nothing about costs and benefits.[6] This is an arbitrary and capricious argument masquerading as a claim about the Commission's authority. Regardless, the plain text of the Act, the cases plaintiffs cite, and the history of the Act all refute the argument. But it is also irrelevant because—as plaintiffs concede—the Commission did consider the costs and benefits of the new form.

The Commission expressly *did* "consider[] … the costs and benefits of the final rule." 89 FR at 89,236. In unambiguous terms, the Commission "considered the reasonableness of requiring additional information in the HSR Filing in light of the statutory scheme established by Congress to more effectively prevent undue consolidation that violates the antitrust laws, including the costs and benefits of the final rule." *Id*. The Commission also "evaluated, on the one hand, the benefits to the Agencies, the parties, third parties and the public in making premerger review more efficient and effective … and on the other hand, the need to reduce unnecessary burden, costs, and delay on filers and the transactions they hope to pursue in a manner consistent with the mandatory premerger notification regime of the HSR Act." *Id.*; *see also id.* at 89,237. This is not a case where

---

[6] Congress also knows how to require the Commission to conduct cost-benefit analysis for its rules. It did so for different FTC rules not long after the HSR Act, *see* 15 U.S.C. § 57b-3(b)(2)(C), but not in the HSR Act or any of the HSR Act's subsequent amendments.

the agency entirely failed—or as in *Michigan*, refused—to consider costs when deciding whether to regulate. 576 U.S. at 752.[7]

Plaintiffs acknowledge, as they must, that the Commission considered costs and benefits, but they argue that "the FTC never determined" that the rule's requirements "were worth the additional burden on thousands of HSR filers." Br. 15. That is simply incorrect. The Commission found that "[f]or those acquisitions that Congress has determined are large enough to be reportable, the long-term benefits, both monetary and nonmonetary, well outweigh the incremental costs associated with the final rule." 89 FR at 89,259; *see also id.* at 89,218 ("[T]he final rule achieves the benefits associated with mandatory premerger review with an overall burden that is reasonable and consistent with the legislative purpose of the HSR Act."). Plaintiffs simply disagree with the Commission's assessment of the relevant costs and benefits. As explained below, that disagreement fails under the APA's deferential standard of review. And that disagreement is not a basis for reading the statute to bar the Commission from adopting the rule, especially when the Commission performed the very analysis plaintiffs contend the statute requires.

In the most charitable reading, plaintiffs' argument seems to boil down to a complaint that the agency did not incant magic words, but neither the APA nor any case imposes such a requirement. The Commission must "act[] within a zone of reasonableness and … reasonably consider[] the relevant issues and reasonably explain[] the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The Commission's deliberate consideration of the costs and

---

[7] The Commission also considered the costs and benefits of various provisions throughout its section-by-section analysis. *See, e.g.*, 89 FR 89,266. In some cases, the Commission "made significant modifications" from the NPRM "in light of "comments" about "significant costs for filers." *Id.* at 89,261. The Commission took care "[t]o make these modifications to align costs and benefits." *Id.* In other cases, the Commission "determined that it is not necessary to collect certain information, particularly in light of the costs that would be imposed on" certain "types of filings" that "often carry low antitrust risk." *Id.* at 89,278.

benefits of the rule, along with the broad discretion Congress granted in the HSR Act, satisfy that standard.

Plaintiffs also cite cases requiring agencies to consider costs and benefits when determining whether to promulgate a rule. Br. 13. (citing *Michigan* and *Mexican Gulf Fishing Co.* v. *U.S. Dep't of Com.*, 60 F.4th 956 (5th Cir. 2023)). The courts in both cases held that the statutes at issue required the agency defendants to consider "whether '*regulation* is appropriate and necessary.'" *Michigan*, 576 U.S. at 752; *Mexican Gulf Fishing*, 60 F.4th at 965 (explaining that the relevant law "authorized" a rule "only if it is necessary and appropriate"). Because Congress had incorporated that requirement into the determination of whether to regulate, the Court held the agency erred by refusing to consider costs. *Michigan*, 576 U.S. at 752-53. Here, by contrast, Congress *required* the Commission to issue a rule creating the HSR form, and did not address costs, so the Commission must regulate even if the costs outweigh the benefits. 15 U.S.C. § 18a(d). Indeed, the Supreme Court has recognized that "[t]here are undoubtedly settings in which the phrase 'appropriate and necessary' does not encompass cost." *Michigan*, 576 U.S. at 752. This is one of them—but the Commission considered the rule's costs anyway.

Plaintiffs' arguments relying on the structure, "purpose," and legislative history of the HSR Act do not contradict this plain text reading of the statute. Plaintiffs are correct that the notification form must be "abbreviated and preliminary" compared to a second request, Br. 14, but the only "obvious inference" to draw from that structure is that the agencies must ensure that the form has sufficient information to make the initial screen effective.[8] *Id.* To the extent that history is relevant,

---

[8] As explained above (at 4), second requests often require terabytes of data and take months to complete. The information in the new form is not in the same stratosphere as the information typically required in a second request.

Br. 14-15, it confirms that Congress and the Commission knew the Commission had discretion to require more information in the premerger notification form than the initial form demanded. When the FTC created the first HSR form, it initially proposed requiring far more information and noted in the final rule that it may revisit some of those omitted requirements if experience suggested they were necessary. 43 FR 33,526.

In short, the Commission considered costs and benefits, even though it was correctly "not convinced that Congress intended the words 'necessary and appropriate' to require a cost-benefit analysis in this context." 89 FR 89,236. The Court should reject plaintiffs' argument for this reason alone.

**2.** Plaintiffs also challenge the rule's officers-and-directors requirement, which requires the acquiring party to list only officers or directors "that serve in those roles at the target or entities that are in the same industry as the target." 89 FR at 89,294. Plaintiffs claim both that the Commission failed to conclude that benefits of this requirement justified its costs and that the Commission lacked authority to include this requirement, Br. 16-18, but their argument clashes with the plain text of the HSR Act and ignores the Commission's discussion of the provision.[9]

First, the Commission did conclude that the benefits of the officers-and-directors requirement justified its costs. The requirement was significantly narrowed from the NPRM in response to comments, 89 FR at 89,294-96—hardly the "tweak[]" plaintiffs claim, Br. 16—and the Commission determined that the final rule "calibrate[d] information requirements to antitrust

---

[9] Plaintiffs also include a footnote with "[f]urther examples" of provisions that allegedly lack sufficient cost-benefit analysis. Br. 17 n.5. But the Fifth Circuit has "repeatedly cautioned that arguments appearing only in footnotes are insufficient[] … and are thus forfeited." *Smith v. Sch. Bd. of Concordia Par.*, 88 F.4th 588, 596 (5th Cir. 2023) (cleaned up). The challenged requirement also applies to fewer transactions than plaintiffs suggest, *see* 89 FR 89304-05

risk, burden, and importance to the Agencies' ability to screen for transactions that may violate the antitrust laws." 89 FR 89,296; *see also id.* at 89,297 (concluding "the benefit to the Agencies is necessary and proportionate" despite some "higher costs").

The statute also authorized the Commission to promulgate this requirement. Congress required the Commission to create a form that would allow the agencies "to determine whether such acquisition may, if consummated, violate the antitrust laws." 15 U.S.C. § 18a(d)(1). The Commission explained that officer and director relationships "can be especially concerning if used to gain access to non-public information about future plans or investments in products-in-development when those same individuals also have interests in competitively relevant businesses." 89 FR at 89,234. Such relationships arising out of an acquisition may violate Sections 7 or 8 of the Clayton Act or the HSR Act itself. 89 FR at 89,295.

Plaintiffs focus largely on Section 8 of the Clayton Act and ignore the Commission's explanation that the officers-and-directors requirement is necessary to determine whether the proposed acquisition may violate Section 7. Like horizontal shareholding, *see Texas v. BlackRock, Inc.*, No. 6:24-cv-437-JDK, 2025 WL 2201071, at *11 (E.D. Tex. Aug. 1, 2025), the presence of common officers or directors at competing businesses may threaten competition. The Commission spent several paragraphs detailing its Section 7 rationale, explaining that the rule allows it to capture relationships that might violate Section 7 but not Section 8, and this alone warrants the officers-and-directors requirement. *See* 89 FR 89,295. For that reason alone, plaintiffs' challenge fails.

The Commission also explained that the requirement is necessary to prevent violations of the HSR Act. If the Commission learns that there are officers and directors already serving at both the acquiring and acquired party, it may suggest in some instances that the acquisition has in effect

already been consummated before the waiting period expired, in violation of the HSR Act. *See* 89 FR 89,295. Plaintiffs say this "has nothing to do with whether the proposed acquisition 'may, if consummated, violate the antitrust laws.'" Br. at 18. (quoting 15 U.S.C. § 18a(d)(1)). But the HSR Act is part of the Clayton Act, which is an antitrust law. *See* Pub. L. No. 94-435, title II, § 201, 90 Stat. 1383, 1390 (1976) ("[T]he Clayton Act … is amended by" inserting the HSR Act). Regardless, the HSR Act allows the Commission to "prescribe such other rules as may be necessary and appropriate to carry out the purposes of" the HSR Act itself. 15 U.S.C. § 18a(d)(2)(C). For these reasons too, the officers-and-directors requirement was a lawful exercise of the Commission's authority.

Plaintiffs' argument that "Section 8 is irrelevant to premerger review," Br. 17, is also wrong. The officers-and-directors requirement helps the Commission determine if the acquisition would create a violation of Section 8, which prohibits someone from serving "at the same time" as a "director or officer" of two different qualifying corporations. 15 U.S.C. § 19(a). Plaintiffs do not dispute that Section 8, 15 U.S.C. § 19, is an "antitrust law" within the meaning of the HSR Act. They acknowledge that "an acquisition can lead to a prohibited board or officer interlock," but they contend that "[i]f a transaction would result in an unlawful interlocking directorate, the answer is not to prevent the acquisition" but "to have the offending officer or director resign." Br. 17-18. That argument confuses the prohibition with the remedy. The Clayton Act prohibits interlocking directorates, which an acquisition may create. 15 U.S.C. § 19. True, the remedy for such a violation (when discovered after the fact) is typically to have the offending officer or director resign—that is a simple solution that avoids more significant government intervention, and the parties are often willing to oblige. But the agencies can and do take premerger enforcement action to prevent illegal board interlocks that may arise from the consummation of HSR-reportable

transactions. *See, e.g.*, Decision and Order, *In the matter of EQT Corp.*, Dkt. No. C-4799 (Oct. 10, 2023). The officers-and-directors requirement thus may help the Commission detect acquisitions that may cause Section 8 violations in addition to Section 7 and HSR Act violations.

**3.** The Commission also lawfully required parties to include a "transaction rationale," an "overlap description," and a "supply relationship description" in the new form. Br. 18. In each case, the Commission explained how this information would help the Commission accomplish its Congressionally mandated duty of detecting transactions that "may, if consummated, violate the antitrust laws." 15 U.S.C. § 18a(d)(1); *see* 89 FR 89,299-300 (transaction rationale); *id.* at 89,314-17 (overlap description); *id.* at 89,317-19 (supply relationships description). Plaintiffs do not dispute any of those rationales.

Plaintiffs instead contend that "[n]othing in the HSR Act authorizes the FTC to demand this kind of substantive legal analysis," Br. 18, but the rule does not require any substantive legal analysis. In response to comments on this exact issue, the Commission explained that it "specifically is not seeking an analysis or post-hoc rationales developed by external parties." 89 FR 89,334. Plaintiffs are also wrong that the "'overlap description' and 'supply relationships description' require parties to take positions on the definition of the relevant market and the current and potential competitiveness of their products." Br. 19. Whether competitors overlap or supply similar products to the market are factual inquiries, not legal conclusions. *See, e.g.*, 89 FR 89,313. The rule merely requires parties to a transaction to provide factual information within their control so that the agencies may assess whether the transaction, if consummated, may violate the antitrust laws. *See* 89 FR at 89,311-13. The Court should reject plaintiffs' invitation to read more into these requirements than either their text or the Commission's rationale demands.

## B.     The rule is a rational product of reasoned decisionmaking.

Congress granted the Commission broad discretion to determine the content of the HSR form. Not only did Congress allow the Commission to decide what information "is necessary and appropriate to enable" effective premerger review, it also granted the Commission discretion to "define the terms used in" the HSR Act. 15 U.S.C. § 18a(d)(1)-(2). The Commission reasonably exercised that discretion here. *See* 89 FR 89,220-36.

The APA sets a high bar for challenges to an agency's exercise of rulemaking discretion: So long as an "agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld." *Luminant Generation Co. LLC v. EPA*, 714 F.3d 841, 850 (5th Cir. 2013) (quotation omitted); *see also State Farm*, 463 U.S. at 56 (agencies must "offer [a] rational connection between facts and judgment" to satisfy the APA). A court considering such a challenge "may not substitute its own policy judgment for that of the agency." *Prometheus Radio Project*, 592 U.S. at 423. Instead, its task is to "simply ensure[] that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.* That is especially so in a case like this one, where Congress has, in the plain text of the statute, conferred broad discretion on the agency. *See Loper Bright*, 603 U.S. at 394-95.

**1.** Plaintiffs claim that the rule is not a product of reasoned decisionmaking. Br. 19-27. They first contend that the Commission's "efforts to assess the increased compliance costs could only generously be described as half-hearted." Br. 20. Plaintiffs quibble with the average time the Commission estimated it would take to fill out the new form, but they do not cite any evidence in the record contradicting that estimate. Their primary complaint is that the Commission calculated those numbers using a "survey of its own staff." *Id*. Plaintiffs would have preferred that the

Commission relied on plaintiffs' own survey, but that survey was inapt because it assessed the time that would have been required by the NPRM, not by the less onerous final rule. Br. 21.

Courts have repeatedly held that an agency may rely on its own staff's experience and expertise. *See, e.g.*, *Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1322 (11th Cir. 2021) ("Agencies are permitted to rely on their experience in the regulated field, so long as they explain what their experience is and how that experience informs the agency's conclusion."); *see also Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1142 (D.C. Cir. 2022); *Sacora v. Thomas*, 628 F.3d 1059, 1069 (9th Cir. 2010).

Here, the Commission fully explained its methodology and the basis for its conclusions. The Commission relied on "FTC and DOJ attorneys who have recent experience preparing HSR filings in private practice." 89 FR 89,332. To "reduce sampling bias as much as possible, the Commission relied on Agency staff" who were not involved in the rulemaking, not part of the team working on the rule, and not even in the Commission's office that handles HSR forms. *Id.* These attorneys were "asked … to estimate, based on their own experience with preparing HSR Filings, the incremental change in hours that would be required to respond to each of the new and updated items in the final rule." *Id.* The Commission further explained the methodology these attorneys used and the results they generated. *Id.*

Plaintiffs do not identify any flaw with this methodology—indeed, it is the same methodology they applied in their own survey following the NPRM. Dkt. 44-11 (Kothari Report) at 1. Nor do they cite record evidence showing what the numbers should have been. Br. 20-21. Instead, they focus on the results of their own survey about the NPRM. *Id.* at 21. Plaintiffs offer no reason or authority that the Commission was required to accept one survey instead of another. And plaintiffs recognize that the rule "cut back to some degree on the NPRM," but state without

explanation that "the differences cannot explain th[e] massive gap" between their initial survey and the final results. *Id.* Their only support for that point is the amended complaint, *id.*, which offers no additional evidence and does not discuss any of the changes the rule made from the NPRM, Dkt. 27 at 65. And "to some degree" is a gross understatement. The rule "dramatically curtail[ed]" the NPRM. 89 FR 89,412-14 (Ferguson Concurrence); *see also, e.g.*, *id.* at 89,331-32 (discussing substantial changes in response to comments).[10]

In any event, plaintiffs simply have not identified any cognizable basis to challenge the Commission's reasonable reliance on evidence in the administrative record. They cite only one case, which they claim "hold[s] that [a] 'serious flaw' in cost-benefit analysis 'renders a rule unreasonable.'" Br. 20 (quoting *Louisiana ex rel. Landry* v. *Biden*, 64 F.4th 674, 678 n.10 (5th Cir. 2023)). Actually, the case said such a flaw "*can* render the rule unreasonable," *Louisiana*, 64 F.4th at 678 n.10 (emphasis added), but the Fifth Circuit never even reached the merits of the rule at issue there. And *Louisiana* quoted a D.C. Circuit opinion, *id.*, which held that courts "review such a cost-benefit analysis deferentially" and the "burden to show error is high," then rejected the cost-benefit challenge. *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012). Neither case held that an agency's cost-benefit analysis was fatally flawed merely because the agency relied on its own expert staff to supply the necessary information or rejected competing estimates in the administrative record.

In short, plaintiffs have identified no methodological error in the Commission's assessment of costs nor pointed to any record evidence in the record that contradicts the Commission's

---

[10] Plaintiffs also complain that the Commission believed the Kothari report may have included costs that its own survey did not. Br. 21. But the Commission identified four different reasons for "the differences in projected total costs" between its own estimate and the Kothari Report, including the "significant modifications" the final rule made to the NPRM. 89 FR 89,334.

conclusion. The Commission permissibly relied on unbiased staff with relevant experience and fully explained its methodology and results.

**2.** Plaintiffs next contend that the Commission's "cost projection … considers only the direct compliance costs of the Rule." Br. 21. They argue that the Commission failed to consider their speculation (offered without record evidence) that the rule will "dissuade" some transactions from occurring and will delay others. *Id*. But they acknowledge that the rule "says *almost* nothing about any of this." Br. 22 (emphasis added). In other words, the rule does say *something* about it— plaintiffs just disagree with the Commission's response. The deferential review of agency decisionmaking does not allow such second-guessing. A rule is arbitrary and capricious only "if the agency … *entirely failed* to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43 (emphasis added). Plaintiffs implicitly concede that the agency cleared that bar.

Indeed, the agency expressly considered and discussed the points plaintiffs complain about, which were raised in the Kothari Report and by other commenters. *See* 89 FR 89,257. The Commission noted that "commenters provided only speculation that the proposed rule would deter or delay some deals merely by increasing the costs associated with making an HSR Filing," and given the "absence of actual data … the Commission must make a predictive judgment based on the evidence available to it." *Id.* The Supreme Court has blessed that exact approach. *See Prometheus Radio Project*, 592 U.S. at 427 ("In the absence of additional data from commenters, the FCC made a reasonable predictive judgment based on the evidence it had."). The Commission was not required to credit the assertions in the Kothari Report or from other commenters, unsupported by data, over its own predictive judgment based on available evidence.

For example, the Kothari Report referred to "[r]egulatory uncertainty arising from new burdens imposed by the Proposed Rule," which it said "can have substantial impact on the level

of merger and acquisitions activity." Dkt. 44-11 at 24. For support, the report cited a paper finding that "regulatory policy uncertainty is associated with" a "decrease in the number of transactions during the next 12 months." *Id*. The Commission responded by explaining that this loose "associat[ion]," identifying (at most) correlation but not causation, was not convincing because there are many factors that influence yearly deal volume. 89 FR 89,257. Plaintiffs label the Commission's response a "non-sequitur," Br. 22, but it was directly responsive to the point in the Kothari Report, and it refutes plaintiffs' argument here that the Commission failed to address the issue. Nor is there any credence to plaintiffs' conjecture that the Commission possesses a "newfound skepticism that 'M&A activity is beneficial to the economy' in the first place." Br. 23 (quoting 89 FR 89,258). The Commission was merely pointing out a shortcoming in a model the Kothari Report cites, not questioning the value of M&A transactions writ large. 89 FR 89,258.

**3.** The Commission also reasonably concluded that the Rule would confer significant benefits in at least six ways. 89 FR 89,251. Among other things, the rule will allow the antitrust agencies to prevent more unlawful mergers, save the agencies time and resources, and decrease burdens and costs to third parties. 89 FR 89,220-22, 89,251-252. Plaintiffs admit that these are benefits but claim that they do not "withstand[] rudimentary scrutiny." Br. 23. Plaintiffs ignore both the record and the standard the Commission must satisfy when making policy judgments that Congress has expressly directed it to make.

a. Plaintiffs agree that allowing the antitrust agencies to "detect and prevent more unlawful mergers … would surely be a benefit." Br. 23. But plaintiffs immediately pivot, claiming that "the FTC had to show that the original version of the HSR Form had meaningful gaps." *Id.* That's legally and factually wrong. As explained above, the old rule is irrelevant; what matters is that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency

*believes* it to be better." *Fox*, 556 U.S. at 515-16. And regardless, the Commission extensively documented "the need for the final rule," including that "changing commercial realities" meant that "the existing requirements for an HSR Filing leave significant gaps in the information available to the Agencies for conducting" their review. 89 FR 89,220; *see also id.* at 89,230 (discussing difficulties identifying corporate consolidation in some modern sectors). Thus, even if the agency had no evidence, and made no findings, that the old form was faulty, the rule would still be valid. The Commission is allowed to make "predictive judgement[s]" about the future, *Prometheus Radio Project*, 592 U.S. at 427, and may "promulgate prophylactic regulations which are broad in scope in order to effectuate the purposes of the enabling legislation," *Sid Peterson Mem'l Hosp. v. Thompson*, 274 F.3d 301, 313 (5th Cir. 2001). The APA does not require the Commission to wait until demonstrably anticompetitive mergers are sneaking through premerger review undetected before it can update the form.

In any event, the Commission *did* conclude that the old form was failing to catch anticompetitive mergers. The Commission explained that a study of hospital mergers suggested that "HSR Filings failed to provide sufficient information to trigger additional investigations that could have blocked these harmful mergers before they were consummated." 89 FR 89,221. The Commission also cited economic research concluding that firms were "employing strategies to avoid antitrust scrutiny of their anticompetitive deals" and "structuring their deals to avoid premerger review." *Id.* at 89,219-20. The Commission also relied on its experience to "assess[] whether having certain types of documentary material and information at the beginning of an investigation would have changed the Agencies' decision whether and how to investigate reportable transactions." *Id.* at 89,217.

Plaintiffs insist that the only way the Commission could justify this rulemaking is by demonstrating that there have been illegal mergers. Br. 24-25. Plaintiffs claim that "no 'resources' should have been needed to uncover" these mergers, which "should have been staring the FTC in the face." Br. 24. But—as Congress recognized when it passed the HSR Act—concluding after the fact that a transaction substantially lessened competition or tended to create a monopoly requires months or years of investigation, millions of dollars in resources, and a neutral arbiter to decide contested questions of fact and law—and that is for just *one case*. *Cf.* 89 FR 89,219 n.14 (explaining that it is "it is not practical for the Agencies to identify specific illegal transactions that they 'missed' during their premerger review"). The APA does not impose such an insanely lofty and impossible standard. And plaintiffs are wrong to claim that the FTC said nothing about this issue. Br. 24. The Commission directly responded to "commenters" who claimed the agency had not shown that it was missing mergers, explaining that "the relatively low number of challenges to consummated mergers does not indicate that the current information requirements for premerger screening are sufficient to detect illegal deals" because various factors prevented that detection. 89 FR 89,239; *see also id.* at 89,219 n.14 (responding to commenters). That is all the APA requires.

Plaintiffs also claim that Commission's resource constraints make it "hard to understand how a massive expansion in the amount of documentary material they receive … will improve antitrust enforcement at all." Br. 25. This is upside down. The whole point of the rule is that this additional information will make the initial screen more effective because the agencies will now immediately have access to the information they need instead of having to rely on voluntary submissions, the withdraw-and-refile process, or second requests, all of which consume time and resources. *See supra* 4-5. And contrary to plaintiffs' suggestion, nothing in the rule indicates that

the agencies "may never even review" the new forms. Br. 25. They review every form, and doing so will now allow them to more quickly screen for potentially anticompetitive mergers.[11]

Nor does *Chamber of Commerce of United States v. SEC*, 85 F.4th 760 (5th Cir. 2023) offer any support to plaintiffs. Br. 23. The agency there "concede[d]" that "it never substantiated" that the subject matter of its rule was a "genuine problem" and therefore had failed to show there was any reason to regulate. 85 F.4th at 777. Here, by contrast, Congress determined that anticompetitive mergers are a problem, and Congress required the Commission to develop a notification form that would allow the antitrust agencies to effectively screen for such mergers. The Commission also extensively documented the problems that the rule was addressing. That is fully consistent with both the APA and *Chamber of Commerce*.

b. Plaintiffs next claim that the Commission is somehow wrong to believe that the rule will save time for the agency and for customers, competitors, and consumers. Br. 26-27. Plaintiffs' argument largely focuses on the NPRM, which is not under review. Br. 26. In the actual rule the Commission adopted, the agency explained that requiring sufficient up-front information about filed transactions will save the antitrust agencies time by allowing them more quickly to conclude their investigations of transactions that do not require further scrutiny. 89 FR 89,252. The Commission also believes that a more efficient initial filing will lead to more targeted second requests, which will save time for the Commission, reporting parties, and third parties. *Id.* at 89,253. And the Commission further explained that, "[b]ased on its own experience and in light of the significant reductions contained in the final rule as compared to the proposed rule … the

---

[11] Plaintiffs also cite a 2009 guide that said the premerger review program had been successful. Br. 25-26. Certainly compared to the baseline, pre-HSR regime, the program has been a success. But the Commission explained how and why the old form was outdated as well as how and why the new form would be more effective. 89 FR 89,220-36. That is all the APA requires.

final rule would result in an overall reduction in the number of staff hours spent collecting additional information from all sources." *Id.* Plaintiffs do not even acknowledge, much less challenge, any of this or explain why it is not the product of reasoned decisionmaking.

The Commission also rationally explained why it expects the rule to benefit third parties, customers, and competitors. 89 FR 89,253. After considering an internal review of prior investigations, the Commission concluded that a more comprehensive initial filing will lead to fewer interviews with third parties, which will in turn save those parties both time and money. *Id.* Third parties will also benefit from better targeted second requests, as they are less likely to receive compulsory process in connection with avoidable second requests. *Id.* And of course, consumers and competitors will benefit from the "enhanced detection made possible by the final rule." *Id.* at 89,252. That is the premise of antitrust law generally and the HSR Act specifically.

Plaintiffs' argument is not backed by any data or caselaw but only by their own "presum[ption]" and policy preferences. Br. 26-27. Plaintiffs incorrectly claim that these time savings occur only after the agency decides to investigate a transaction (the time savings occur at all phases of premerger review). But it was also rational for the Commission to consider the time savings that occur after the agency has decided to investigate. Plaintiffs also ignore that the rule provides information that informs and expedites the agencies' decision to investigate a transaction, and by extension, they ignore that the rule will *save* time and money for some parties whose transactions may have been unnecessarily flagged under the old rule. Plaintiffs' true complaint is that transacting parties will face an increased burden in exchange for these benefits to others. *Id.* at 27. The Commission considered this objection and decided that it was appropriate to "shift[] more of the costs of information acquisition to the merging parties, both because they are the most reliable and ready sources for that information and to reduce the costs and delays associated with

information acquisition from other sources." *Id.* at 89,246; *see also id.* at 89,250, 89,253 (same). The APA requires only that the Commission consider and rationally respond to a problem, not that it agree with plaintiffs' policy preferences. The Commission met that burden here.

### C. The Commission considered and reasonably responded to proposed alternatives.

The Commission considered the plaintiffs' preferred alternatives to the final rule and explained why they were inadequate. 89 FR 89,268-70. Plaintiffs do not dispute this. *See* Br. 28-29 (acknowledging the Commission "offered three responses" to certain alternatives); 30 (citing Commission's reasoning for rejecting another alternative). That satisfies the APA. *See Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008) (agency should consider "responsible alternatives" and "give a reasoned explanation" for rejecting them) (cleaned up).

Accordingly, this is not a case where the agency entirely failed to consider an important alternative or to explain its reasoning. *Cf. State Farm*, 463 U.S. at 46 (1983) (agency "gave no consideration whatever to modifying [a vehicle safety] standard to require that airbag technology be utilized"); *California v. EPA*, 72 F.4th 308, 317 (D.C. Cir. 2023) (recognizing that "failure to consider an alternative" can reflect "a failure to consider an important aspect of the problem" (quotation omitted). Rather, plaintiffs simply disagree with the Commission's policy choice to require certain filers to submit more information at the outset, instead of relying on other mechanisms to obtain information later. Plaintiffs claim these other tools are "more targeted" and "transaction-specific," Br. 27, 28, but the Commission explained why they are less effective, less efficient, and slower. *See, e.g.*, 89 FR 89250. Beyond that, "the Commission was not required to do more." *Am. Radio Relay League*, 524 F.3d at 242 (FCC sufficiently explained its rejection of alternative by discussing tradeoffs and exercising its considered judgment in light of its chosen policy).

1. **Third party information**. Seeking more information from third parties, such as "customers and competitors," Br. 28, would be inefficient and at odds with the Commission's goal to shift costs to "the most reliable and ready sources" for information—the merging parties. *See* 89 FR 89,246. In the Commission's view, a key benefit of the final rule was reducing the burden on third parties (and agency staff) that stemmed from the agencies' attempts to obtain relevant information not required by the existing HSR form. *See* 89 FR 89,251 (recognizing benefits from "the reallocation of staff hours" and "the reduction in burden required" on "third parties … to provide information known to the filing parties"); *id.* at 89,252 (explaining that the final rule will avoid investigational costs created by insufficient information in the HSR filing, including "unnecessary burdens for the parties, the Agencies, and third parties").

The Commission determined that "it is appropriate to shift some of this information-gathering burden to the merging parties and away from other market participants—including customers who may suffer harm if the merger is consummated—who currently absorb this burden due to deficiencies in the existing HSR Form." 89 FR 89,253. The Commission further explained that relying on information from third parties often involves delay, meaning the agencies only receive information late in the initial waiting period—which can hinder or even preclude staff's timely review of the transaction. *See id.* The Commission "reasonably prioritized" efficiency and timeliness in deciding to seek more information up front, directly from the merging parties, rather than leaning more heavily on third parties. *See California v. EPA*, 72 F.4th at 317 (holding that EPA reasonably rejected alternative approaches that would not achieve one of the agency's central goals); *see also* 89 FR 89,250, 89,253.

2. **Voluntary requests and withdraw-and-refile.** Relying on additional voluntary requests or greater use of the withdraw-and-refile strategy, Br. 28-29, likewise fails to meet the

agencies' objectives. Agency staff usually issue voluntary requests once the waiting period clock already is ticking. And because requests are voluntary, the agencies cannot use them to compel timely or complete submission of information that is necessary to screen a proposed transaction before the clock runs. Requiring more information in the HSR filing, as the rule does, ensures that the agencies have the full, congressionally established waiting period to complete their review. Moreover, as the Commission explained, "[w]ithout the collection of information related to the antitrust risks … the Agencies lack a basis to identify the need for additional voluntary submissions from the parties." 89 FR 89,249. The Commission reasonably concluded that "[r]outinely requiring voluntary submissions from even more filers as an alternative to obtain needed information in the HSR Filing would impose unnecessary burden and delay on filings that are not currently flagged for follow up."[12] 89 FR 89,249.

Plaintiffs are wrong that this explanation "makes no sense." Br. 29. Voluntary requests "often result[] in the parties withdrawing and refiling their notification," which restarts the clock for the agencies' review, delaying transactions and imposing more burdens on agency staff and third parties, as well as the reporting parties. 89 FR 89,249. A key goal of the final rule is "to improve the efficiency and effectiveness of premerger review." *Id.* at 89,216. The Commission found that "[e]xpending so many resources on withdraw-and-refile investigations is inefficient both for the parties and the Agencies and is a source of undue delays for many deals every year, because having more time is not a substitute for having sufficient and reliable information provided on a mandatory basis on the first day of the waiting period." 89 FR 89,244-45. The Commission thus aimed to *reduce* the need for withdraw-and-refile investigations. *Id.* at 89,244-45. The

---

[12] Petitioners are also wrong that this option would "spare something like 8% of transactions." Br. 29. The Commission was responding to an alternative where it would "[r]outinely requir[e] voluntary submissions from even more filers." 89 FR 89,249. "Routinely" suggests more than 8%.

Commission reasonably opted to require more information in the HSR form rather than increasing reliance on voluntary requests (and the delays and burdens those requests entail). *See id.* at 89,250.

The Commission also cited valid concerns that voluntary requests are more susceptible to selectively compiled submissions that may not fully disclose antitrust risk. *See* 89 FR 89,244. Plaintiffs are incorrect that those concerns "appl[y] equally to responses to the HSR Form itself." Br. 29. Filers are required by law to include the information requested in the HSR form; the government can seek civil penalties and injunctive relief for noncompliance. *See* 15 U.S.C. § 18a(g)(1), (2). By contrast, as noted above, "the Agencies have no ability to demand compliance with voluntary requests." 89 FR 89,244. The Commission's choice to require, rather than simply request, the information reflected in the new form is hardly illogical.

**3. Second requests.** Issuing more second requests is no substitute for obtaining more complete and accurate information at the outset, as the rule provides. As the Commission explained, "it is consistent with the statutory premerger regime to collect certain critical information directly from those involved in the transaction and to have that information available on the first day of the initial waiting period." 89 FR 89,248; *see also id.* at 89,314, 89,250. That HSR filing information enables staff to conduct a more accurate initial assessment of antitrust risk sufficient to flag higher-risk transactions for further investigation—*i.e.*, second requests. To avoid delaying competitively beneficial or neutral transactions, and to manage limited agency resources, the agencies use that potent tool only for transactions that appear, after the initial screening, to "warrant an in-depth antitrust investigation." *Id.* Second requests thus are a complement to—not a substitute for—the HSR form.[13]

---

[13] Civil investigative demands (CIDs), which plaintiffs offer as another option, Br. 28, suffer from similar flaws. Issuing a CID takes time, and as a general investigative tool available to the

Urging more use of second requests also puts the cart before the horse: "without the additional information required by the final rule, the agencies would continue to struggle to uncover key facts necessary to determine whether to issue" a second request for a given transaction. 89 FR 89,247. And plaintiffs' suggestion that the agencies could simply rely on media reports and customer or competitor complaints to identify transactions of concern, Br. 28-29, can hardly be taken seriously: In creating the HSR filing regime, Congress made a legislative judgment that the agencies needed information from the parties themselves to conduct effective premerger review and antitrust enforcement. *See* 89 FR 89,241-43, 89,248. Likewise, plaintiffs' complaint that the rule burdens a set of "obviously harmless transactions" Br. 30, ignores that Congress made a deliberate decision that mergers exceeding certain thresholds warranted premerger review. *See* 89 FR 89,241-42. In any event, the agencies have other tools to expeditiously clear non-problematic mergers. *See* 15 U.S.C. § 18a (b)(2). Indeed, as explained above (at 6), the rule has allowed the agencies to resume the early termination process, which had been suspended for several years. The additional information in the new HSR form has allowed the agencies to grant early termination to over 200 transactions. *Supra* 7. That itself is a significant benefit.

Finally, plaintiffs are wrong that "the FTC has nothing to substantiate the claim that problematic transactions are flying under its radar." Br. 28-29. The Commission thoroughly discussed the agencies' ample experience over decades of HSR review and merger enforcement, revealing serious concerns about "inadequate detection" of anticompetitive mergers. *See, e.g.*, 89 FR 89,220; *see supra* 29-30. And contrary to plaintiffs' suggestion, Br. 29, that discussion included reference to specific "harmful mergers" that could have been further investigated and potentially

---

agencies for a broad swath of law enforcement areas, CIDs are not well designed for fast-moving HSR review purposes. They also are not self-enforcing. *See* 15 U.S.C. § 57b-1; *id.* § 1312(a).

blocked with better information in the HSR filing. *See* 89 FR 89,221 (discussing paper analyzing consummated hospital mergers and resulting price increases). Moreover, in addition to improving the accuracy of premerger review, the Commission also sought to make "the process more efficient for filers, third parties, and the Agencies," 89 FR 89,220, and to "more quickly and confidently complete the review of" non-problematic mergers so those deals could "proceed to closing" more promptly, 89 FR 89,221. The rule reflects the Commission's careful judgment about how best to further all those objectives. The APA does not require anything more.

## III.     Any remedy should be appropriately tailored.

If the Court grants plaintiffs' motion, it should tailor any relief. Article III permits courts to grant relief that remedies "the inadequacy that produced the injury." *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (quotation omitted). Here, that means relief should run to only the members of the plaintiff associations who have demonstrated that they have standing. Indeed, it is unclear that the APA authorizes anything more. *See United States v. Texas*, 599 U.S. 670, 693-99 (2023) (Gorsuch, J., concurring); John C. Harrison, *Vacatur of Rules Under the Administrative Procedure Act*, 40 Yale Journal on Regulation Bulletin 119, 123-26 (2023).

Even assuming the APA authorizes universal vacatur, it does not mandate that relief. The APA was enacted against a backdrop that statutory remedies must be limited to those consistent with "traditions of equity practice," *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944), and thus incorporates the principle that relief should be no more "burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Starbucks v. McKinney*, 602 U.S. 339, 345 (2024) ("When Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority … consistent with traditional principles of equity."). And the APA expressly preserves "the power or duty of the court to … deny relief on any … equitable ground." 5 U.S.C. § 702(1).

Plaintiffs ask that the rule be "set aside," Br. 30, but that unexplained phrase alone does not warrant broader relief. As Judge Sutton recently explained, "the statute does not say against whom an unlawful agency action must be 'set aside,'" and "[i]n the context of a law authorizing identifiable persons aggrieved by agency action to seek judicial review" courts "should not lightly conclude that" they are "entitled to 'set aside' agency action against persons not privy to the case before it." *Arizona v. Biden*, 40 F.4th 375, 397 (6th Cir. 2022) (Sutton, C.J., concurring).

This case is especially ill-suited for universal relief. As explained above (at 7), hundreds of parties have already sought premerger review of their transactions using the new form. Many more are presently preparing to do the same. Vacating the rule on a nationwide basis would harm these parties—some of whom are likely members of some of the plaintiff organizations—by forcing them to scrap the time and money spent on preparing the new form and pivoting to the old form, which included requirements that are not part of the new form. Such relief may also delay those transactions. Plaintiffs offer neither evidence nor argument demonstrating that anything beyond vacating the rule as to their identified members is necessary to afford complete relief. Finally, none of the plaintiff associations have demonstrated that they have the authority to litigate claims on behalf of their unnamed members, or that those members have agreed to be bound by any judgment. *See Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826 (5th Cir. 1997). Any relief should thus be limited to plaintiffs' members that have demonstrated standing.

Finally, to the extent the Court concludes that any specific provision of the rule is invalid, it should strike only that provision. Severability is the default rule, the rule includes an express severability provision, *see* 16 C.F.R. § 803.90, and the Commission explained how the various provisions were severable, *see* 89 FR 89,330-31. Combined with the required party-specific relief

39

explained above, this would mean that the pseudonymous members who have established standing would not have to comply with any specific provision the Court finds legally unsound.

## CONCLUSION

The Court should grant the defendants' cross-motion for summary judgment because plaintiffs lack standing. Alternatively, this Court should dismiss Longview Chamber as a plaintiff and transfer this case to the District of Columbia. If this Court reaches the merits, it should grant the Commission's motion for summary judgment and deny plaintiffs' motion.

Respectfully submitted,

LUCAS CROSLOW
    *General Counsel*

H. THOMAS BYRON III
    *Deputy General Counsel*

MARIEL GOETZ
BENJAMIN F. AIKEN
    *Attorneys*

August 29, 2025
    /s/    Benjamin F. Aiken

D.C. Bar No. 1046730
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
T: (202) 326-2151
baiken@ftc.gov